F I L E D
CLERK, U.S. DISTRICT COURT

DEC 27 2022

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ rsm _____ DEPUTY

S/I

Brittany A. Stillwell
info@brittstillwell.com
811 Wilshire Blvd., 17th Floor
Los Angeles, California 90017
Tel: 702-907-1908

PLAINTIFF APPEARING IN PRO PER

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTICT OF CALIFORNIA

| | |
|---|---|
| **BRITTANY A. STILLWELL** | **2:22-CV-09426-JWH-JC** |
| Plaintiff, | Case No. |
| v. | **VERIFIED COMPLAINT** against **CITY OF LOS ANGELES,** a municipal entity; **ONNI REAL ESTATE IX, LLC,** a Delaware limited liability company**; ONNI REAL ESTATE HOLDINGS LTD** a Canadian limited corporation**; KIMBALL, TIREY & ST. JOHN LLP,** a Louisiana Debt Collection Agency, **CHRIS JAMES EVANS,** an individual**; and DOES 1 though 50 INCLUSIVE** for: |
| **CITY OF LOS ANGELES,** a municipal entity; **ONNI REAL ESTATE IX, LLC,** a Delaware limited liability company; **ONNI REAL ESTATE HOLDINGS LTD** a Canadian limited corporation**; KIMBALL, TIREY & ST. JOHN LLP,** a Louisiana Debt Collection Agency, **CHRIS JAMES EVANS,** an individual**; and DOES 1 though 50 INCLUSIVE** | |
| Defendants. | 1. **Negligence;**<br>2. **Premise Liability;**<br>3. **Violations of Unruh Civil Rights Act, Ca. Civ. Code §§ 51, 52** *et seq.***;**<br>4. **Violations of Fair Housing Act (42 U.S.C. §§ 3604** *et seq.)***;**<br>5. **Violation of 42 U.S.C. § 1982**<br>6. **Violation of 42 U.S.C. § 1983**<br>7. **Violation of 42 U.S.C. § 1985**<br>8. **Violation of 42 U.S.C. § 1986**<br>9. **Malicious Prosecution (December 2021 Unlawful Detainer);**<br>10. **Malicious Prosecution (June 2022 Unlawful Detainer);** |

11. **Violations of City of Los Angeles Temporary Protection of Tenants During COVID-19 Pandemic (L.A.M.C. §§ 49.99 *et seq.*);**
12. **Violations of Fair Debt Collection Practices Act (15 U.S.C. §§ 1692 *et seq*);**
13. **Violations of Ca. Civ. Code § 1942.5 (Retaliation)**
14. **Violations of Tom Bane Civil Rights Act (Ca. Civ. Code §§ 52.1, 52 *et seq).;***
15. **Violations of Tenant Anti-Harassment Ordinance (TAHO) (L.A.M.C §§ 45.30 *et seq*.);**
16. **Civil RICO (18 U.S.C. §§ 1962(c), 1964(c)),** Predicate Act: Honest Services Fraud (18 U.S.C. § 1346**);**
17. **Civil RICO (18 U.S.C. §§ 1962(c), 1964(c)),** Predicate Act: Wire Fraud (18 U.S.C. § 1343**);**
18. **Violations of Unfair Competition Law (Bus. & Prof. Code §§ 17200 *et seq.);***
19. **Breach of Contract**
20. **Intentional Infliction of Emotional Distress; and**
21. **Negligent Infliction of Emotional Distress**

**JURY TRIAL DEMANDED**

Plaintiff Brittany A. Stillwell submits this Verified Complaint under penalty of perjury pursuant to Ca. Civ. Code §§ 446 and  2015.5 that the facts and statements contained herein are true and correct.

Under penalty of perjury, Plaintiff Brittany A. Stillwell alleges as follows:

**INTRODUCTION**

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

- 1 -

1.     Plaintiff Brittany Stillwell ("Stillwell") files this verified Complaint against her landlords, Onni Real Estate IX, LLC ("Onni") and Onni Real Estate Holdings Ltd. ("Onni-BC"), attorney Chris James Evans ("Evans"), debt collection agency Kimball, Tirey & St. John LLP ("KTS"), which holds itself out to be "southern California's most prominent real estate law firms," and the City of Los Angeles ("LA City").

2.     At the height of the COVID-19 pandemic Onni, one of Los Angeles' largest developer and one of America's largest corporate landlords, cheated its Los Angeles tenants out millions of dollars in excessive fees, hidden charges, and by passing off its corporate expenses to its residents.

3.     From March 2021 through March 2022, Onni submitted at least two-hundred and seventy (270) rental assistance applications that contained fraudulent information about the amount of rent and fees in arrears for its Los Angeles tenants. Onni's COVID-19 rental assistance scheme defrauded California's neediest families out of more than $1 million and led to the unlawful eviction of more than twenty (20) families that had pending rental assistance applications.

4.     From December 2021 through June 2022, Evans and KTS represented Onni in more than fifty (50) unlawful detainer lawsuits against minority tenants, including Stillwell, despite the local state and national eviction moratoriums that were in place.

5.     Onni evicted tenants who had pending rental assistance applications that Onni ultimately received payment for, despite unlawfully evicting the tenants. After eviction, Onni collected up to 18 months in past *and* prospective rental assistance payment, then leased the apartments out as short-term rentals under the guise of Level Hotels & Furnished Suites, the illegal hotel Onni operates inside of Hope + Flower Apartments.

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

6.     In addition to operating an illegal hotel at Hope + Flower, Onni allowed several illegal marijuana dispensaries to operate at Hope + Flower and allowed drug and criminal activity to continue despite receiving many complaints from residents.

7.     Upon information and belief, Onni and Onni-BC were aware of the illegal gambling, drug distribution, and drug-fueled parties that occurred in Penthouse 4002 of the Hope Tower and led to the death of Heidi Planck ("Planck") in October 2021.

8.     Upon information and belief, Planck died in Penthouse 4002 after encountering a fentanyl laced item; Planck's body was thrown down the trash chute after unsuccessful resuscitation attempts. Tenants, including Stillwell, that witnessed, or complained about Planck's death were harassed, threatened, and faced unlawful detainer eviction lawsuits out of retaliation.

9.     Onni and Does 1 though 50 inclusive have engaged in a systemic, relentless, and ongoing barrage of discrimination retaliation and harassment of Stillwell for more than *thirty* (30) months.

10.     Onni's adverse actions include but were not limited to multiple unlawful entries into Stillwell's home, overcharging Stillwell more than $7,000 in excessive fees, staging a burglary that led to the theft of over $2,000,000.00 worth of Stillwell's personal and business property, mounting two hidden cameras in Stillwell's apartment, and other conduct that led to more than *fifty* (50) violations of local, state, and federal law, as discussed in detail below.

11.     Upon information, complaints about Onni's unlawful conduct to LA City, Los Angeles County, and California State officials and agencies went uninvestigated due to Onni's stronghold on LA City Councilmembers and other elected officials via an extensive, on-going pay-for-play scheme, which is discussed below. Onni's pervasive disregard for the law was embolden

by elected LA City, County, and State officials, who turned a blind eye to Onni's corruption in exchange for bribes, kickbacks, and campaign donations.

12.     Upon information and belief, LA City Councilmembers used its so-called "planning process" as a play-to-play game, set up to benefit developers and the politicians who serve them. Nearly all projects that a part of this pay-for-play scheme receive unanimous approval by the members of the LA City Council, owing to the unspoken agreement that "I'll approve your project if you'll approve mine." There's rarely any discussion of a project's actual merits or flaws, and any talk of planning is limited to sound bites to appease the concerns raised by many Angelenos and advocacy groups.

13.     While acting in their *unofficial* capacities, corrupt LA City Councilmembers negotiated contracts and collected bribes and kickbacks from Onni and other real estate developers. While acting in their *official* capacities, corrupt LA City Councilmembers approved measures, issued permits, passed ordinances, and approved annual budgets, based on the bribes and kickbacks that were negotiated in their unofficial capacities.  These extensive pay-for-play would ultimately leave the City of Los Angeles facing annual deficits of $200 million to $400 million over the next several years.

14.     As discussed in detail below, LA City Councilmembers also collected bribes and kickbacks to pass new zoning ordinances that would allow Onni and other real estate developers convert *thousands* of residential housing units to transient occupancy hotel rooms. This scheme allowed Onni and other developers to avoid offering prior agreed upon affordable residential housing, despite receiving millions of dollars in tax incentives, thus exacerbating Los Angeles' current housing and homelessness crisis.

15.     Stillwell files this Complaint against LA City to enjoin the City of Los Angeles from enforcing its revised zoning ordinances, which were the result of bribes and kickbacks that deprive LA City residents of honest services. Stillwell also seeks to enjoin LA City from issuing and renewing Onni's building and occupancy permits at Hope + Flower Apartments, as these permits were obtained by Onni providing materially false statements, as discussed below. Lastly, Stillwell seeks to enjoin LA City from contracting with Onni and its subsidiaries due to Onni's unlawful conduct described herein, its complicity in criminal activity, and its pattern of violating the tenants' civil rights of its tenants.

16.     Upon information and belief every document incorporated by reference in this verified Complaint is in the possession of the Plaintiff and or each Defendant and is discoverable.

**PARTIES**

17.     Plaintiff Brittany Stillwell ("Stillwell") is a natural person currently residing in Los Angeles, California.

18.     Defendant City of Los Angeles is a municipal corporation, organized and existing under the Constitution and laws of the State of California, and holding a freeholders' charter.

a.     The Los Angeles City Charter created several departments of city government that are under the control and management of boards of five commissioners. Commissioners are appointed by the Mayor and approved by City Councilmembers.[1]

---

[1] Los Angeles Police Department ("LAPD") is led by the Chief of Police, the highest-ranking officer in the LAPD; The Chief of Police is appointed by the Mayor and subjected to approval by the Police Commission *and* City Council.

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

- 5 -

b. The City Charter established the nine-member City Planning Commission (CPC), which provides recommendations to the Mayor, City Council, and Director of Planning on land use policies and proposed development projects. The Los Angeles City Charter also created several departments of city government that are under the control and management of City Council.

c. The City of LA is divided up into 15 council districts composed of multiple neighborhoods and each containing approximately between 200,000-300,000 residents. Each of the 15 council district is represented by an elected official called a Council Member, who votes on proposed laws and budgets for the entire city, and has informal power over development, transportation, many other types of city services and projects in their own district.

d. The LA City Council is responsible for enacting laws that govern the City of Los Angeles and have final say on the budget for *all* departments and agencies within the City.

e. The Planning and Land Use ("PLUM") Committee of the City Council has extensive influence over the zoning in Downtown Los Angeles. The City Council holds public hearings on certain real estate developments that affect the City's general plan for development. These hearings will typically take place before the PLUM Committee, which will make a recommendation to City Council. Following that hearing, there will be a vote before the full City Council regarding whether to amend the general plan. In addition, PLUM is a step of the approval process for development projects seeking to build in Los Angeles. PLUM also handles the appeals process for project approvals.

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

f.   The City of Los Angeles is government that received more than $10,000.00 per fiscal year in funds from the United States, including for the years 2013 through 2022, in the form of grants, contracts, subsidies, loans, guarantees, insurance, and other forms of federal assistance.  All legislative power in LA City is vested in the City Council and is exercised by ordinance subject to a veto by the Mayor.

g.   Council Members maintain tremendous power and influence over their respective districts and the City of Los Angeles.

19.   Defendant Onni Real Estate IX, LLC ("Onni") is incorporated as a limited liability corporation in Delaware, with its headquarters and principal location in Phoenix, Arizona. At all relevant times and as mentioned in this Complaint, Onni was doing business as Hope + Flower located at 1201 S. Hope Street, Los Angeles, California 90015.

a.   According to its website,  https://www.onni.com/rental-apartments/unfurnished/ Onni owns and operates five (5) apartment complexes in Los Angeles County, California.

b.   According to its websites,  https://www.onni.com/hospitality/level/  and https://stayinglevel.com/destinations/los-angeles/ Onni owns and operates three (3) hotels in Los Angeles County, California.

20.   Upon information and belief, Defendant Onni Real Estate Holdings LTD ("Onni-BC") is a Canadian limited corporation incorporated in Vancouver, British Columbia, Canada. Onni Group's headquarters is located at 1010 Seymour Street, Suite 200, Vancouver, British Columbia, Canada V6B 3M6. Onni Group's principal location is in the United States of America at 1031 S. Broadway, Suite 400, Los Angeles, California 90015.

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

- 7 -

a. Onni-BC is the parent of: Onni Real Estate Group USA (Master) Limited Partnership, Onni Real Estate VII LLC, Onni Real Estate VII LLC, Onni Real Estate IX LLC, Onni Real Estate USA (NO. 1) Limited Partnership, Onni Real Estate USA (NO. 2) Limited Partnership, Onni Real Estate USA (NO. 3) Limited Partnership, and Onni Real Estate USA (NO. 4) Limited Partnership, (collectively, hereafter, "Onni Group").

b. Each of the eight (8) legal entities comprising of the Onni Group are incorporated in Delaware, United States of America.

c. According to Onni-BC's website, "Onni is proud to offer a wealth of rental opportunities in some of North America's most renowned cities; managing more than 11,200 rental apartment units in Metro Vancouver, Los Angeles, Chicago, and Phoenix, with another 10,600 in the pipeline."

d. Onni-BC has over fifty (50) subsidiaries and legal entities registered in California that are related to real estate, construction, and property management.

e. Onni Group is one of America's largest corporate landlords. Since the enaction of America's federal eviction moratorium in 2020, Onni Group has been one of America's a top ten (10) filers of evictions, despite national, state, and local eviction moratoriums in place.

f. Upon information and belief, Onni Group was one of America's top ten (10) recipients of COVID-19 rental assistance paid to corporate landlords.

g. Onni Group is an enterprise, as defined by 18 U.S.C. § 1961(4).

21. Upon information and belief and according to the Louisiana Secretary of State, Defendant, Kimball, Tirey & St. John LLP ("KTS") is incorporated as a "Collection Agency/ Debt

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

Collector" pursuant to Louisiana's Debt Collector Registration statute, R.S. 9:3534.5, with its principal business office address located at "1202 Kettner Blvd.  San Diego, California 92101."

    a.  A true and correct copy of KTS' Louisiana Certificate of Incorporation and Collection Agency/Debt Collector Registration Form, obtained from the Louisiana Secretary of State, is incorporated by reference and attached as **Exhibit A.**

    b.  KTS holds itself out as a law firm with its Los Angeles office located 915 Wilshire Boulevard, Suite 1650, Los Angeles County, California 90017. According to KTS website   https://www.kts-law.com/practice-areas/collection-division/   "Kimball, Tirey & St. John LLP is a law firm, not a collection agency." Below is a true and correct copy of a screenshot KTS' taken on December 25, 2022 of KTS' website.



c.  According to the California Secretary of State's website, https://bizfileonline.sos.ca.gov/search/business at the time of filing this Complaint, KTS is *not a* licensed business or limited liability partnership in the state of California.

d.  According to the Los Angeles County Registrar and County Clerk's website, https://www.lavote.gov/fbn-search at the time of filing this Complaint, 'Kimball, Tirey & St. John LLP' is *not* a fictious business name of any business in Los Angeles County.

e.  According to the County of Los Angeles Treasurer and Tax collector website, https://ttc.lacounty.gov/search-existing-business-license/ at the time of filing this Complaint, KTS does *not* have an existing business license.

f.  Upon information and belief, KTS is *not* licensed to conduct business in the state of California.

22. Upon information and belief, Defendant Chris James Evans ("Evans") is an individual who resides in Los Angeles County, California.

g.  According Evans' Attorney Profile on the State Bar of California website, https://apps.calbar.ca.gov/attorney/Licensee/Detail/202135 Evans was admitted to the California Bar on June 27, 1999 and his California Bar Number is 202135. Evans' address is listed as: "Address: Kimball Tirey & St John, 915 Wilshire Boulevard, Suite 3400, Los Angeles, CA 90071."

h.  According to KTS website, https://www.kts-law.com/attorneys/chris-j-evans/, "Chris Evans is the Managing Partner for the Landlord/Tenant Practice Group in

our Los Angeles office. Mr. Evans practices in the areas of unlawful detainer litigation and real estate law." Below is a true and correct copy of a screenshot of KTS website, https://www.kts-law.com/attorneys/chris-j-evans/, taken on Decem 18, 2022.



23.      Defendants KTS and Evans each are engaged in the business of collecting debts, using mail and telephone in this state with its principal place of business located at 915 Wilshire Boulevard, Suite 3400, Los Angeles, CA 90071

a.      Defendants KTS and Evans each are engaged in the business of a collection agency, using the mails, telephone, and consumer collection agencies to collect consumer debts originally owed to others.

b.   Defendants KTS and Evans each regularly collects or attempts to collect defaulted consumer debts due or asserted to be due another, and is a "debt collector" as defined in 15 U.S.C. § 1692a(6) of the FDCPA.

c.   Defendants KTS and Evans are each a "furnisher of information" as that term is defined by the FCRA, 15 U.S.C. §1681s-2(b).

24.    Whether individual, corporate, associate, or otherwise, defendants' true names and capacities DOES 1 through 50, (hereafter, "Doe Defendants") are unknown to Plaintiff currently. Therefore, Plaintiff sues those defendants by such fictitious names pursuant to Ca. Code Civ. P. § 474 will amend this Complaint to show their true names and capacities when ascertained.

25.    Onni-BC, Onni, Evans, KTS, and the Doe Defendants are each a person as defined by 18 U.S.C. § 1961(3), that participated in the conduct of Onni Group via a pattern of racketeering activity, as defined by 18 U.S.C. §1961(5).

26.    Onni-BC, Onni, Evans, KTS, and the Doe Defendants each devised, intended to devise, and or participated in a scheme or artifice to defraud Stillwell and other tenants of Hope + Flower Apartments of money and or property by means of false or fraudulent pretenses, representations, or promises in violation of 18 U.S.C. §§ 1343, 1962 as discussed in detail below.

27.    Onni, Evans, KTS, and the Doe Defendants participated in schemes to defraud Stillwell and other tenants at Hope + Flower Apartments of COVID-19 rental assistance payments, in exchange for kickbacks, and in violation of 18 U.S.C. §§ 1346, 1962 as discussed in detail below.

28.     Onni, Evans, KTS, and the Doe Defendants were each necessary and each committed at least two predicate acts in furtherance of Onni Group's schemes, as discussed in detail below.

29.     Plaintiff is informed, believes, and based thereon alleges, that at all times relevant, each Defendant was acting as an agent, joint venturer, and/or alter ego for each of the other Defendants, and each were co-conspirators with respect to the acts and the wrongful conduct alleged herein so that each is responsible for the acts of the other in connection with the conspiracy in such wrongful acts with the other Defendants.

30.     Plaintiff is informed, believes, and based thereon alleges, that each Defendant was acting partly within and partly without the scope and course of their employment, and was acting with the knowledge, permission, consent, and ratification of every other Defendant.

31.     Plaintiff is informed and believes, and therefore alleges, that each of the Defendants was an agent, managing general partner, managing member, owner, co-owner, partner, employee, and/or representative of each of the Defendants and was at all times material hereto, acting within the purpose and scope of such agency, employment, contract and/or representation, and that each of them is jointly and severally liable to plaintiff.

32.     Plaintiff is informed and believes, and therefore alleges, that each of the Defendants is liable to plaintiff under legal theories and doctrines including but not limited to (1) joint employer; (2) integrated enterprise; (3) agency; and/or (4) alter ego, based in part, on the facts set forth below.

33.     Plaintiff is informed and believes, and therefore alleges, that each of the named Defendants are part of an integrated enterprise and have acted or currently act as the employer and/or joint employer of plaintiff making each of them liable for the violations alleged herein.

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

**JURISDICTION & VENUE**

34.     Under 28 U.S. Code § 1391(d) a corporation shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate state. Accordingly, Jurisdiction is proper in this Court because Defendants LA City, Onni, Onni-BC, Evans, and KTS are located in Los Angeles County and work and or conduct business in Los Angeles County, thus having sufficient contacts with Los Angeles County, California to subject each Defendant to personal jurisdiction in this Court's district.

35.     Defendants KTS and Evans, collect debt and are headquartered in Los Angeles, California. Accordingly, this court has jurisdiction of the federal claims against KTS and Evans pursuant to 15 U.S.C. § 1692k(d).

36.     Defendants KTS and Evans has actual knowledge of where Plaintiff resided, and by attempting to collect from Plaintiff, purposefully availed themselves to the jurisdiction in which Plaintiff resided. Defendants KTS and Evans knowingly attempted to collect on a debt allegedly incurred in Los Angeles, California and thus has sufficient minimum contacts with this venue. Venue is additionally proper under 28 U.S. Code § 1391(b)(1).

37.     Under 28 U.S. Code § 1391(b)(2) a civil action may be brought in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred. The acts that occurred giving rise to this complaint occurred in Los Angeles County, California. Defendants LA City, Onni, Onni-BC, Evans, and KTS have sufficient minimum contacts with this venue, thus making this a proper venue under 28 U.S. Code § 1391(b)(2).

**ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

**Hope + Flower Apartments**

38.    Hope + Flower Apartments ("Hope + Flower") is located at 1201 S. Hope Street, Los Angeles, California 90015, in City Council District 14 ("CD14"). The current city councilmember is Kevin DeLeon ("DeLeon").[2]

39.    Hope + Flower is approximately three (3) years old and began leasing in January 2020.

     a.    Hope + Flower has two towers: "Tower 1" is called Hope Tower, and "Tower 2" is called Flower Tower. The Hope Tower has forty-one (41) floors, and the Flower Tower has thirty-four (34) floors.

40.   Upon information and belief, there are six hundred and sixty (660) residential apartment units at Hope + Flower, and each apartment has a balcony. There are also balconies in the common areas on the eighth floor and on each rooftop.

41.   Onni advertises Hope + Flower as "luxury rental apartments" with "courteous staff." Hope + Flower's advertised amenities include, but not limited to: "secure valet parking, "premier parcel management system includes cold storage, Amazon lockers, package lockers, and even grocery delivery service," "secure and convenient bike storage," and "any additional requests can be taken care of by our attentive 24-hour concierge and security to ensure all your needs have been met.

---

[2] In June 2020, former CD14 city councilmember Jose Huizar ("Huizar") was arrested on Federal RICO Charge that alleges Huizar operated a 'Pay-to-Play' scheme and agreed to accept at least $1.5 million in illicit benefits from real estate developers who funneled cash and other benefits to secure favorable treatment from Los Angeles city councilmembers.

42.     As discussed in detail below, more than 2 years prior to opening, Onni applied to convert more than two hundred (200) residential units into transient housing. Onni intended for the 28th floor in Hope Tower to be used as transient residential units. Accordingly, Onni furnished the 28th floor of Hope Tower with subpar appliances and no CCTV recording.

a.  Stillwell's oven and washing machine have been broken for over three-months, forcing Stillwell to resort to stove-top cooked meals only and hand-washing her clothes – not quite a luxurious experience, as advertised.

43.     On its website, https://stayinglevel.com/destinations/los-angeles/downtown-flower/ Onni advertises its short-term rentals at Hope + Flower "Luxury furnished short-term rentals in downtown Los Angeles. Spacious suites, unparalleled lifestyle amenities and dedicated Guest Services. Level Flower welcomes extended stays of 30+ nights" The rentals also advertised and leased under the name *Level Flower*, located at 1201 S. Hope Street.

a.  Hope + Flower is not zoned or licensed to be a hotel, motel, or boarding house as required by Los Angeles County Municipal Code ("L.A.M.C.") § 7.50.020.

b.  Below are five true and correct screenshots the Level Flower website taken on December 25, 2022.

i.  The following screenshot show Onni's advertisement of illegal hotels in Los Angeles at "Downtown Flower," "Downtown South Olive," "Long Beach (Winter 2023) and "Hollywood (Summer 2023"). Each of these properties were originally approved for *residential* housing, not hotels.

1

2

3

4

5

6

7

8

9

10

11

12



13    ii.    The following screenshot shows the address of "Downtown Flower" as

14    "1201 S. Hope Street, Los Angeles, CA 90015," which is the same address

15    as Hope + Flower Apartments.

16

17

18

19

20

21

22

23

24

25

26

27

28



VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

iii.   The following screenshot shows the "Offers" page, which advertises "Extended Stays (30+ Nights)"



## Offers



### Extended Stays (30+ Nights)

Discover your home-away-from-home with Level's fully-furnished luxury extended stay suites. Monthly or yearly stays available in Vancouver, Chicago, Los Angeles, and Seattle.

LEARN MORE

iv.   The following screenshot shows the "In-Suite Amenities" page, which advertises: "fully-equipped kitchen, in-suite laundry, WIFI, pet friendly, housekeeping, open-air balconies, premium linens, King or Queen bed with Hypnos mattress, air conditioning, flat-screen TV, spacious, modern design, private phone line, utilities" Onni passed its commercial costs of an operating illegal hotel to tenants at Hope + Flower, as discussed in detail below.

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



v.   The following screenshot shows the "In-Suite Amenities" page, which advertises: "24hr Guest Services, Secure parking, outdoor pools, fully-equipped gyms, entertainment spaces"

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

- 19 -

c.   Onni also blatantly advertised "Level Hotels & Furnished Suites" on  Hope + Flower's website. On the landing page, the option for "FURNISHED" appears just above "CONTACT." Clicking "FURNISHED takes users to the following website for Level at Hope+Flower, https://hopeflowerdtla.com/level-furnished

d.   The website advertises:

> Whether you're in town for 30 days, a few months or more, start your next DTLA adventure at Level Downtown Flower. We're pleased to provide elegant accommodations, resort-inspired amenities and exceptional service. Our suites feature fully-equipped kitchens and spa-like bathrooms. Expect thoughtful touches like in-suite laundry, hypoallergenic linens and complimentary WiFi. Enjoy exclusive access to our recreational and social areas, including a premium fitness center, outdoor pool and laidback sports lounge. We also provide a 24-hourconcierge to make sure your stay is seamless. Welcome back!

e.   Below are two true and correct screenshots the Hope + Flower website taken on December 25, 2022



VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

- 20 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15



16  44.   Upon information and belief, in June 2020 Onni began converting more than 40%

17  of its apartments at Hope + Flower to short term rentals, hotels, and Airbnb rentals. Onni denied

18  offering short-term rentals, despite many residents locating the "weekend rentals" on sites such as

19  Airbnb. During this time many Hope + Flower residents, including Stillwell, began to complain to

20  Onni about the increase in crime at Hope + Flower caused by transient guests.

21

22  45.   Upon information and belief, Onni converted hundreds of Residential Units to

23  commercial use and or and tourists' units, then passed its commercial costs of utilities to residents

24  of Hope +Flower, including the costs of at least forty (40) EV charging and the utilities of more

25  than two hundred (200) units that were illegally converted into a hotel or short-term rentals.

26

27

28

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

46.     In or about March 2020, more than fifty (50) Hope + Flower residents joined a private Facebook group, Hope + Flower Residents, where the tenants organized and exchanged information related to tenancy at Hope + Flower.

47.     At the time of filing this Complaint, Onni has three (3) available apartments in Hope Tower and three (3) available apartments in Flower Tower advertised on its website for Hope + Flower Apartments, https://hopeflowerdtla.com/availability

  a. Based on the number of available units listed on Hope + Flower's website, at the time of filing this Complaint Hope + Flower's occupancy is approximately ninety-nine percent (99%) and the monthly rents range from $3,230.00 to $56,118.00.

  b. Upon information and belief, at the time of filing this complaint, more than two-hundred (200) of Hope+ Flower's apartments are not listed as available for rent because they are used as illegal hotel rooms.

**RICO Scheme #1: Hope + Flower Plan Approval Bribes (2014)**

48.     Hope + Flower is currently zoned [Q]R5-4D-O. According to Los Angeles Department of City Planning the "R5" zoning is "restricted density multiple dwellings" for one and two-family dwellings, apartment houses, multiple dwellings, and home occupations.

49.     According to the chart copied from the LA City ZIMAS[3] website on December 25, 2022, http://zimas.lacity.org, Hope + Flower is in the following economic zones:

---

[3] Zone Information and Map Access System ("ZIMAS") is a web-based mapping application that provides users with a convenient and centralized point of reference for planning and zoning information on properties in the City of Los Angeles. ZIMAS assists residents and businesses in making better informed land use decisions. LA City Planning maintains ZIMA.

| Business Improvement District | GREATER SOUTH PARK |
|---|---|
| Hubzone | None |
| Jobs and Economic Development Incentive Zone (JEDI) | None |
| Opportunity Zone | No |
| Promise Zone | South Los Angeles Transit Empowerment Zone |
| State Enterprise Zone | LOS ANGELES STATE ENTERPRISE ZONE |

50.     According to the LA City ZIMAS website Hope + Flower is subjected to the following local and State ordinances: Rent Stabilization Ordinance (RSO) [APN: 5138026036], Housing Crisis Act Replacement Review, Housing Element Replacement Required, and Senate Bill 166. Hope + Flower's density is listed as "Above Moderate."

51.     Pursuant to the Subdivision Map Act, Cal. Gov. Code § 66474.2, the approval of a vesting tentative parcel map or vesting tentative tract map shall confer a vested right to proceed with development in substantial compliance with the ordinances, policies, and standards as described in Section 66474.2 of the Subdivision Map Act.

a.     The purpose of the Vesting Tentative Tract Map ("VTTM") is to show the design and improvement of the proposed subdivision in relationship to the existing conditions and the adjacent properties.

52.     According to the VTTM for Hope + Flower, Vesting Tentative Tact No. 72560 ("VTT No. 72560"):

The adopted Central City Community Plan designates the subject property for High Density Residential land use which permits R5 uses. The property is currently zoned [Q]R5-4D-O. The "Q" condition allows uses permitted in the C4 Zone, a

primary objective of the Central City Plan is to facilitate the expansion of housing choices in order to attract new and "economically and ethnically diverse households."

The subject property is located within the Greater Downtown Housing Incentive Area which permits unlimited density within the confines of the permitted floor area ratio (FAR). The height district on the site permits a FAR of 13:1. There is however a "D" limitation on the zone which limits the floor area to a maximum FAR of 6:1, unless a Transfer of Floor Area (TFAR) is approved. The applicant has requested a TFAR as part of the discretionary approval (Case No. CPC-2013-4125-TDR-MCUP-ZV-SPR) to transfer 325,946 square feet from the Los Angeles Convention Center (Donor Site) to the project site (Receiver Site) to permit a FAR of 11.01:1 and 716,000 square feet of floor area, in lieu of a 6:1 FAR which permits only 390,054 square feet of floor area.

53.    VTT No. 72560 is 26-pages long, dated September 11, 2014 and addressed to Applicant Rossano De Cottis, Onni Real Estate IX, LLC.VTT No. 72560 is incorporated by reference, and can be downloaded directly from the Los Angeles City Clerk website at:

https://cityclerk.lacity.org/councilagenda/AttachmentViewer.ashx?AttachmentID=51945&ItemID=50703

54.    Upon information and belief, after accepting bribes and kickbacks from Onni Group in their *unofficial* capacities LA City Planning Commission took the following actions in their *official* capacities on October 9, 2014: approved variances and other concessions for two high-rise development towers, 31 and 40 stories in height, located between South Flower and

South Hope Streets, and West 12th Street and West Pico Boulevard, in downtown Los Angeles ("Project"), proposed by Onni.

    a.   the Planning Commission abused its discretion in granting variances for the Project and allowing other deviations from the City Code and the Downtown Design Guide.

    b.   As stated in the L.A.M.C. § 12.27, a variance is a "special privilege." Onni's project design decisions alone were not an adequate reason to grant special privileges regarding compliance with the City's development standards. The Transfer of Floor Area Rights ("TFAR")  Ordinance expressly states that projects utilizing the City's TFAR option must comply with *all* such standards.

    c.   Onni would not have suffered unnecessary hardships if the requested variances were denied. There are no special circumstances on the Project site that warranted the variances, and the variances were not required for the preservation and enjoyment of a substantial property right.

    d.   Onni's Project utilized a large proportion of the City's Convention Center floor area rights (approximately 266,928 square feet).

    e.   Upon information and belief, the LA City Planning Commission knowingly and willingly acted based on inaccurate and misleading information regarding the scope of the City's discretion under the TFAR Ordinance, in exchange for bribes and kickbacks from Onni Group.

    55.   Upon information and belief, after accepting bribes and kickbacks from Onni Group in their *unofficial* capacities PLUM Committee and Councilmembers Huizar, Gilbert A.

Cedillo ("Cedillo"), and Mitchell Englander[4] ("Englander") took the following actions in their *official* capacities on December 9, 2014:

    a.  Approved, and recommended the City Council approve, Onni's request to purchase the City's limited TFAR rights for a project that deviated from City development standards. Onni failed to provide more than $5,000,000 dollars in direct public benefits by refusing to commit to local hire and prevailing wages, as authorized by the TFAR Ordinance.

    b.  Approved the requested Variance from LAMC Section 12.21 G.2(a)(3) to provide one tree per 11.1 dwelling units in lieu of one tree per four dwelling units (47 trees in lieu of 131 trees).

    c.  Approved the requested Variance from LAMC Section 12.21 A.5(c) to permit compact stalls to be utilized as all required parking, in lieu of a maximum of 40% of compact stalls for non-residential uses, and in lieu of a minimum of one standard space for each residential unit.

    d.  Approved the requested Variance from LAMC Section 12.21 A.16(e)(2)(iii) to deviate from the location and access requirements for long-term bicycle parking, which requires specific locations for long-term bicycle parking in parking garages.

---

[4] In 2021, Englander was charged by the Justice Department with obstructing a corruption investigation. In 2022 Englander was sentenced to 14 months in federal prison for accepting cash bribes from a developer who had business with and projects in LA City. Prosecutors have charged nine other people and two developers in the so-called "Operation Casino Loyale," including the alleged mastermind, former City Councilmember Jose Huizar. Huizar was charged with 41 criminal counts involving racketeering and fraud, with a criminal trial set for 2023.

e.   From 2014 through 2019, throughout Onni's development of Hope + Flower, the PLUM Committee knowingly and willingly acted based on inaccurate and misleading information approved other major variances that are discoverable via the LA City Clerk's records. These variances helped line the pockets of corrupt politicians while simultaneously saving Onni Group millions of dollars at the expensive of depriving Angelenos of affordable housing.

**Los Angeles Housing + Community Investment Department ("HCID")**

56.   Los Angeles Housing + Community Investment Department (HCID) serves as the head housing department for the City of Los Angeles. A core responsibility of HCID includes developing housing programs to expand access to housing to low-income, homeless, and special needs populations/communities.

a.   HCID's Regulatory Compliance and Code Bureau serves as a resource center to landlords and tenants, to provide information on their rights and responsibilities under City and State Housing Code, Rent Stabilization Ordinance (RSO), and evictions.

b.   HCID administers programs related to tenant protections and affordable housing production, while the City Planning Department creates plans for housing production and approves new construction, and Housing Authority of the City of Los Angeles (HACLA) runs the City's limited stock of public housing.

c.   Lastly, HCID acts as a research and data hub for government agencies and the general public on market trends and socio-economic factors around housing.

d.   The highest-ranking HCID employees are appointed by the City Council.

**Los Angeles Housing Department ("LAHD")**

57.     In 2012, responding to a statewide budget deficit due to the Great Recession, the State of California ended the legal authority for redevelopment activities, resulting in the closure of the Community Redevelopment Agency of Los Angeles (CRA/LA). The City transferred CRA/LA's housing assets to the Los Angeles Housing Department ("LAHD"). LAHD.

a.  Subsequently, LA City split up the Community Development Department ("CDD"), created the Economic and Workforce Development Department and transferred CDD's community development functions to LAHD, which was renamed the Los Angeles Housing + Community Investment Department (HCIDLA) in mid-2013.

b.  In 2021, the LA City Council approved to split operations from HCIDLA including the creation of a new department and the renaming of the existing department. As of August 2021, HCIDLA officially became the Los Angeles Housing Department (LAHD).

c.  The highest-ranking LAHD employees are appointed by the City Council.

**Housing Element & Regional Housing Needs Assessment (RHNA)**

58.     In the State of California, all cities are required to develop a General Plan, and the Housing and Safety Elements are a required component of every city's General Plan. The General Plan can be thought of as a city's "constitution for development," or the foundation upon which all land use decisions are to be based. It establishes policies and programs that assist decision makers as they review planning approvals for a new project or consider a proposed ordinance or policy. the General Plan provides the foundational guide for planning, outlining how land is to be used and how the City allocates its resources.

59.     Pursuant to Assembly Bill 686 (2018), the Housing Element must include an analysis and determination of consistency with Affirmatively Furthering Fair Housing (AFFH) requirements. AFFH is defined as "taking meaningful actions, in addition to combating discrimination, that overcome patterns of segregation and foster inclusive communities free from barriers that restrict access to opportunity based on protected characteristics."

60.     The Los Angeles General Plan includes a total of 12 elements, covering specific aspects of land use and planning, such as ecological conservation and infrastructure provision. The General Plan is maintained by the Department of City Planning but intended to capture the work of all City Departments that have a role in land use and development decisions.

61.     According to LA City's General Plan:

To meet the 2021-2029 RHNA Allocation, the City needs to permit about 57,000 units per year; however, since 2014 the City has produced an average of 16,700 units per year, indicating substantial changes are needed to achieve these housing goals. This need is most pronounced when considering the lower income Allocation. Of the City's total 2021-2029 RHNA, about 23,000 units per year should be affordable to lower income households (80% of the area median income, or AMI, and below); however, the City has only produced an average of 1,650 affordable units per year since 2014.

The Housing Element Update establishes a new Goal 2 focused on housing preservation and tenant protections in order to elevate critical City priorities around housing stability. This new goal is a recognition of the importance of maintaining existing affordable housing, enforcing existing and newly adopted tenant protections, keeping people housed, and preventing displacement. The five goals that guide the 2021-2029 Housing Element are as follows:

GOAL 1: A City where housing production results in an ample supply of housing to create more equitable and affordable options that meet existing and projected needs.

GOAL 2: A City that preserves and enhances the quality of housing and provides greater housing stability for households of all income levels.

GOAL 3: A City in which housing creates healthy, livable, sustainable, and resilient communities that improve the lives of all Angelenos.

GOAL 4: A City that fosters racially and socially inclusive neighborhoods and corrects the harms of historic racial, ethnic, and social discrimination of the past and present.

GOAL 5: A City that is committed to preventing and ending homelessness.

Updated, new and noteworthy Policies (Pol.) supporting housing preservation and housing stability can be summarized as follows:

- Strengthen the protection of tenants' rights through enhanced RSO enforcement and legal assistance (Pol. 2.1.4)

- Expand right of first refusal and ensure a no net loss of affordable units (Pol. 2.1.5)

- Promote acquisition and extension of expiring covenants (Pol. 2.1.5)

- Limit short-term rentals, residential conversions to hotels and vacancies (Pol. 2.1.6)

- Develop local anti-displacement strategies with big investments (Pol. 2.1.7)

- Expand individual and community ownership opportunities (Pol. 2.2.1)

- Prioritize wealth generation for underserved communities (Pol. 2.2.3)

- Protect communities, especially communities of color, from predatory lending, land acquisition, speculative real estate transactions (Pol. 2.2.5)

62.     The LA City Housing Plan is incorporated by reference, and can be downloaded directly from the Los Angeles City Clerk website at: https://planning.lacity.org/odocument/e5bf573f-0132-4cc6-a8ba-186931cca4e0

63.     Pursuant to the LA City Housing Plan, LA City Council enacted legislation such as the Tenant Anti-Harassment Ordinance ("TAHO"), but underfunded the departments charged with enforcing the regulations. At the time of filing this complaint, LA City has not brought any TAHO suits against any landlords, despite receiving thousands of tenant complaints.

64.     LA City councilmembers enacted but failed to enforce laws that penalized landlords, developers and participants of a lucrative pay-for-play scheme. City Hall corruptions

1   and pay-for-play schemes hurt millions of Los Angeles' most vulnerable residents, which are

2   renters who spend more than 30% of their incomes on housing.

3
    65.    Upon information and belief, benefits of Onni Group's bribes to LA City
4
5   councilmembers included but were not limited to, LAHD and other departments refusing to

6   investigate housing discrimination complaints against Onni.

7   66.    Upon information and belief, Onni, LA City councilmembers, and other elected

8   officials used threats, intimidation, or coercion, or attempted to interfere by threat, intimidation, or

9   coercion against LAHD employees to prevent the investigation of complaints involving the Onni

10  Group.
11
12  67.    At the time of filing this Complaint, Stillwell's complaints to LAHD about Onni's

13  theft of Stillwell's COVID-19 rental assistance, and her multiple housing discrimination and safety

14  complaints have *not* been investigated. Stillwell's last complaint to LAHD about Onni was in June

15  2022.
16
17  68.    Onni, LA City councilmembers, and other elected officials used threats,

18  intimidation, or coercion, or attempted to interfere by threat, intimidation, or coercion with

19  Stillwell's exercise or enjoyment of rights secured by the Constitution or laws of the United States,

20  or of the rights secured by the Constitution or laws of California, in violation of Ca. Civil Code

21  §52.1
22
23  **RICO Scheme #2: Transient Occupancy Tax (TOT) Scheme**

24  69.    In 2017, Onni Group sought exceptions to the city's required set-asides for

25  affordable housing because it wanted out of its obligation to include nearly one hundred (100)

26  affordable units at Hope + Flower, a real estate project which was initially approved for 730

27  residential units.

28

70.     On November 28, 2017 Onni applied for a Transit Occupancy Residential Structure conversion ("TORS conversion"). According to Onni's Application / Permit 17016-10000-35147 for Plan Check / Job No. B17LA21705 so that it could "CHANGE OF USE FOR PORTION OF APARTMENT (R2) PERMANENT RESIDENTIAL TO (R1) TRANSIENT RESIDENTIAL UNITS: TOWER 1 - LEVELS 10-16 AND 28 ; TOWER 2 - LEVELS 10-17 AND 36 . TOTAL # OF UNITS = 207 UNITS."

71.     A TORS conversion allows residential housing to be converted into hotel rooms.

72.     Once converted into TORS designation hotel rooms, former residential units are no longer counted when calculating Downtown Los Angeles' vacancy rate, which is used to determine the necessity of residential real estate projects. Accordingly, if a residential apartment is empty, then it's considered a vacant unit. Conversely, a vacant hotel room, is just an empty hotel room and not calculated in the vacancy rate.

73.     L.A.M.C. § 21.7 establishes the Transient Occupancy Tax (TOT), a 14% tax on the rent charged to transient guests in hotels, motels, and short-term rentals. In Fiscal Year 2022-2023, the TOT is projected to raise $263 million to pay for vital city services, and in recent years the TOT has represented as much as 5% of General Fund revenue.

74.     Onni's operation of Illegal hotels at Hope + Flower and Level were part of a tax avoidance scheme. LA City failed to collect the tax and enforce its transient occupancy tax obligations on the Onni Group, in exchange for bribes and kickbacks of LA City councilmembers.

75.      Seeking a TORS designation up front, allows real estate developers like Onni to use news building as housing or hotel once the building is open, despite the project description being approved and zoned for residential only.

76.     This unscrupulous reclassification scheme allows corrupt City Hall officials to reduce the Downtown vacancy rate thus creating a false scarcity and need for housing in Downtown. The false justification leads to the "need" and subsequent approval for more real estate development, which allows for more lucrative bribes in a massive pay-for-play scheme.

77.      For developers that can't market residentials units as apartments or condos, just turn them into hotel rooms. That way you're turning a profit even if there really is no demand for housing. And the best part is, once you slap on the TORS designation,

78.     In 2017 local activists discovered that Onni was illegally offering residential units at Level Furnished Living (888 S. Olive Street) as hotel rooms. Instead of fining Onni, City Hall granted Onni grant a TORS conversion for 97 units at Level. It was approved as 303 residential units

79.     L.A.M.C. § 21.7 establishes the Transient Occupancy Tax (TOT), a 14% tax on the rent charged to transient guests in hotels, motels, and short-term rentals. In Fiscal Year 2022-2023, the TOT is projected to raise $263 million to pay for vital city services, and in recent years the TOT has represented as much as 5% of General Fund revenue.

80.     Onni's operation of Illegal hotels at Hope + Flower and Level were part of a tax avoidance scheme. LA City failed to collect the tax and enforce its transient occupancy tax obligations on the Onni Group, in exchange for bribes and kickbacks of LA City councilmembers.

81.     At the time of filing this Complaint, Hope + Flower is not zoned or licensed as hotels, motels, or boarding houses as required by L.A.M.C. § 7.50.

    a.   Since 2020 Onni was allowed to avoid paying the City of Los Angeles hundreds of thousands of dollars by bribing elected officials to operate its illegal hotel at Hope + Flower.

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

**RICO Scheme #3: Up-Zoning Related Bribes**

82.    Upon information and belief, beginning in sometime in 2017 Huizar undertook an initiative as the Chair to overhaul the City's entire zoning guidelines.

83.    Upon information and belief, beginning sometime in 2017 through 2022, and at the time of filing this Complaint, Councilmembers Huizar, Englander, DeLeon[5], Cedillo, and other Los Angeles elected officials[6] and Councilmembers accepted bribes and kickbacks from Onni Group in exchange for up-zoning land that allowed Onni Group to avoid paying LA City millions in public benefit payments and escape its obligations to provide affordable housing.

84.    Sometime in 2018 Huizar flew to Vancouver, British Colombia, Canada, where Onni-BC is headquartered, and discussed rezoning the Downtown Community Plan Area ("Plan Area"). The Plan Area is located in Huizar's former and DeLeon's current district, CD14.

85.    Upon information and belief, sometime in 2019, the PLUM committee agreed to Huizar's rezoning of the Plan Area and agreed to move forward with the overhaul of LA City's zoning ordinances *after* LA City's Housing Element[7] for 2021-2029 was approved.

_____

[5] DeLeon was President pro tempore of the California State Senate, the highest-ranking democrat in California, from October 15, 2014 – March 21, 2018. DeLeon was proceeded Cedillo was served from December 2, 2002 – November 30, 2010.

[6] On October 17, 2017, former Mayor Eric Gracetti ("Gracetti") nominated Jennifer Barraza Mendoza ("Mendoza") as a Commissioner on the Los Angeles Area Planning Commission ("LAAPC"). At the time of Mendoza's nomination, she was the political consultant to DeLeon, who was then the California Senate pro temp.  Mendoza's appointment was approved by Huizar's PLUM Committee. Mendoza served on the LAAPC from November 28, 2017 to September 16, 2020. Mendoza's LAAPC term ended one month before DeLeon's term as the LA City Councilmember for CD14, which conveniently began on October 15, 2020. Mendoza currently serves as DeLeon's Chief of Staff. Gracetti's appointment letter for Mendoza is incorporated by reference and can be accessed at the LA City Clerk's website: http://clkrep.lacity.org/onlinedocs/2017/17-1194_rpt_MAYOR_10-17-2017.pdf

[7] The Housing Element is a required component of every jurisdiction's General Plan and must comply with specific standards and requirements set by the state. The Housing

86.     On December 17, 2019 Onni withdrew its TOT application due to a bribed arrangement with Huizar and other City Councilmembers that would allow Onni to operate it illegal hotels until the Plan Area up-zoning was completed.

87.     Upon information and belief, sometime in 2020 after Huizar's arrest, Onni demanded repayment of money it paid for up-zoning and or reassurances that the Plan Area would still be up-zoned as previously agreed.   Several current PLUM Committee and LA City councilmembers accepted bribes to carry out Huizar's rezoning plan for the Plan Area.

88.     On June 29, 2022 the California Department of Housing and Community Development (HCD) sent a letter to Planning Director Vince Bertoni confirming that the revised "Plan to House L.A." is in full compliance with the State Housing Element Law. The HCD letter is incorporated by reference and can be accessed at   LA City Planning website: https://planning.lacity.org/odocument/c30f832f-9f91-47ff-bcc0-69f33b197a11/LACityAdoptedIN062922.pdf

89.     On September 27, 2022, PLUM Committee members DeLeon, Cedillo, and Curren Price ("Price") approved Huizar's up-zoning plan, which has been since rebranded as "DTLA 2040," but contains proposed ordinances that will make the zoning applicable city-wide.

      a.     Once enacted city-wide, the new zoning ordinances will remove thousands of residential units from the housing market, thus worsening LA City's housing and homeless crisis.

Element must be updated every eight years, with an additional progress report created annually. The 2021-2029 Housing Element was adopted by the Los Angeles City Council on November 24, 2021 but rejected by the State. On June 14, 2022, LA City Council adopted the targeted amendments, which were ultimately accepted by the State, and will be in effect through 2029.

b.  LA City Council is expected to vote on DTLA 2040 before the end of 2022.

c.  The PLUM Committee's proposed ordinances for DTLA 2040 is incorporated by reference and can be accessed at the LA City Clerk's website at: https://planning.lacity.org/pdiscaseinfo/document/Mjg4NTk0/1823a02c-5d95-4003-95c4-258347c32f18/pdd

**Councilmembers violated Brown Act, Cal. Gov. Code § 54952.2**

90.  The Brown Act, Cal. Gov. Code § 54952.2 forbids the Los Angeles City Council and its committees from meeting in secret to conduct its public business. The prohibition is found at §54952.2(b)(1), which states categorically that: "A majority of the members of a legislative body shall not, outside a meeting authorized by this chapter, use a series of communications of any kind, directly or through intermediaries, to discuss, deliberate, or take action on any item of business that is within the subject matter jurisdiction of the legislative body."

a.  There are both civil remedies and criminal misdemeanor penalties for Brown Act violations pursuant to Cal. Gov. Code §§ 5460, 54960.1. Any person may also seek declaratory and injunctive relief to find a past practice of a legislative body to constitute a violation of the Brown Act

b.  The civil remedies include injunctions against further violations, orders nullifying any unlawful action, and orders determining the validity of any rule to penalize or discourage the expression of a member of the legislative body. The provision relating to efforts to penalize expression may come up in the context of measures by the legislative body to censure or penalize one of its members for breaching confidentiality or other violations.

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

- 36 -

91.     Upon information and belief, several LA City Councilmembers, directly or through intermediaries, discussed pending motions, votes, rezoning CD14, and other subject matter jurisdiction of the City Council in secret and in violation of the Brown Act.

92.     Upon information and belief, on the following dates Huizar had secret meetings with Onni Group to discuss the zoning and permits for Hope + Flower, in violation of the Brown Act:

    a.  Wednesday, January 11, 2017: "Dinner with Onni @ Terroni, located at 802 S Spring St. Los Angeles, CA 90014"

    b.  Saturday, March 24, 2018: "Dinner @ Beverly Hills (with Art Gasteulum & Mark Spector, Vice President of Dev. CA at Onni Group of Comp. 618 N Beverly Dr, Beverly Hills, CA 90210, USA 5pm-6pm"

    c.  Saturday, March 24, 2018: "Dinner @ (Home of Mr. & Mrs. De Cotiis) (with Art Gasteulum & Mark Spector, Vice President of Dev. CA at Onni Group of Comp. 618 N Beverly Dr, Beverly Hills, CA 90210, USA 6pm-7pm"

93.     Sometime in October 2022, an audio recording of a secret Councilmember meeting that took place in October 2021, ("Secret Meeting"), was posted on Reddit.com. The Secret Meeting, which violates the Brown Act, was attended by former LA City Council President Nury Martinez ("Martinez",) DeLeon, Cedillo, and former Los Angeles County Federation of Labor President, Ron Herrera ("Herrera").

    a.  The comments made during this meeting were extremely disturbing, exposing the racism and bigotry of the meeting's attendees. For example, Martinez made remarks about Councilmember Mike Bonin, who is white, and Bonin's young son, who is Black. At one point, Martinez called Bonin a "little bitch" and referred to

his son as "Parece changuito," or "like a monkey." She also said Bonin's son had misbehaved on a parade float and needed a "beatdown."

b.   Upon information and belief, during the October 2021 secret meeting, Martinez, DeLeon, Cedillo, and Herrera also discussed DTLA 2040, the rezoning, and rezoning of CD14 and citywide redistricting.

c.   Every 10 years LA City undergoes a process called redistricting to redraw the maps that determine each district. It is important that the districts are defined fairly and equally with the updated population sizes. According to the U.S. Constitution, all electoral districts within a given redistricting map must contain approximately the same number of people. The redistricting maps determine the allocation of political power and representation at every level of government (city, county, state and federal) across the nation for at least the next ten years.

d.   On October 29, 2021, less than two weeks after the Secret Meeting, the Los Angeles City Council Redistricting Commission[8] ("LACCRC") submitted its final report with recommendations and map to LA City Council (C.F. 20-0668-S7).

e.   On December 15, 2021, the LACCRC passed resolutions to adopt a final redistricting plan and report. The final redistricting plan, including shapefiles can be accessed and downloaded from the Los Angeles County Redistricting website at https://redistricting.lacounty.gov/final_map_and_submissions/

---

[8] The Los Angeles City Council Redistricting Commissioners were appointed by former Mayor Gracetti and confirmed by LA City Council pursuant to the Charter of the City of Los Angeles.

f. Upon information and belief, the LACCRC's redistricting maps were unlawfully discriminatory and based upon the racially discriminatory conduct of LA City's elected officials through a series of secret meetings that violate the Brown Act.

**LA City Councilmember Kevin DeLeon's Refusal to Resign**

94.  In late 2022, Martinez, Cedillo, and Herrera each resigned from their respective positions after a recording of the Secret Meeting was posted on Reddit.com. However, DeLeon refuses to resign despite pleas from United States President Joseph R. Biden and California Governor Gavin Newsom.

a. Upon information and belief, DeLeon's refusal to resign places Angelenos at risk for on-going and future corruption, as DeLeon has accepted bribes and kickbacks to carryout Huizar and Onni Groups prior unfinished plans.

b. Upon information and belief, DeLeon laundered bribe money through several out-of-state business including: Dallas-based Leon Capital Group (www.leoncapitalgroup.com) and an Ohio based nonprofit, Northeast Ohio Association for Hispanic Health, LLC (https://noahhsalud.org)

c. DeLeon's refusal to resign can potentially cost Los Angeles and California taxpayers for the costs of removal proceedings and litigation, if LA City agrees to cover expenses.

95.  In California, legislators, public employees, and other public servants may face severe consequences for violating the public trust. The range of penalties includes censure, removal from office, permanent disqualification from holding any state position, restitution, decades in prison, and fines up into the hundreds of thousands of dollars.

a. Pursuant to California's Penal Code, bribing is punishable by imprisonment in the state prison for two, three or four years. Cal. Penal Code § 85. Acceptance of a bribe is punishable by imprisonment in the state prison for two, three, or four years and, in cases in which no bribe has been actually received, by a restitution fine of not less than $4,000 or not more than $20,000 or, in cases in which a bribe was actually received, by a restitution fine of at least the actual amount of the bribe received or $4,000, whichever is greater, or any larger amount of not more than double the amount of any bribe received or $20,000, whichever is greater. In imposing a fine under this section, the court shall consider the defendant's ability to pay the fine. Cal. Penal Code § 86. Shall also result in forfeiture of elected office. Cal. Penal Code § 88.

b. Despite having laws and procedures in place, LA City and the State of California have not taken any legal action or steps towards the investigation and removal of DeLeon and other corrupt elected officials. Thus, subjecting Angelenos to on-going systemic corruption that deprives Angelenos of honest services from its elected officials, as well as millions of taxpayers' dollars.

96.   This Court has the authority to enjoin the City of Los Angeles from covering litigation costs related to DeLeon's refusal to resign. This Court also has authority to enjoin LA City from enforcing any ordinances or legislation put forth by or voted on by DeLeon.

**RICO Scheme #4: City Contract Related Bribes**

97.   Upon information and belief, Huizar and other LA City elected officials accepted bribes and kickbacks from Onni Group in exchange for contracts with the City of Los Angeles.

The actual number of contracts existing between Onni Group and LA City is known by Defendant City of Los Angeles and is discoverable.

98.    According to LA City Council meeting Item No. 19-0607, on June 25, 2019 Huizar motioned LA City Council to "AUTHORIZE the Department of General Services (GSD) to negotiate and execute a new lease agreement with Onni Group dba Onni Times Square Limited Partnership for office space located at 145 South Spring Street, for a term of five years, with four one-year options to extend."

    a.    According to LA City Council meeting Item No. 19-0607, on July 2, 2019 Huizar motioned LA City Council to "TRANSFER OF FUNDS relative to a lease agreement with Onni Group for office space located at 145 South Spring Street. Recommendation for Council action, SUBJECT TO THE APPROVAL OF THE MAYOR: AUTHORIZE the Controller to transfer $491,901 in Capital Improvement and Expense Program funds to the Department General Services leasing account for all costs to be incurred in Fiscal Year (FY) 2019-20 "

    b.    The 5-year Onni Times Square lease is worth $1.46 million dollars.

99.     According to LA City Contract No. C-138578, in July 2021, LA City contracted with Onni Group, to "provide emergency housing for those affected by the events on June 30th where confiscated illegal fireworks resulted in the damage to several homes in Council District 9." The initial contract was worth $300,000.

    a.    Onni provided housing at "the HOTEL, known as ONNI 888 OLIVE ST. LP located at: 888 South Olive Street, Los Angeles, CA 90014" According to Contract No. C-138578, "the representative of the HOTEL shall be: LEVEL Furnished Living, 888 South Olive Street Los Angeles, CA 90014"

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

b. Paragraph 5 of the contract contains "antidiscrimination provisions" that state in relevant part, "HOTEL shall comply with the provisions of the Fair Employment and Housing Act (Government Code, Section 12900 et seq.), the regulations promulgated thereunder (California Code of Regulations, Title 2, Section 11000 et seq.), the provisions of Article 9.5, Chapter 1, Part 1, Division 3, Title 2 of the Government Code (Government Code, Sections 11135-11139.8), and the regulations or standards adopted by the awarding City to implement such article."

c. LA City Contract No. C-138578 is incorporated by reference and can be downloaded from the LA City Clerk's website at:

https://clkrep.lacity.org/onlinecontracts/2021/C-138578_c_7-20-21.pdf

d. The First Amendment to LA City Contract No. C-138578 ("1st Amendment") was on September 2, 2021 and extended the contract through December 31, 2021 for a total amount of $463,000. The 1st Amendment is incorporated by reference and can be downloaded from the LA City Clerk's website at:

https://clkrep.lacity.org/onlinecontracts/2021/C-138578_C_9-2-21.pdf

e. The Second Amendment to LA City Contract No. C-138578 ("2nd Amendment") was on January 10, 2022 and extended the contract from January 1, 2022 through December 31, 2022. There is no total amount listed on the 2nd Amendment. The 1st Amendment is incorporated by reference and can be downloaded from the LA City Clerk's website at: https://clkrep.lacity.org/onlinecontracts/2022/C-138578_C_01-10-2022.pdf

**Onni Group's business and building permits are revocable; Onni's contracts are voidable**

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

- 42 -

100.    Upon information and belief, all LA City contracts contain antidiscrimination provisions. As discussed in detail below, Onni breached each of its contracts with LA City by continuing to participate in a pattern of discrimination that violate city, state, and federal housing discrimination laws.

101.    Pursuant to L.A.M.C. §§ 93.0209, 98.0601 the Board of Building and Safety Commissioners[9] ("the Department") can revoke city permits and approvals for real estate projects if the City Council finds that developers or their representatives engaged in corruption, made material misrepresentations, or if the permits violate local, state, or federal laws.

  a.    Onni Group and their representatives engaged in corruption, knowingly made material misrepresentations to obtain permits, building checks and pass inspections for Hope + Flower. Onni's building permits at Hope + Flower is revocable pursuant to L.A.M.C. §§ 93.0209, 98.0601.

102.    Pursuant to L.A.M.C. § 5.04.230 LA City Council can revoke Onni Groups business licenses if the City Council finds:

  The building, structure, premises or equipment used to transact or conduct the business fails to comply with any applicable health, zoning, fire, or building and safety laws of the United States, the state of California, or the city; (2) The licensee has knowingly made any false, misleading or fraudulent statement of material fact in the application for a business license, in the application for an exemption pursuant to Section 5.04.180 of this chapter, or in any other report or statement required to be submitted to the business license officer; (3) The licensee or any of the licensee's employees or agents has violated any provision of federal or state law or any provision of this code or any other rule or regulation regarding the business premises or otherwise in transacting and carrying on the business; or (4) Any other condition for which a business license application could be denied under Section 5.04.210 of this chapter.

_____

[9] Board of Building and Safety Commissioners were appointed by former Mayor Gracetti Mayor and confirmed by LA City Council pursuant to the Charter of the City of Los Angeles.

a.  As discussed herein, Onni Group used Hope + Flower to transact and conduct unlawful business and criminal activity, and knowingly made any false, misleading, or fraudulent statements of material fact on their applications for business licenses. Onni Groups business permits in the City of Los Angeles are revokable pursuant to L.A.M.C. § 5.04.230.

103.    This Court has the authority to enjoin LA City from enforcing its proposed rezoning of the Plan Area, now known as "DTLA 2040," because it materially reduces the amount of affordable residential housing by allowing developers to convert thousands of residential units into hotels into hotel rooms.

a.  The proposed rezoning of Downtown Los Angeles ("DTLA") was the result of corruption, bribes, and unlawful schemes that deprived Los Angeles' residents of the honest services of its elected officials.

b.  The proposed DTLA 2040 rezoning ordinances, violate the Brown Act (Cal. Gov. Code § 54952.2), California's No Net Loss (Senate Bill 166, codified at Cal. Gov. Code § 65863), California's Housing Element statues, codified at Cal. Gov't Code §§ 65580 et seq., and California's Housing Crisis Act of 2019 (Senate Bill 330, codified at Cal. Gov. Code § 65863), which prohibits local jurisdictions from enacting new laws that would have the effect of reducing residential housing withing their borders.

c.  Upon information and belief, LA City councilmembers, and other elected officials used threats, intimidation, or coercion, or attempted to interfere by threat, intimidation, or coercion with Stillwell and the Residents of Los Angeles' exercise or enjoyment of rights secured by the Constitution or laws of the United States, or

1    of the rights secured by the Constitution or laws of California, in violation of Ca.

2    Civil Code §52.1

3    **Housing Discrimination**

4

5    104.    California's Unruh Civil Rights Act, Cal. Civ. Code § 51(b) provides:

6            All persons within the jurisdiction of this state are free and equal, and no matter
             what their sex, race, color, religion, ancestry, national origin, disability, medical
7            condition, genetic information, marital status, sexual orientation, citizenship,
             primary language, or immigration status are entitled to the full and equal
8            accommodations, advantages, facilities, privileges, or services in all business
             establishments of every kind whatsoever.
9

10   105.    Cal. Civ. Code § 51(e)(6) of California's Unruh Civil Rights Act provides that "Sex,

11           race, color, religion, ancestry, national origin, disability, medical condition, genetic

12           information, marital status, sexual orientation, citizenship, primary language, or

13           immigration status" includes a perception that the person has any particular characteristic

14           or characteristics within the listed categories.

15

16   106.    Cal. Gov. Code § 12955(a) of California's Fair Employment and Housing Act

17           ("FEHA") states:

18           It shall be unlawful for the owner of any housing accommodation to discriminate
             against or harass any person because of the race, color, religion, sex, gender, gender
19           identity, gender expression, sexual orientation, marital status, national origin,
             ancestry, familial status, source of income, disability, veteran or military status, or
20           genetic information of that person.

21

22   107.    Cal. Gov. Code § 12955(m) of FEHA states:

23           "race, color, religion, sex, gender, gender identity, gender expression, sexual
             orientation, marital status, national origin, ancestry, familial status, source of
24           income, disability, veteran or military status, or genetic information," includes a
             perception that the person has any of those characteristics or that the person is
25           associated with a person who has, or is perceived to have, any of those
             characteristics.
26

27

28

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

- 45 -

108.     The Fair Housing Act, 42 U.S.C. §§ 3601 et seq. ("FHA"), prohibits discrimination because of race, color, religion, sex, familial status, and disability.

109.     Stillwell is a 38-year-old is an unmarried, Black, African American woman with Native American ancestry. Stillwell has resided and continues to reside at Hope + Flower apartments since March 2020.

110.     From March 2020 until June 2021, Stillwell resided at Hope + Flower with a co-tenant Felix Felder ("Felder"). Felder is a 37-year-old Black, African American man.

111.     At all relevant times, Stillwell and Felder resided on the twenty-first (21st) and twenty-eighth (28th) floors of the Hope Tower, where they were the only African American residents.

112.     Upon information and belief, less than five (5) percent of Hope + Flower residents are African American.

**Discrimination because of Marital Status / Color/Race: Apartment #2914**

113.     On March 9, 2020, Felder paid $500.00 holding deposit for Apartment #2914 and paid an application fee of $47.50.  According to Onni, Felder had 72 hours to complete his rental application and be approved, otherwise Felder's $500.00 holding fee would be forfeited.

114.     On March 9, 2020, Felder completed his portion of the rental application. According to Onni, most rental applications are approved on the same day.

115.     Onni's rental application has a required question which states: "Martial Status" and the two available options are "single" and "married."

116.     Upon information and belief, on or about March 9, 2020, Onni became aware that Stillwell and Felder were unmarried after Felder completed his rental application.

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

117.     Cal. Gov. Code § 12955(b) of FEHA states make it unlawful for Onni to make or to cause to be made any written or oral inquiry concerning the marital status of any person seeking to purchase, rent, or lease any housing accommodation.

118.     On March 9, 2020, an Onni leasing agent emailed Stillwell stating in part,

> Good Morning Brittany, Felix came by to tour a few two bedrooms and he narrowed down to a large two-bedroom two bath in the Hope Tower called the D14 floor plan. The apartment he liked best is 2914 which looks at the Staples Center and the city from the living room." The email further stated, "With this home, you will receive 6 weeks free on a 13-25 month lease in addition to a $500 move in rent credit.

119.     In March 2020, the monthly rent for Apartment #2914 was advertised as $ 4498 on Hope + Flower's website, and Onni was advertising eight (8), not six (6) weeks of free rent for new leases that were more than twelve (12) months long.

120.     Upon information and belief, in March 2020, Onni offered similarly situated persons outside of Stillwell's protected classes eight (8) of free rent for new leases that were more than twelve (12) months long.

121.     Offering inferior terms, conditions, privileges, or services in connection with renting, such as Onni offering Stillwell less than 8 weeks of free rent is an act of discrimination as defined by Cal. Gov. Code § 12927(c)(1), a discriminatory housing practice as defined by 42 U.S.C. § 3602(f), and unlawful housing discrimination as defined by 24 C.F.R. § 100.50 (b)(2).

122.     On March 9, 2020, Onni knowingly and intentionally offered Stillwell inferior terms, conditions, privileges, or services in connection with renting Apartment #2914 because of Stillwell's race and or color in violation of Cal. Civ. Code § 51(b), Cal. Gov.

Code § 12955(a), 42 U.S.C. § 3604(b), 24 C.F.R. § 100.60(a)(3), and 24 C.F.R. §100.50(b)(2).

**More Stringent Income Criterion: Apartment #2914**

123.     On March 11, 2020, Onni informed Stillwell that she needed to complete "occupant screening" as part of Felder's rental application. On March 11, 2020, Stillwell completed Onni's screening process, which asked several questions related to Stillwell's employment, including the contact information for Stillwell's employer, income, prior felonies, prior evictions, date of birth, social security number, and marital status.

124.     On March 11, 2020, Onni made inquiries concerning Stillwell's marital status in violation of Cal. Gov. Code § 12955(b).

125.     On March 11, 2020, after Stillwell completed the Occupant screening, an Onni leasing agent called Stillwell stating that Onni could not accept Stillwell's foreign employment or foreign income. Onni further required Stillwell to remove her foreign employment and foreign income from the Occupant screening form.

126.     On March 11, 2020, Stillwell at approximately 2:27PM, Stillwell updated the following required responses on the Occupant screening:  Country and Gross Monthly Income. Stillwell changed Country from "Saudi Arabia" to "United States" and she changed Gross Monthly Income from $50,000.00 to $13,500.00.

127.     On March 11, 2020, at approximately 3:33PM, Onni emailed Stillwell and Felder stating in part, "It looks like the screening was not completed for Brittany because she did not provide her social. Brittany, can you log back into the portal and enter your social security number to complete the screening."

128.      On March 11, 2020, Stillwell logged into Rent Cafe, an online portal Onni uses for rental applications, and noticed she was listed as "Roommate of Felix Felder" for "Apartment #2727" and the rent listed was "$2,255 - $15,676." A true and correct screenshot of Stillwell's Rent Cafe profile taken by Stillwell on March 11, 2020 appears below:



129.      On March 11, 2020, Stillwell called Onni to clarify the need for her social security number and to confirm that Felder applied for Apartment #2914, not Apartment #2727.

Onni confirmed Felder applied for Apartment #2914 and stated Occupants are required to provide a social security number as part of its occupant screening process.

130.    Onni misrepresented to Stillwell that it collected Occupants' social security numbers for legal purposes such as needing to enforce a court order if an Occupant causes damages.

131.    On March 11, 2020, Stillwell provided Onni with her social security number to complete the Occupant screening process.

132.    On March 11, 2020, at 6:04PM Onni emailed Stillwell and Felder stating in part, "The screening results came back as accepted for you, Brittany. I just need your income documents for the manager to approve the application. If you have your 2018 tax return, you may provide that instead. I'll also need your 3 recent bank statements."

133.    On or about March 12, 2020, Stillwell provided Onni three months of bank statements and a copy her tax return, which included a Form 2555, for Foreign Earned Income. The Form 2555 listed Stillwell's bona fide foreign residency in Saudi Arabia as beginning in 2017.

134.    On or about March 12, 2020, Onni verified Stillwell's employment and income.

135.    On or about March 13, 2020, Onni informed Stillwell and Felder that they were not approved for Apartment #2914 because Felder's application was not completed by close of business on March 12, 2020. According to Onni, Felder's credit report was the only item still pending.

136.    Upon information and belief, Onni verified' Felder's employment and income on or about March 9, 2020.

137.    Onni does not subject its short-term renters to background, credit checks or stringent qualification criteria. Upon information and belief, Onni does not have a limit on how long long-term renters can rent. Stillwell is aware of a least one short-term renter, who was not a member of Stillwell's protected class, who stayed at Hope + Flower for over fifteen (15) months.

138.    On March 13, 2020, by Proclamation 9994, former President Donald Trump declared a national emergency concerning the coronavirus disease 2019 (COVID-19) pandemic. California had declared a state of emergency nearly ten (10) days prior. Felder and Stillwell were both living in hotels desperate to secure housing.

139.    On or about March 13, 2020, Felder made a Onni a bona fide offer to pay $60,000.00 "up front," which was the approximate cost of thirteen (13) months of rent in Apartment #2914. Onni refused Felder's bona fide offer because Felder's credit report allegedly still pending.

140.    On or about March 13, 2020, Stillwell made Onni a bona fide offer to pay the $60,000.00 up front to cover 13 months of rent in Apartment #2914. Onni refused Stillwell's bona fide offer stating it could only consider Stillwell's "U.S. earned income" and Stillwell's banking statements reflected Stillwell's foreign income.

141.    Cal. Gov. Code 12955(p) defines "source of income" as "lawful, verifiable income paid directly to a tenant or paid to a representative of a tenant." Stillwell's foreign earned income was lawful, verifiable income paid directly to Stillwell and considered a "source of income" as defined by Cal. Gov. Code 12955(p).

142.     At all relevant times, Stillwell's source of income was and is as "lawful, verifiable income paid directly to a tenant or paid to a representative of a tenant," as defined by Cal. Gov. Code §12955(p).

143.     Upon information and belief, over twenty (20%) of residents at Hope + Flower are non-United States Citizens and / or foreign exchange students and persons who used foreign earned income to qualify for apartments.

144.     Upon information and belief, at all relevant times, Onni accepted foreign earned income from similarly situated persons outside of Stillwell's protected classes.

145.     Pursuant to 24 C.F.R. §§100.60(a), 100.60(b)(1) and 100.60(b)(2), it is unlawful to refuse to rent an apartment to a person, or who has made a bona fide offer, because of race or color. It is also unlawful to refuse to negotiate with a person, because of race or color.

146.     Onni's exclusion of Stillwell's foreign earned income, and Onni's refusal to consider, negotiate, or accept Stillwell's offer to pay the rent for Apartment #2914 is an act of discrimination as defined by Cal. Gov. Code § 12927(c)(1), a discriminatory housing practice as defined by 42 U.S.C. § 3602(f), and unlawful housing discrimination as defined by 24 C.F.R. §§ 100.50 (b)(1) and 100.50 (b)(3).

147.     On March 13, 2020, Onni knowingly and intentionally excluded Stillwell's source of income so that it could refuse Stillwell's bona fide offer, because of Stillwell's race and or color in violation of Cal. Civ. Code § 51(b), Cal. Gov. Code § 12955(a), 42 U.S.C. § 3604(a), 24 C.F.R. § 100.60(a), and 24 C.F.R. §§100.50(b)(1) and 100.50(b)(3).

148.     On March 13, 2020, after refusing bona fide offers from Stillwell and Felder, Onni informed Stillwell and Felder "the only way you two can rent an apartment today is if the apartment in Brittany's name," or "you could wait until Felix's application is processed."

149.    On March 13, 2020, Onni offered to execute a "temporary" lease listing Stillwell the Tenant and Felder the Occupant. Onni stated once it received Felder's credit report an "updated" lease would be executed listing Felder as the Tenant and Stillwell as the Occupant. Stillwell and Felder accepted this offer.

150.    On March 13, 2020, Onni informed Stillwell that rental applications are typically approved same day and blamed the delay in receiving Felder's credit report on COVID-19 related business closures.

151.    Stillwell agreed to be the temporary primary Tenant on the lease for Apartment #2914, with Felder listed as an Occupant.

152.    On March 13, 2020, after Stillwell agreed to sign the lease for Apartment #2914, Onni informed Stillwell that she no longer met the income requirements for Apartment #2914 because it could not consider Stillwell's foreign earned income.

153.    On March 13, 2020, Onni informed Stillwell that the rent special for Apartment #2914 ended, and the new monthly rent was $4,772.00, and no longer $4,498.00. However, monthly rent for Apartment #2914 remained advertised as $4,498.00 on Hope + Flower's website.

154.    Upon information and belief, in March 2020, Onni offered Apartment #2914 to Stillwell at a higher rental rate than it offered to similarly-situated persons outside of Stillwell's protected classes.

155.    On March 13, 2020, after excluding Stillwell's foreign earned income, Onni stated Stillwell was only qualified to rent apartments with monthly rents of $3,600.00 or less, based on Stillwell's net income.

156.     On March 13, 2020, Onni knowingly and intentionally used more stringent criterion to disqualify Stillwell from renting apartments at Hope + Flower with monthly rents that exceeded $3,600.00, because of Stillwell's source of income, race and or color in violation of Cal. Civ. Code § 51(b), Cal. Gov. Code § 12955(a), 42 U.S.C. § 3604(b), 24 C.F.R. §§ 100.60(b)(2) and 100.60(b)(3), and 24 C.F.R. §§100.50(b)(2) and 100.50(b)(3).

157.     On March 13, 2020, Onni knowingly and intentionally excluded Stillwell's source of income so that it could refuse leasing Apartment #2914 to Stillwell, because of Stillwell's source of income, race and or color in violation of Cal. Civ. Code § 51(b), Cal. Gov. Code § 12955(a), 42 U.S.C. § 3604(b), 24 C.F.R. §§ 100.60(b)(2) and 100.60(b)(3), and 24 C.F.R. §§100.50(b)(2) and 100.50(b)(3).

158.     On March 13, 2020, Onni informed Stillwell that Felder's income could not be considered to determine Stillwell income qualifications, since Felder's credit report was still pending.

159.     Pursuant to Cal. Gov. Code § 12955(n), it is unlawful for landlords to use a financial or income standard in the rental of housing that fails to account for the aggregate income of persons residing together or proposing to reside together on the same basis as the aggregate income of married persons residing together or proposing to reside together.

160.     Pursuant to 24 C.F.R. § 100.60(b)(4), its unlawful to use different qualification criteria or applications, or different rental standards or procedures, such as income standards, application requirements, application fees, credit analysis or sale or rental approval procedures or other requirements, because of race, color, religion, sex, handicap, familial status, or national origin.

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

161.     Upon information and belief, at all relevant times, Onni used the aggregate gross incomes of similarly situated, unmarried persons residing together or proposing to reside together in determining whether applicants met its income criterions.

162.     On March 13, 2020, Onni knowing and intentionally excluded Felder's income and refused to use the aggregate gross incomes of Stillwell and Felder because they were unmarried, and so that it could refuse leasing Apartment #2914 to Stillwell in violation of Cal. Civ. Code § 51(b), Cal. Gov. Code § 12955(a).

163.     Upon information and belief, at all relevant times, Onni used the aggregate gross incomes of similarly situated persons outside of Stillwell's protected classes residing together or proposing to reside together in determining whether applicants met its income criterions.

164.     On March 13, 2020, Onni knowing and intentionally excluded Felder's income and refused to use the aggregate gross incomes of Stillwell and Felder so that it could refuse leasing Apartment #2914 to Stillwell, because of Stillwell's race and or color in violation of Cal. Civ. Code § 51(b), Cal. Gov. Code § 12955(a), 42 U.S.C. § 3604(b), 24 C.F.R. §§ 100.60(a) and 100.60(b)(4), and 24 C.F.R. §§100.50(b)(2) and 100.50(b)(3).

165.     Onni's offer to lease Apartment #2914 to Stillwell at a higher rent is an inferior term, conditions, privileges, or services, and is an act of discrimination as defined by Cal. Gov. Code § 12927(c)(1), a discriminatory housing practice as defined by 42 U.S.C. § 3602(f), and unlawful housing discrimination as defined by 24 C.F.R. §§ 100.50 (b)(2) and 100.50 (b)(3).

166.     Onni's use of an "occupant screening" application, refusal to consider Felder's income, and its different income requirements, rental standards, and qualification criteria

for Stillwell to lease Apartment #2914 are all acts of discrimination as defined by Cal. Gov. Code § 12927(c)(1), a discriminatory housing practice as defined by 42 U.S.C. § 3602(f), and unlawful housing discrimination as defined by 24 C.F.R. §§ 100.50 (b)(2) and 100.50 (b)(3), and 24 C.F.R §§ 100.60(a) and 100.60(b)(4).

167.    On March 13, 2020, Onni knowingly and intentionally offered Stillwell higher rates and used different qualification criteria to discourage Stillwell from renting for Apartment #2919, because of Stillwell's race and or color in violation of Cal. Civ. Code § 51(b), Cal. Gov. Code § 12955(a), 42 U.S.C. § 3604(b), 24 C.F.R §§ 100.60(b)(3) and 100.60(b)(4), and 24 C.F.R § 100.70(c)(1).

168.    On or about March 13, 2020, Stillwell informed Onni she wanted to rent Apartment #2118.

169.    Apartment #2118 has Floorplan B4 and is a 599 square foot one bedroom apartment in Hope Tower. On March 13, 2020, the monthly rent advertised for Apartment #2118 on Hope + Flower's website was $2,995.00.

170.    All apartments with Floorplan B4 are only located in the Hope Tower at Hope + Flower Apartments from floors 9 through 36. Floors 9 – 36 in the Hope Tower have the same layout, and every Floorplan B4 apartment ends in -18. For example, Apartment #2118 is a Floorplan B4 unit located on the 21st floor of the Hope Tower.

171.    On or about March 13, 2020, Stillwell asked Onni what additional information and documentation she would need to complete a Rental Application for Apartment #2118. Onni informed Stillwell that she only needed to sign a document titled "Application Rental Criteria" because Onni "accidentally" qualified Stillwell as Tenant, instead of an Occupant.

172.      On March 13, 2020, Stillwell signed Application Rental Criteria. A true and correct copy of Stillwell's signed Application Rental Criteria is incorporated by reference and attached as Exhibit F. According to Onni's Application Rental Criteria

    a.   "A credit report is processed for every applicant."

    b.   "A criminal background check is processed for every applicant."

    c.   "Applicant must show written proof of a minimum monthly gross income greater than 2.5 times the monthly rent for the apartment," which is a lower requirement than the "net income for three times the monthly rent" that Onni used to qualify Stillwell.

173.      Stillwell never authorized Onni to run a credit report or background check. Onni knowingly and willingly obtained Stillwell's social security number under false pretenses.

174.      On March 16, 2020, Stillwell noticed a feature in Rent Cafe titled "Alert and Notifications" According to the notifications:

    a.   On March 12, 2020, Onni's "Quoted rent changed from $3,814.00 to $3,964.00"

    b.   On March 13, 2020 "Apartment Changed from Apt# 2727 to Apt #2118"

    c.   On March 13, 2020, Onni's "Quoted rent changed from $3,964.00 to $3,175.00"

    d.   On March 15, 2020 "Move in Date changed from 3/16/2020 to 3/17/2020"

    e.   On March 16, 2020 "An occupant has been removed. Name: Brittany Stillwell"

    f.   A true and correct screenshot Stillwell's Rent Cafe Alerts and Notifications from March 16, 2020, appears below:

1



2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17   175.   On or about March 16, 2020, Stillwell discovered that Onni used the monthly rent

18   of Apartment #2727 to qualify Stillwell's income to rent Apartment #2914. Stillwell never

19   considered leasing Apartment #2727.

20

21   176.   After Onni excluded Stillwell's foreign earned income, Stillwell's gross monthly

22   income was reduced from $50,000.00 to $13,500.00.

23   177.   Upon information and belier, on or about March 12, 2022, after receiving Stillwell's

24   proof of income, Onni arbitrarily applied a twenty (20%) reduction of Stillwell's gross

25   income to calculate a net income of $10,800.00 to disqualify Stillwell from leasing

26   Apartment #2914.

27

28

178.     On March 12, 2022, after calculating Stillwell net income, Onni increased the monthly rent for Apartment #2727 from $3,814 to $3,964, then qualified Stillwell's income for Apartment #2914 using three times the monthly rent of Apartment #2727.

179.     Based on Onni's Application Rental Criteria, when the monthly rent for Apartment #2914 was $4,498.00, Stillwell and Felder's aggregate gross income needed to be $11,245.00.

180.     Based on Onni's Application Rental Criteria, when the monthly rent for Apartment #2914 was $4, 772.00, Stillwell and Felder's aggregate gross income needed to be $11,930.00.

181.     In March 2020, Stillwell and Felder's individual and aggregate gross incomes exceeded the income requirements for Apartment #2914.

**Inferior Leasing Terms: Apartment #2118**

182.     On March 14, 2020, Onni emailed Stillwell informing her that "application for 2118 was approved" Attached to the emailed was a document titled "Welcome Letter_2118," which is incorporated by reference and attached as Exhibit U.

183.     According to the Welcome Letter_2118, monthly rent for a thirteen (13) month lease for Apartment #2118 was now $3,175.00 and Stillwell was only offered four (4) weeks of free rent and no $500.00 move-in credit.

184.     Upon information and belief, in March 2020, Onni offered similarly situated, non-African American potential renters eight (8) weeks of free rent and a $500.00 move-in rent credit for new leases that were more than twelve (12) months long.

185.     On March 14, 2020, in connection with renting Apartment #2118, Onni knowingly and intentionally offered Stillwell inferior terms, conditions, privileges, or services when

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

it offered Stillwell four (4) weeks of free rent and no $500.00 move-in credit, because of Stillwell's race and or color in violation of Cal. Civ. Code § 51(b), Cal. Gov. Code § 12955(a), 42 U.S.C. § 3604(b), 24 C.F.R. § 100.60(a)(3), and 24 C.F.R. §100.50(b)(2).

186.     On March 16, 2020, Onni provided Stillwell with an eight (8) page lease for Apartment #2118 that excluded Felder's name as an Occupant. Onni informed Stillwell that Felder could not be listed as an Occupant on the lease for Apartment #2118 until the lease was in force.

187.     On March 16, 2020, Stillwell signed a thirteen (13) month lease for Apartment #2118. The rent amount was $3,175.00 per month. The lease agreement began on March 17, 2020, and ended on April 16, 2021, ("Temporary Lease").

188.     The Temporary Lease is numbered consecutively "Page 1 of 8" through "Page 8 of 8" plus an unnumbered signature page, for a total length of (9) pages. Stillwell did not sign any addendums to the Temporary Lease. A true and correct copy of the Temporary Lease is incorporated by reference and attached as Exhibit G.

189.     The Temporary Lease was a legally valid and enforceable contract.

190.     Paragraph 10 SPECIAL PROVISIONS of the Temporary Lease states in relevant part, "The following special provisions and any addenda or written rules furnished to you at or before signing will become a part of this Lease Contract and will supersede any conflicting provisions of this printed Lease Contract form."

191.     Stillwell was not furnished any addenda or written rules until March 17, 2020, after signing the Temporary Lease.

192.  On March 17, 2020, Onni provided Stillwell with a forty-eight (48) page document that included a signed copy of the Temporary Lease, plus thirty-nine (39) pages of unsigned addenda, hereafter ("Lease Addenda.")

193.  On March 17, 2020, Onni informed Stillwell that its standard practice is to provide Lease Addenda to all residents after signing a lease because the Lease Addenda are "notices" that California requires Onni to provide to tenants. Onni confirmed a lease addendum only become part of the lease if signed by Stillwell and Onni.

194.  Paragraph 2 OCCUPANTS of the Temporary Lease states "No one else may occupy the dwelling. Persons not listed above must not stay in the dwelling for more than 7 consecutive days without our prior written consent, and no more than twice that many days in any one month."

195.  Paragraph 30 JOINT AND SEVERAL RESPONSIBILITY of the Temporary Lease states in relevant part, "Each resident is jointly and severally liable for all Lease Contract obligations. If you or any guest or occupant violates the Lease Contract or rules, all residents are considered to have violated the Lease Contract."

196.  Paragraph 32 DEFAULT BY RESIDENT states in relevant part, "You'll be in default if you or any guest or occupant violates any terms of this Lease Contract … Any of the above defaults shall be a material breach of the Lease and shall be a just cause to evict you from the dwelling."

197.  On March 16, 2020, after Stillwell signed the Temporary Lease, Onni refused to provide Stillwell with written consent for Felder to occupy Apartment #2118 pursuant to Paragraph 2 of the Temporary Lease.

198.     Upon information and belief, Onni added spouses of married couples as Occupants to the lease.

199.     Upon information and belief, Onni provided written consent allowing Occupants to similarly situated persons outside of Stillwell's protected classes.

200.     Stillwell took possession of Apartment #2118 on March 17, 2020. Onni refused to complete an initial walkthrough with Stillwell.

201.     On March 18, 2020, Onni blocked Stillwell's access to using the amenities at Hope + Flower Apartments but allowed similarly situated persons outside of Stillwell's protected classes access to use the amenities.

202.     By March 27, 2020, Felder's seven (7) consecutive days of occupancy in Apartment #2118 was a material breach of the Temporary Lease and just cause to for Onni to evict Stillwell and Felder. The material breach was a result of Onni's omission of Felder from the lease, and Onni's refusal to provide Stillwell written consent

203.     On May 23, 2020, more than sixty (60) days after singing the Temporary Lease, Onni informed Stillwell that it received Felder's credit report. Onni also informed Stillwell that she and Felder were qualified to rent apartments with monthly rents up to $20,000.00 based upon their combined incomes.

204.     On or about May 23, 2020, Onni emailed Stillwell and Felder an "updated" lease for Apartment #2118, which listed Stillwell and Felder as co-tenants. Onni informed Stillwell that it could not make her an Occupant on the "updated" lease for Apartment #2118, despite the representations Onni made to Stillwell on March 13, 2020.

205.     On May 26, 2020, Felder signed the "updated lease" for Apartment #2118 (hereafter "May 2020 Lease"). The May 2020 Lease contained the same terms and conditions as the Temporary Lease.

206.     Onni uses an 8-page template containing fifty-five (55) paragraphs, titled 'Lease Contract' that was created by the National Apartment Association, (hereafter "Standard Onni Lease"). Every Standard Onni Lease offered by Onni to Hope + Flower tenants contains the same standard contracting language.

207.     The May 2020 Lease is numbered consecutively "Page 1 of 8" through "Page 8 of 8" plus an unnumbered signature page, for a total length of (9) pages. Stillwell did not sign any addendums to the May 2020 Lease. A true and correct copy of the May 2020 Lease is incorporated by reference and attached as Exhibit H.

208.     The May 2020 Lease was a legally valid and enforceable contract.

209.     On March 13, 2020, and March 16, 2020, Onni knowingly and intentionally misrepresented to Stillwell that once it received Felder's credit report, an "updated" lease for Apartment #2118 would be executed listing Stillwell as an Occupant and Felder as the Tenant.

210.     Onni offered Stillwell inferior terms, conditions, privileges, and or services for Apartment #2118, because of Stillwell's race and or color in violation on the following dates: March 13, 2020, March 14, 2020, March 16, 2020, March 17, 2020, March 18, 2020, May 23, 2020, May 25, 2020. Onni's conduct is an act of discrimination as defined by Cal. Gov. Code § 12927(c)(1), a discriminatory housing practice as defined by 42 U.S.C. § 3602(f), and unlawful housing discrimination as defined by 24 C.F.R. §§ 100.50 (b)(2) and 100.50 (b)(3), and 24 C.F.R. § 100.70.

**RICO Scheme #5 Unlawfully Withholding Tenant Deposits**

211.	Under Cal. Civ. Codes §§ 1959.5, 1940.5(g) California law, a landlord must return the renter's security deposit, with an itemized statement of deductions, within 21 days after the renter has surrendered the rental property to the landlord.

212.	Upon information and belief, from March 2020 and at the time of filing this complaint, Onni developed and continues to engage in a scheme to defraud residents of Hope + Flower out of their rental deposits. Onni accomplishes this scheme by charging residents excessive fees and charges, then refusing to provide its tenants with an itemized statement of deductions as required by California law.

213.	On August 31, 2020, Stillwell completed an exit tour of Apartment #2118 with Onni, returned the key fobs, and vacated the apartment.

214.	On September 1, 2020, Onni informed Stillwell that her $500 deposit for Apartment #2118 would become the deposit for Apartment #2814 since there was no damage in Apartment #2118.

215.	In August 2022, Stillwell discovered that Onni charged her excessive fees for utilities and cleaning which equaled exactly $500.00. Specifically,

    a.	On September 1, 2020, Onni charged Stillwell $100.18 for a "Miscellaneous Income"

    b.	On September 3, 2020, Onni charged Stillwell twice for common area electric, sewer, water, gas allegedly accrued from "08/01/20 to 09/01/20." The cost of utilities totaled $189.82.

    c.	On September 3, 2020, Onni charged Stillwell $140.00 for paint and drywall, and $70 for a "clean fee"

d. The charges listed in subparagraphs a-c equal $500.00, the amount of Stillwell's deposit. Stillwell had autopay set up and became aware of Onni's excessive utility charges in August 2022.

e. In September 2020, Onni failed to return Stillwell's $500 deposit for Apartment #2118, and never provided Stillwell an itemized statement of deductions, in violation of Cal. Civ. Codes §§ 1959.5 and 1940.5(g)

f. Below is a true and correct screenshot of Stillwell's payment account for Apartment #2118 reflecting these charges:



216.    On October 26, 2020, Onni charged Stillwell a $500.00 deposit for Apartment #2814, after previously stating Stillwell's $500 deposit from Apartment #2118 would be

transferred to Apartment #2814. Stillwell had autopay set up and became aware of Onni's duplicate security deposit for Apartment #2814 in August 2022.

217.    In August 2022, Stillwell became aware of Onni's scheme to unlawfully withhold deposits from Hope + Flower residents after reading Yelp.com reviews of other Hope + Flower residents whose deposits were never returned.

**Overcharged Rent for Apartment #2118**

218.    In March 2020, Onni leasing agents informed Stillwell that the monthly rent for apartments in the Hope Tower are calculated by using the monthly rent, of any Floorplan on the 9th Floor and adding $15.00 per floor. The least expensive Floorplan B4 unit is Apartment #918 and the most expensive Floorplan B4 unit is Apartment #3618.

219.    Upon information and belief, in March 2020 the monthly rent for Apartment #918, the least expensive Floorplan B4 unit, was $2,805.00, and the monthly rent for Apartment #3618, the most expensive Floorplan B4 unit, was $3,186.00. The advertised monthly rent for Apartment #2118, was $2,995.00.

220.    Upon information and belief, the monthly rents at Hope + Flower have increased at least twenty (20) percent since March 2020.

221.    Upon information and belief, in September 2022 the monthly rent for Apartment #918 was $2,987.00. In September 2022, the advertised monthly rent for Apartment #3618, the most expensive Floorplan B4 unit available, was $3,158.00, which is less expensive than the rent Onni charged Stillwell for Apartment #2118 more than two years ago.

222.    Upon information and belief, Onni advertised and quoted a Stillwell higher rent for Apartment #2118 than similarly situated persons outside of Stillwell's protected classes.

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

223.     From March 17, 2020 until August 31, 2020, Onni overcharged Stillwell for rent six (6) times. Onni overcharged Stillwell at least $180.00 per month to rent Apartment #2118, because of Stillwell's race and or color in violation of Cal. Civ. Code § 51(b), Cal. Gov. Code § 12955(a), 42 U.S.C. § 3604(b), 24 C.F.R. § 100.60(a)(3), and 24 C.F.R. §100.50(b)(2).

**Second Refusal to Lease Apartment #2914**

224.     Onni advertised and offered Hope + Flower residents ten (10) weeks of free rent toward their new rentals of larger apartments with lease terms of at least 13 months on the following dates: July 20, 2020, August 14, 2020, August 26, 2020, September 16, 2020, October 23, 2020, and November 16. 2020.

225.     On or about August 20, 2020, Stillwell informed Onni informed she wanted to rent Apartment #2914. Onni informed Stillwell that Apartment #2914 was available for rent with a monthly rent of $4,498.00.

226.     Apartment #2914 is a Floorplan D14 and is a 1,028 square foot two-bedroom apartment in Hope Tower. In March 2020, Onni refused to rent to Stillwell Apartment #2914.

227.     All apartments with Floorplan D14 are only located in the Hope Tower at Hope + Flower Apartments from floors 9 through 36. Floors 9 – 36 in the Hope Tower have the same layout, and every Floorplan D14 apartment ends in -14. For example, Apartment #2914 is a Floorplan D14 unit located on the 29th floor of the Hope Tower.

228.     On or about August 24, 2020, Onni informed Stillwell that Apartment #2914 was no longer available for rent because the apartment needed to be painted. Onni stated the

1   painting would not be completed before September 1, 2020. Onni recommended Stillwell

2   rent Apartment #2814, which Onni stated had a monthly rent of $4,158.00.

3   229.     Based on Onni's purported monthly rent increases of $15.00 per floor, the rent for

4

5   Apartment #2814 should have been $15.00 per month less than the rent for Apartment

6   #2914.

7   230.     Notable differences between Apartment #2914 and Apartment #2814 were the

8   color of the finishings, the view of Staples Center, and the cost of rent. Apartment #2914

9   has dark brown finishings, and darker floors which Stillwell preferred. Apartment #2814

10   has light brown finishings, and lighter floors. Stillwell also preferred the view of Apartment

11   #2914 over the view of Apartment #2814. Apartment #2814 is located on the 28th floor of

12

13   Hope Tower, which Onni designated for short-term rentals and hotel stays, thus making

14   the 28th floor more prone to criminal activity.

15   231.     On or about August 24, 2020, Stillwell agreed to rent Apartment #2814 for thirteen

16   (13) months at a monthly rental rate of $4,158.00, and provided Onni with a Move-Out

17   Notice, pursuant to Paragraph 48 MOVE-OUT NOTICE of the May 2020 Lease.

18

19   232.     Stillwell's Move-Out Notice stated Stillwell would vacate Apartment #2118 by

20   11:59PM on September 1, 2020, to take possession of Apartment #2814.

21   233.     On August 26, 2020, at approximately 1:12pm, Onni emailed Stillwell a lease for

22   Apartment #2814. The monthly rent was listed as $4752.00, which was $594.00 per month

23   more expensive than the rate Onni originally told Stillwell.

24

25   234.     Onni informed Stillwell that it was no longer offering ten (10) weeks of free rent,

26   therefore the monthly rent for Apartment #2814 was now $4752.00.

27

28

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

235.      On August 26, 2020, at approximately 1:56PM, Onni emailed Hope + Flower residents, an advertisement offering Hope + Flower residents ten (10) weeks of free rent toward their new rentals of larger apartments with lease terms. The email also advertised Apartment #2914 as available with a monthly rent of $4,4998.00.

236.      On August 26, 2020, Stillwell asked a similarly situated persons outside of Stillwell's protected classes named "John" to inquire about the availability of Apartment #2914. Onni informed "John" that Apartment #2914 was "move-in ready" and confirmed Apartment #2914 was available for lease on September 1, 2020.

237.      On August 26, 2020, after confirming availability, "John" scheduled a tour of Apartment #2914. "John" informed Onni that he was out of town and would be sending an agent to view Apartment #2914 on his behalf.

238.      On August 27, 2020, Stillwell toured Apartment #2914 on behalf of "John." Immediately after touring and confirming the move-in readiness of Apartment #2914, Stillwell recorded a video of Apartment #2914 to document her findings, (hereafter, "Apartment 2914 Tour Video").

239.      Apartment 2914 Tour Video is one minute and seventeen (17) seconds in length. Stillwell uploaded the Apartment 2914 Tour Video to a secure cloud drive to make the video available and accessible for viewing. A true and correct copy of the Apartment 2914 Tour Video can be accessed and viewed at https://link.brittstillwell.com/Apt-2914-toured-on-08-27-2020 Stillwell incorporates the Apartment 2914 Tour Video by refence.

240.      Below are two true and correct screenshots taken from the Apartment 2914 Tour Video. Both screenshots are time stamped "August 27, 2020 11:00 AM"

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

- 69 -



241.   On August 27, 2020, after touring Apartment #2914, Stillwell toured Apartment #2814 and noted several things that needed repair including the refrigerator and the electricity in the guest bedroom.

242.   On August 27, 2020, at approximately 11:35am, Stillwell emailed Onni stating in part, "In addition to being cleaned, "There are several things that need to be repaired in 2814 prior to move-in. Will these repairs be completed by September 1st"

243.     On or about August 27, 2020, Onni confirmed all repairs, painting, and cleaning for Apartment #2814 would be completed before Stillwell took possession on September 1, 2020.

244.     On August 27, 2020, Stillwell showed Onni its August 26, 2020, email that advertised ten (10) weeks of free rent to other residents, and the Apartment 2914 Tour Video.

245.     On August 24, 2020, and August 27, 2020, Onni misrepresented to Stillwell that Apartment #2914 was not available for lease because of Stillwell's race and or color in violation of Cal. Civ. Code § 51(b), Cal. Gov. Code § 12955(a), 42 U.S.C. § 3604(d), and 24 C.F.R. §§ 100.50 (b)(3) and 100.50 (b)(5).

246.     On August 26, 2020, Onni offered Stillwell inferior terms, conditions, privileges, and or services for Apartment #2814, because of Stillwell's race and or color in violation of Cal. Civ. Code § 51(b), Cal. Gov. Code § 12955(a), 42 U.S.C. § 3604(b), 24 C.F.R. § 100.60(a)(3), and 24 C.F.R. §100.50(b)(2).

**Inferior Leasing Terms (Apartment #2814): August 2020 Lease**

247.     On or about August 28, 2020, Onni informed Stillwell that she was required to pay a $500.00 for transfer fee. Similarly situated persons outside of Stillwell's protected classes were not charged a transfer fee to move into larger apartments.

248.     On or about August 28, 2020, Onni agreed to honor its advertisement of ten (10) weeks free rent and offered to rent Stillwell Apartment #2814 with the monthly rent of $4158.00. According to Onni, the monthly rent of $4158.00 was equivalent to ten weeks of free rent, based on a 13-month lease.

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

249.     Onni informed Stillwell it calculated the rent for Apartment #2814 by subtracting the 10-week cost of rent for Apartment #2814, form the 13-month cost of rent, then dividing this number by thirteen (13).

    a.   Onni calculated the 10-week cost of rent dividing $4752 by four (4), making each week of rent was equivalent to $1,188.00. Ten (10) weeks of free rent was equivalent to $11,880.00.

    b.   Onni calculated the 13-month cost of rent by multiplying $4752 by thirteen (13), for total cost of $61,776.00.

    c.   The 10-week cost of rent, subtracted from the 13-month cost of rent for Apartment #2814, divided by thirteen (13) equals $3,838.15.

250.     On August 31, 2020, less than 24 hours before Stillwell was to take possession of Apartment #2814, Onni emailed Stillwell the lease for Apartment #2814. The monthly rent stated in the lease was $4752.00, not $4158.00. The lease also included a rental "concession" in the amount of $8,316.00, which was equivalent to seven (7) weeks of rent. Applying Onni's calculation for rent, the rent for Apartment #2814 was now equivalent to $4,112.00 per month.

251.     On August 31, 2020, the rent Onni offered Stillwell for Apartment #2814 was approximately $274.00 per month *more* expensive than the rates offered to similarly situated persons outside of Stillwell's protected classes.

252.     On August 31, 2020, after Stillwell complained to Onni about the terms, Onni informed Stillwell that if she did not accept the new lease terms, then Stillwell would vacate Apartment #2118 by 11:59PM on September 1, 2020, pursuant to her Move-Out Notice.

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

253.     On August 31, 2020, Stillwell was forced to accept Onni's new rental terms and higher rent, or risk being homeless during the height of the COVID-19 pandemic.

254.     On August 31, 2020, Stillwell signed a thirteen (13) month lease for Apartment #2814. The rent amount was $4,752.00 per month.   The lease agreement began on September 1, 2020 and ended on October 31, 2021 ("August 2020 Lease").

255.     The August 2020 Lease is numbered consecutively "Page 1 of 8" through "Page 8 of 8" plus an unnumbered signature page, for a total length of (9) pages. Stillwell did not sign any addendums to the August 2020 Lease. A true and correct copy of the August 2020 Lease is incorporated by reference and attached as **Exhibit I.**

256.     The August 2020 Lease was a legally valid and enforceable contract.

257.     Stillwell took possession of Apartment #2814 on September 1, 2020. At all relevant times, Stillwell was listed as the Primary Resident of Apartment #2814, where she currently resides.

258.     On August 28, 2020 and On August 29, 2020, Onni offered Stillwell inferior terms, conditions, privileges, and or services for Apartment #2814, because of Stillwell's race and or color, in violation of Cal. Civ. Code § 51(b), Cal. Gov. Code § 12955(a), 42 U.S.C. § 3604(b), 24 C.F.R. § 100.60(a)(3), and 24 C.F.R. §100.50(b)(2).

**Overcharged Rent for Apartment #2814: August 2020 Lease**

259.     Upon information and belief, Onni advertised and quoted a Stillwell higher rent for Apartment #2814 than similarly situated persons outside of Stillwell's protected classes.

260.     From September 1, 2020 until October 31, 2021, Onni overcharged Stillwell for rent thirteen (13) times. Onni overcharged Stillwell at least $274.00 per month to rent Apartment #2814, because of Stillwell's race and or color in violation of Cal. Civ. Code §

51(b), Cal. Gov. Code § 12955(a), 42 U.S.C. § 3604(b), 24 C.F.R. § 100.60(a)(3), and 24 C.F.R. §100.50(b)(2).

**Tenant Anti- Harassment Ordinance ("TAHO"): L.A.M.C. §§ 45.30 *et. seq.***

261.    On June 23, 2021, the Los Angeles City Council adopted the Tenant Anti-Harassment Ordinance #187109 ("TAHO") which prohibits the landlord's knowing and willful harassment directed at a specific tenant or tenants. TAHO applies to all residential units in the City of Los Angeles. TAHO is codified under L.A.M.C. §§ 45.30 45.30 *et. seq* and became effective August 6, 2021.

262.    Under TAHO, the unlawful harassing behavior must cause detriment or harm, such as an overpayment in rent, property damage, or wrongful eviction.  Further, the harassing conduct must have no lawful purpose. TAHO also makes violations a criminal offense. Stillwell incorporates TAHO, L.A.M.C. §§ 45.30 45.30 *et. seq l,* by reference.

263.    Onni and Onni-BC are landlords as defined by L.A.M.C. § 45.32. Stillwell is a tenant as defined by L.A.M.C. § 45.32.

264.    From September 1, 2021, until October 31, 2021, Onni knowingly and willfully overcharged Stillwell for rent twice for Apartment #2814, because of Stillwell's race and or color in violation of L.A.M.C. § 45.33(13). Each act constitutes a separate TAHO violation.

**Hope + Flower Resident Complaints About Safety via YELP REVIEWS**

265.    Upon information and belief, YELP is one of the premier marketing tools used by Onni to promote living at Hope + Flower. The YELP Reviews of Hope + Flower consistently showed a 4.0 Star Rating. However, upon information and belief, the 4.0 Star Rating was achieved through misrepresentation.

266.     Upon information and belief, Yelp was relied upon by Hope + Flower residents, like Stillwell, to remain informed of the criminal activity and safety issues at Hope + Flower, as many residents were not part of Hope + Flower's Tenant Group.

267.     Upon information and belief, many Hope + Flower residents resorted to writing YELP reviews after receiving no response from Hope + Flower management, because it was widely known that Onni management typically acknowledged YELP reviews with a reply within one business day.

268.     At the time of filing this Complaint, there are 208 reviews of Hope + Flower. The oldest review is dated January 8, 2020, and the most recent review is dated September 1, 2022. At least 122 of these reviews are one-star ratings and at least 15 of these reviews are two-star ratings, mostly from former and current Hope + Flower. Seventy-five (75) reviews are not currently recommended, and at least ten (10) one-star reviews have been removed. These numbers do not reflect the number of reviews that have been deleted by tenants like Stillwell, after being threatened or harassed by Onni, as discussed further below.

269.     Upon information and belief, many reviews containing video and photos of criminal conduct has been removed. In December 2021, Onni filed an unlawful detainer suit against Stillwell after she posted a review that contained evidence of criminal conduct at Hope + Flower. Onni offered to dismiss the suit against Stillwell and honor her leasing agreement if Stillwell agreed to remove and never repost her Yelp review.

270.     Below are excerpts from twelve (12) YELP reviews from former, current, and or prospective Hope + Flower residents. The thirteen YELP reviews, in their entirety, (hereafter "YELP Reviews") are incorporated by reference and attached as **Exhibit J**. The YELP Reviews voice concerns like the allegations made by Stillwell in this Complaint.

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

271.     On October 5, 2020, Brandon B. states in their Yelp review:

> There have also been two separate "gun incidents" within the building. Management has acknowledged one via email but provided no details other than a "gun went off." All we know is that a gun was fired and it traveled through a wall into a neighboring unit. No idea what actions were taken to prevent this from happening again.
>
> ONNI has allowed several floors to be used as "short term rentals." This was a specific concern of ours and we were told explicitly by the leasing agent that "this building will have NO short term rentals." This was a flat out lie. If we had known we would be living in a glorified hotel during this pandemic we would have never moved here.

a.   Brandon's YELP review on October 5, 2020 included four photos, one of which, upon information and belief, is a photo of a dispensary that was operated in the Hope Tower in 2020 and contained the following caption "some units are dispensaries. Which is convenient if we didn't have guns being fired all the time."

b.   Below is a true and correct copy of the photo that appears in Brandon's review:



272.    On June 28, 2020, Leo S from states on their YELP review:

Many of the 5-stars are fake or people who don't even live here or just moved in. Staff will ask you for one, which I'm sure the managers force them to do.

Pay attention to the updated reviews (and longer ones) from PEOPLE WHO ACTUALLY LIVE HERE!!!"

273.    On June 11, 2020, Luis R states in their Yelp review:

Don't be fooled. Most of the 5 star reviews are from a brokers event that My friend came to she says they incentivized people for leaving reviews and others have to be fake. I've lived here 3 months and can assure you I will not be resigning my lease.

274.    On November 29, 2021, Beejoli states in their Yelp review:

Not a safe building for women. I moved out of here after less than a year due to the fact that the management did not enforce any consequences against bad actors, and I had my safety threatened and was physically shoved by an older male resident when asking him to wear a mask. Utility prices soared while living there with no explanation, and management refused even simple help on major issues, like when my car was broken into in the supposedly secure parking lot. (It wasn't secure, the gate was broken for months on end.)

Most terrifyingly, a local woman, Heidi Planck, was murdered here at Hope+ Flower. This building is not safe. abc7.com/heidi-planck-ca…

   a.    Below is the complete web address for article about Heidi Planck that's referenced in Beejoli's Yelp review: https://abc7.com/heidi-planck-case-castaic-landfill-downtown-la-missing-woman-search/11280849/

275.    On April 28, 2022, Jennique states in their Yelp review:

BEWARE do NOT move here !! I can assure you that all of the good reviews are incentivized which should be illegal. They told my neighbor if he write a good review he would get a concession on parking. Hope and flower has great potential to be a good place to live because the building is beautiful and has more Amenities than any other building downtown but living here has been a NIGHTMARE!

My friend was robbed at gunpoint and a lady went missing here. It's been all over the news but no one in management ever tells the residents what's going on. There was also an armed robbery right in the lobby and unless you're there to witness it they just don't tell you or report anything. This building is NOT secure and it is NOT safe !

276.    On December 14, 2021, Ev A. states in their Yelp review:

They left eviction notices on my door when their online rent portal was malfunctioning and then denied doing so when confronted.

Trash will often be piling up by the trash chutes, and is almost always on the ground outside of the holding room. There was actually a time when there were filled trash bags left smack dab outside of my front door.

LASTLY AND MOST IMPORTANTLY - in the last month I was living there a local woman, Heidi Planck, was murdered 18 floors above me and they've done nothing but try to cover it up,Ä¶. There are missing person posters now surrounding the building and it's absolutely creepy. For anyone reading this I plead with you to look elsewhere, there are PLENTY of better options in Downtown LA and South Park specifically. It's simply not safe here.

277.    On October 25, 2021, K S. states in their Yelp review:

Safety is a major concern - cars and storage units broken into in our so called secured parking garage. There are units that are party houses and bring in all sorts of criminal activity into the building. Guns have been fired and people have been robbed mid day.

We cannot use our balcony and have told this to resident services and they replied with oh you think eggs being thrown on your balcony is bad I almost got hit with an Xbox controller walking in to the building.

278.    On April 11, 2022, Justin M. states in their Yelp review:

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

- 78 -

1
2
3

Don't move into Hope + Flower. Their employees entered my unit as I was still moving out, before my lease had ended, rummaged through my property, and stole the valuables they wanted -- leaving the trash they didn't want behind. I repeat -- their employees STOLE MY THINGS.

4
5
6
7

When confronted about this, residential services took ZERO ownership and said it was nobody's fault, when it's so clearly theirs. Note that this all happened while I still had my keys in my possession. When their employees were asked to return the items, they returned only some of them. Many items to this day are still missing and many are damaged.

8

279.     On March 11, 2021, Chad M. states in their Yelp review:

9
10
11
12
13

The HOPE + FLOWER APARTMENTS is a disgusting fraud, they will take your money and have you running for the hills. The staff and management team is extremely prejudiced and has been targeting people of color since I got here. I have first-hand witnessed my friends and family who visited being intimidated, harassed, and threatened by staff and security. This is heartbreaking to go through all of this, while paying price gouging rent.

14
15

The positive reviews you see on Yelp are from compensated individuals or new tenants, which haven't lived through the horrible experiences with HOPE + FLOWER APARTMENTS yet.

16
17
18

The staff is extremely prejudiced, intimidating, and harassing my African-American friends and family by continuously asking them do they live there, but never asking any other race.

19
20

280.     On August 25, 2021, Avery V. states in their Yelp review:

21
22
23
24
25
26

RACIST towards African Americans!!!! This place really hurt my feelings .I sat in the lobby and watched as groups of people came in and out. When a group of AA came in , security was right on them/us. We were in the elevator and one security guard ran in just to see where we were going and hopped right back out .:/A few of were going to the bathrooms by the pool and you literally seen the security guard running towards the area to follow . I called to report to the manager and guess what !! She basically was like "I guess I can update the staff ". No type of care . !! Don't live here !!! There's other good places !!

27

281.     On June 6, 2020, King N. states in their Yelp review:

28

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

- 79 -

I typically don't write reviews but I feel compelled to speak up: Read the rental agreement and be aware of what is being requested when applying if you are a member of a protected class. Although seemingly nice in person, Leasing agent, Chase, and Leasing Manager will demand additional items not required per rental requirements (I apologize, I actually read what I sign and know proper protocol and etiquette). Senior Property Manager, James, was understanding and agreed that it was inappropriate and would offer discrimination training to the staff. I still did not feel comfortable proceeding to secure housing at an apartment building that blatantly discriminates.

282.     On July 1, 2022, L D. states in their Yelp review:

They've been overcharging me rent since March. They not only charged me for extra parking spots and storage that I never had or signed a contract for, but they also continue to charge me late fees because I won't pay for stuff that I don't have or never signed for. Additionally, they never gave me a portion of the concessions that were promised to me in my lease, and refuse to refund the concessions I've lost as a result of them over charging me monthly.

I had my life and property threatened by a non resident and they did absolutely nothing about it. A non resident essentially broke into "secure" resident-only parking and parked in the personal spot, and when the building refused to tow him, I asked them to move after he was parked in my spot for over 8 hours. Guy was clearly on drugs that he clearly acquired/took on the property. He became aggressive, threatened my life, and attempted to ram my car. They NEVER did anything, and I've seen the guy back on property multiple times. All I can say is please please please, for your own sanity and piece of mind, listen to these reviews. I didn't take the negative ones to heart when I first moved in and this has become the single worst decision in my entire life.

283.     Upon information and belief, many of the reviews that contained videos and photos of the dispensaries and underground casino at Hope + Flower have been removed. Upon information and belief, some of Onni's responses to certain reviews have been removed.

284.     Onni was made aware of the of the alleged unsafe conditions and discriminatory practices at Hope + Flower because Onni replied and acknowledged YELP reviews from Hope + Flower residents that raised such concerns.

285.     Onni was aware of the crime occurring at Hope + Flower Apartments, as leaders of the Tenant Group often emailed Onni the concerns of its residents, often including video and photos of criminal conduct. Many residents, including Stillwell, also complained about the crime on sites like Yelp.

286.     On October 9, 2020, Onni emailed Hope + Flower Residents a Community Update that stated in relevant part:

> Dear Residents,
>
> I will begin by introducing myself as your new Assistant Property Manager. My name is Tania Martinez and I have been a Property Manager within the DTLA Onni Family for over two years…
>
> Now on to a few items that I've become familiar with in the last week since arriving at Hope and Flower: *Lease violations are 100% preventable, which to list a few specific to our community in the recent months include and are not limited to: setting fireworks on-site, illegal possession/accidental use of weapons, vandalism throughout your common areas, allowing your pets or ESA to relieve themselves in common spaces while having a perfectly adequate dog run on-site, throwing items off of balconies which is not only unsafe but also illegal, use of drones around your neighbors, harassment towards staff and fellow residents, noise/smoking disturbances, misusing parking services, etc.*

**Stillwell Complaints About Safety**

287.     Paragraph 21 PROHIBITED CONDUCT of the Standard Onni Lease states in relevant part,

> You, your occupants or guests, or the guests of any occupants, may not engage in the following activities: behaving in a loud or obnoxious manner; disturbing or threatening the rights, comfort, health, safety, or convenience of others (including our agents and employees) in or near the Community; disrupting our business activities; manufacturing, cultivating, delivering, selling, possessing with intent to

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

- 81 -

1    deliver or sell, or otherwise possessing or using a controlled substance or drug
2    paraphernalia for use with a controlled substance

3    288.    Upon information and belief, from June 2020 to December 2020 there were at least
4    
5    two shootings, multiple break-ins, and robberies at Hope + Flower. One resident told
6    Stillwell she was sitting in her bathtub when bullets came through her walls.

7    289.    At all relevant times, there were known drug dealers, including at least two illegal
8    marijuana dispensaries at Hope + Flower.

9    290.    Many residents, including Stillwell, complained about maintenance entering the
10   units of residents without notice or consent. Upon information and belief, in November
11   
12   2020, Maintenance workers stole over $30,000.00 from a resident in Apartment #2222,
13   including her Audemars Piquet watch valued at $24,123.28.

14   291.    In December 2020, after a rash of thefts from residential units, tenants at Hope +
15   Flower raised the safety concerns with Onni and asked for surveillance cameras to be
16   installed in the hallways on all residential floors.
17   
18   292.    Onni declined to install cameras in the hallways and refused and continues to refuse
19   to allow residents to install doorbell cameras, despite the rising crime and ongoing criminal
20   activity at Hope + Flower. At all relevant times, Onni placed the privacy of criminals over
21   the safety of Hope + Flower residents.
22   
23   293.    Upon information and belief, Onni allowed illegal drug distribution and gambling
24   in Penthouse 4002 of the Hope Tower, until October 2021, after the homicide of Heidi Planck
25   ("Planck"), whose corpse was thrown down the Hope Tower trash chute after Planck's death.

26
27
28

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

294.    Upon information and belief, from 2020 and at the time of filing this complaint, the following unlawful items are sold and distributed at Hope + Flower: fake Canadian Passports, firearms, cocaine, fentanyl, marijuana, and methamphetamines sold as black-market Adderall.

295.    Stillwell complained to Onni multiple times about stolen packages and stolen mail from Stillwell's mailbox, which Onni employees can access via a master key.

a.  During litigation with Onni in both unlawful detainer suits, Stillwell never received the mailed documents as stated in KTS' proofs of service, which were signed under penalty of perjury.

b.  Upon information and belief, Onni removed court related documents from Stillwell's mailbox to prevent Stillwell from defending two unlawful detainer suits.

c.  Unlawful Detainer suits filed in Los Angeles Superior Court are sealed cases. Stillwell was only able to access court documents to remain abreast of court proceedings by appearing physically in the Stanley Mosk Courthouse Records department.

d.  Most recently, on November 3, 2022 Onni emailed Stillwell stating in relevant part, "We received a Box delivery from Fedex for Brittany Stillwell today. Please come to the Front Desk of the property Hope + Flower to pick up your delivery."

e.  On November 6, 2022 Onni emailed Stillwell stating in relevant part, "The items which were dropped off at property Hope + Flower were picked up by Brittany Stillwell on 11/06/2022. On November 6, 2022 Stillwell informed Onni that she, nor anyone on her behalf, picked up any packages from Concierge in November 2022. At the time of filing this complaint, Stillwell's Fedex package has not been

1    located and Onni has refused to provide Stillwell with the tracking information for

2    the package.

3    f.   Upon information and belief, Onni is aware that its employees steal packages at

4        Hope + Flower and send out falsified emails stating residents have collected their

5        packages. Despite many complaints of theft at Hope + Flower,  Onni has not taken

6        any steps to prevent the theft of its tenants' property, packages, and deliveries from

7        the Concierge and Front Desk employees.

8

9    296.    Upon information and belief, Onni is aware of an apartment that manufactures

10   methamphetamine on the 28th floor of the Hope Tower ("Meth Lab"). Upon information and belief,

11   the drugs manufactured on the 28th floor are distributed throughout Hope + Flower and were

12   distributed at illegal gambling parties that were held in Penthouse 4002.

13

14   a.   The Meth Lab has armed guards that wear all-white hazmat suits. The guards

15       routinely prevent residents from using both stairwells on the 28th floor whenever

16       the stairs are being used to transport items to and from the Meth Lab.

17

18   b.   On November 7, 2022 Stillwell emailed Onni about two armed men with a dog that

19       chased Stillwell from the 28th floor to the 26th floor of Hope Tower.

20   c.   On December 4, 2022, a small fire in the 28th floor meth lab set off fire alarms on

21       the 28th floor. Stillwell's security cameras captured guards from the meth lab

22       preventing residents from exiting using the stairs, despite the fire alarm instructions

23       which repeatedly stated: "There has been a fire emergency reported in the building.

24       Please evacuate the building by the nearest exit. Do not use the elevators."

25

26   d.   On December 11, 2022 Stillwell's surveillance camera captured a meth lab security

27       guard chasing two men.

28

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

e.  At the time of filing this complaint, Onni has not investigated or responded to Stillwell's complaints or concerns regarding the drug distribution and meth laboratory on the 28th floor. Upon information and belief, the laboratory and distribution have been operational on the 28th floor since sometime in 2021.

297.  Upon information and belief, the Meth Lab in Hope Tower also manufactures fentanyl.

a.  Upon information and belief, on or about August 25, 2022, more than fifteen (15) boxes of chemicals, including N-Phenyl-4-piperidinamine ("Phenyl-4") were shipped from China to a business registered to an apartment on the 28th floor of Hope Tower.

b.  Phenyl-4 is a compound used to manufacture fentanyl.

c.  Below is a true and correct photo, taken by Stillwell, of the shipment of chemicals on August 25, 2022 at 5:21AM.





298.     Based on the Yelp.com and Google reviews from tenants and guests of Onni's other properties located in Los Angeles, Onni has a pattern or practice of discriminatory, unlawful, unsafe, and predatory housing practices.

**Balcony Incident: February 21, 2021**

299.     On February 21, 2021, at approximately 3:40AM Stillwell was awaken by yells and screams for help. Stillwell went to her balcony and witnessed what she believed to be a person being thrown off a balcony in the Hope Tower. Upon information and belief, the incident occurred in an apartment that was leased as a short-term rental under Level Hotel and transpired after a 'drug deal went bad.'

a.   On February 21, 2021, Stillwell followed up Onni regarding the incident and to express her concerns about safety and the lack of response from the concierge and security. A property manager laughed at Stillwell in front of several other Onni employees and told Stillwell that she was "hallucinating" because the incident "simply did not happen."

b.   Stillwell provided Onni with video of the incident, (hereafter "February 2021 Balcony Incident Video"). After receiving Stillwell's video, Onni never responded, followed-up or addressed Stillwell's safety concerns. Stillwell uploaded the February 2021 Balcony Incident Video to a secure cloud drive to make the video available and accessible for viewing.

c.   A true and correct copy of the February 2021 Balcony Incident Video can be accessed and viewed at https://link.brittstillwell.com/balconyincident-02-21-21 Stillwell incorporates the February 2021 Balcony Incident Video by refence.

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

d.  Below is a true and correct screenshot taken from the February 2021 Balcony Incident Video. The screenshot is timestamped "February 21, 2021 3:41 AM."



**Balcony Incident: July 4, 2021**

300.  On July 4, 2021, Stillwell informed Onni multiple times that residents and guests of Hope +Flower were shooting fireworks from the parking lot located across from Hope Tower, on 12th and Hope Streets.

301.  On July 4, 2021, at approximately 10:20PM Stillwell showed the Hope Tower concierge and security video of the fireworks getting "dangerously close" to Stillwell's balcony. Onni dismissed and never addressed Stillwell's concerns stating, Stillwell's balcony was "too high" for fireworks to reach.

302.     The fireworks were so close that Stillwell could see flashes from fireworks outside of her windows. On July 4, 2021, at approximately 10:27 PM Stillwell stood near the entrance of her apartments and recorded more video of the fireworks to provide proof to Onni that the fireworks were getting dangerously close to Stillwell's apartment.

    a.   At the 00:05 second mark, Stillwell's dining room and office are illuminated by the fireworks. At the 00:06 second mark, Stillwell's dining room is shown without the illuminated of the fireworks.

    b.   Below are true and correct screenshots from Stillwell's video taken from the 00:05 00:06 second marks. Both screenshots are timestamped "July 4, 2021 10:27 PM"



303.     On July 4, 2021, at approximately 10:31PM, the fireworks and pyrectics originating from the parking lot on 12th and Hope Streets looked and sounded like explosions. Stillwell began recording more video to substantiate her safety concerns to Onni about the fireworks, (hereafter "July 4, 2021 Balcony Video").

304.     Stillwell uploaded the July 4, 2021 Balcony Video to a secure cloud drive to make the video available and accessible for viewing. The July 4, 2021 Balcony Video is thirty-nine (39) seconds long and contains at least twenty (20) seconds of bright flashing lights.  A true and correct copy of the July 4, 2021 Balcony Video can be accessed and viewed at https://link.brittstillwell.com/July-4-2021-Balcony-Video Stillwell incorporates the July 4, 2021 Balcony Video by refence.

305.     Below are two true and correct screenshots taken from the July 4, 2021 Balcony Video.   Both   screenshots   are   timestamped   "July   4,   2021   10:31PM"



306.     On July 4, 2021, Stillwell was injured after a firework, originating from the parking lot on 12th and Hope Streets, was shot into the Hope Tower.

307.     Studies have shown that exposure to flickering light, can have detrimental effects and can invoke measurable physiological changes.

308.     The bright flickering lights from the July 4, 2021 Balcony Video caused measurable physiological changes in Stillwell, who has a neurodevelopmental disorder.

309.     Studies have shown that Noise-Induced Hearing Loss ("NIHL") can be caused by extremely loud bursts of sound, such as fireworks, gunshots or explosions, which

can rupture the eardrum or damage the bones in the middle ear. This kind of NIHL can be immediate and permanent. Loud noise exposure can also cause tinnitus—a ringing, buzzing, or roaring in the ears or head.

310.    The loud noise exposure on July 4, 2021 caused Stillwell to experience a constant, high-pitched ringing in both ears.  At the time of filing this Complaint, Stillwell still experiences a constant, high-pitched ringing in both ears.

311.    Studies have shown that exposure to loud noise can lead to short term impairments in cognitive function, particularly with respect to the ability to focus and remember, while some studies suggest that similar to air pollution, chronic exposure to noise pollution may increase the risk for dementia.

312.    Upon information and belief, the extremely loud bursts of sound in the July 4, 2021 Balcony Video caused Stillwell short term impairments in cognitive function.

313.    On July 4, 2021, Stillwell was injured after being exposed to more three (3) hours of bright flickering lights and extremely loud bursts of sound while inside her apartment.

314.    On or about July 5, 2021, Stillwell complained to Onni about her injuries, and the glass on Stillwell's balcony. Onni denied that fireworks were shot into Hope Tower.

315.    Onni was aware of residents shooting fireworks from Hope + Flower balconies and from the parking lot located on 12th and Hope Streets as early as October 2020 and took no actions to stop residents and guests of Hope + Flower from using illegal fireworks.

316.    In November 2020, Onni was aware of potential dangers of rioting after the 2020 United States Presidential elections and took precautions to protect residents.

317.    In November 2020, Onni emailed residents of Hope + Flower to announce the safety measures it would be taking ahead of the. Onni worked with local business owners to

1  prevent gathering in the parking lot on 12th and Hope Streets, and Onni also removed scooters to

2  prevent damage from the scooters being thrown at Hope + Flower.

3  318.    On or about July 5, 2021Stillwell threatened to sue Onni for injuries she sustained

4  during the July 4, 2021 Balcony Incident after Onni advised Stillwell to file an insurance claim for

5  any "make belief" injuries.

6

7  319.    Under Cal. Civ. Code § 1942.5(d) it is illegal for a landlord to retaliate against

8  a tenant who has lawfully and peaceably exercised any rights under the law.

9  320.    Stillwell's complaints to Onni regarding the July 4, 2021 Balcony incident

10  and other unsafe or illegal living conditions at Hope + Flower were lawful, peaceful and

11  protected activities under, Cal. Civ. Code § 1942.5(d)

12

13  **National News and Viral Social Media Coverage of July 4, 2021 Incident**

14  321.    On July 5, 2021, ABC News Los Angeles ("KABC") published an article titled,

15  "Fireworks shatter windows of downtown Los Angeles high-rise (hereafter, "KABC Article").

16  The KABC Article incorporated by reference and can be accessed at https://abc7.com/los-

17  angeles-fireworks-downtown-la-fourth-of-july-independence-day/10863971/ . The KABC

18  Article states in part:

19

20       The windows of a downtown Los Angeles high-rise were shattered when someone set off
         fireworks too close to the building. The fireworks were launched from the ground between
21       two high-rises and crashed into the window of one of the upper units. Glass and debris
         rained down onto the street below.
22

23

24  322.    The KBAC Article also contains an embedded video of a KBAC news broadcast

25  segment title "Fireworks shatter windows of downtown Los Angeles high-rise," which discusses

26  a July 4, 2022 firework incident at Hope + Flower, (hereafter, "KBAC News Segment")

27

28

323.      The KBAC News Segment is forty-three (43) seconds long and begins with a video of a firework being launched from the parking lot on 12th and Hope Street. The firework is then seen crashing into the Hope Tower. At approximately the 00:06 second mark, KBAC News Anchor "Jovana" can be heard saying,

> "take a look at what went wrong when someone set off illegal fireworks in downtown LA last night" You can see one of those fireworks launched in the air between two high-rise buildings and then crash into a window of one of the upper units. Glass and debris was spotted on the street below."

324.      The KBAC News Segment is embedded in the KBAC Article is incorporated by reference and be accessed on YouTube at the following site https://youtu.be/P4geFfXFNms At the time of filing this Complaint, the KBAC News Segment has more than 72,000 views on YouTube.

325.      On July 6, 2021, CBSLA News published an article titled, "Caught On Camera: Fireworks Collide With DTLA High-Rise Apartment Building, (hereafter, "CBSLA Article"). The CBSLA Article is incorporated by reference and can be accessed at https://www.cbsnews.com/losangeles/news/caught-on-camera-fireworks-collide-with-dtla-high-rise-apartment-building/. The CBSLA Article states in part:

> There was still broken glass on the street in downtown Los Angeles Tuesday where fireworks shattered at least one window on the Fourth of July.
>
> Dramatic video circulating on social media shows the fireworks shoot into the sky before colliding with the side of the high-rise at the intersection of Hope and 12th streets. The people setting off the illegal fireworks quickly left the scene.
>
> "I thought it looked like a war zone," Miguel Altamirano, who was home at the time, said. "It actually hit my floor. Not me, it hit the unit next to me, but it was on my floor, the 34th floor."

326.     The CBSLA Article also contains an embedded video of a CBSLA news broadcast segment title "Firework Launched Into High Rise" which discusses a July 4, 2022 firework incident at Hope + Flower, (hereafter, "CBSLA News Segment")

327.     The CBSLA News Segment is two minutes and twenty-two seconds long and starts with a female news anchor stating: "Dramatic video of fireworks slamming into the side of a downtown high-rise is blasting across social media," which is immediately followed by a male news anchor stating, "the fireworks shattered a window and as you can imagine, rattling the nerves of residents"

328.     At approximately the 0:15 second mark, cameras then cut to news anchor Kristine Lazar (@CBSLAKristine) who is standing on 12th Street in front of Hope + Flower. At approximately the 0:35 second mark, a voice states, "watch as these fireworks shoot into the sky and collide with the Hope and Flower high rise in downtown L.A." At approximately the 0:37 second mark, a video begins and shows fireworks being shot into the Hope Tower from the parking lot on 12th and Hope.

329.     The CBSLA News Segment is embedded in the CBSLA Article is incorporated by reference and be accessed on YouTube at the following site https://youtu.be/A4gM_DOt92c. At the time of filing this Complaint, the CBSLA News Segment has more than 49,500 views on YouTube. Stillwell incorporates the CBSLA News Segment by reference.

330.     On July 6, 2021, Newsweek published an article titled, "Viral Video Shows Moment Apartment Catches Fire From Rogue Firework, (hereafter, "Newsweek Article"). The Newsweek Article is incorporated by reference and can be accessed at:

https://www.newsweek.com/viral-video-shows-moment-apartment-catches-fire-rogue-firework-1607269?amp=1. The Newsweek Article states in part:

> Viral video captured the moment another apartment building was hit by a firework during the Fourth of July festivities, prompting a response from a local fire department. According to a report from KABC, a fireworks display in downtown Los Angeles resulted in a fire in a high-rise complex after one of the rockets crashed through an apartment window on Sunday at approximately 10:30 p.m. One witness known by her TikTok handle @axhleylashes confirmed with *Newsweek* that she saw the firework explode in her neighboring apartment in real time. Ashley later posted footage of the incident to her account, which has since been viewed over 7 million times and liked by over 1.5 million viewers.

> Ashley also noted with *Newsweek* that she went outside to check on her brother's vehicle, and confirmed that another car was found with a shattered windshield. Many viewers took to the comments to air grievances about the damage fireworks can cause." This is exactly why personal fireworks should be illegal," one user wrote.

331.    The TikTok video posted by witness Ashley with TikTok handle @axhleylashes is embedded in the Newsweek Article. Upon information and belief, witness Ashley with TikTok handle @axhleylashes mentioned in the Newsweek Article changed her TikTok handle to @axhley.danielle.

332.    At the time of filing this Complaint, Ashley's TikTok video from Newsweek Article (hereafter "Axhley.Danielle TikTok Video") has 1.8 million likes, and over 10,000 comments. The Axhley.Danielle TikTok Video was posted on TikTok on July 5, 2021, saved more than 72, 600 times and was shared more than 20, 200 times.

333.    The Axhley.Danielle TikTok Video, which is embedded in the Newsweek Article is incorporated by reference and can be viewed and downloaded from TikTok at https://www.tiktok.com/t/ZTRaYmwHE/. The Axhley.Danielle TikTok Video is TikTok user @axhley.danielle's top liked video on TikTok.

334.      Below are two true and correct screenshots from the Axhley.Danielle TikTok Video. The second screenshot has Stillwell's apartment, Apartment #2814, labeled with numbers 1, 2 and 3, and Apartment #3418 labeled with the number 4 :

a.   Stillwell's balcony is labeled with the number "1"

b.   Stillwell's living room is labeled with the number "2"

c.   Stillwell's bedroom is labeled with the number "3"

d.   Apartment #3418 is where the firework entered the Hope Tower and is labeled with the number "4"



335.      The Newsweek Article also states in relevant part,

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

Another clip taken from another nearby building was also posted to TikTok shortly after the firework incident. Lexie Jayy, or @lexie_jayy on the platform, is seen sitting on a friend's lap, reflecting that the fireworks display had ended. Behind her, the rogue firework flies into the apartment complex across from her building. Her video provides a clearer image of the moment of impact and the fire beginning.

Lexie's video has been viewed nearly 400,000 times and liked by over 87,000 viewers, many of whom previously viewed Ashley's video. "Lucky no one was in the unit," one viewer commented. "The glass trinkling down hurts my stomach," another added.

"I didn't think it would actually reach the building, but it hit the building," witness Andrew Yi said. "I think one of the sparks caught something on fire, and that was it. I wasn't expecting it. I've never seen anything like that in the past."

NBCLA reported that the fire had been put out by the time emergency responders arrived, and that the person or persons responsible have not yet been identified by law enforcement.

336.    The TikTok video posted by witness Lexie Jayy with TikTok handle @lexie_jayy is embedded in the Newsweek Article. At the time of filing this Complaint, Lexie Jayy's TikTok video from Newsweek Article (hereafter "Lexie Jayy TikTok Video") has 1.1 million likes, and 3,213 comments. The Lexie Jayy TikTok k Video was posted on TikTok on July 7, 2021, saved more than 21,700 times and was shared 8,677 times. The Lexie Jayy TikTok Video is TikTok user @lexie_jayy's top liked video on TikTok. The Lexie Jayy TikTok Video, is incorporated by reference and can be viewed and downloaded from TikTok at https://www.tiktok.com/t/ZTRaYEAmr/

337.    Below are two true and correct screenshots from the Lexie Jayy TikTok Video

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL
- 97 -



**July 3, 2022 Helipad Incident**

338.     On July 3, 2022, Stillwell informed Onni that several people were shooting fireworks and throwing objects from the Flower Tower helipad. Onni dismissed Stillwell's concerns as "impossible" stating that the "helipads are secure" and "no resident can access the helipad without the alarms going off"

    a.   On July 3, 2022, Stillwell provided Onni with video of people on the Flower tower helipad, (hereafter "July 2022 Helipad Incident Video").

b.  Stillwell uploaded the July 2022 Helipad Incident Video to a secure cloud drive to make the video available and accessible for viewing.

c.  A true and correct copy of the July 2022 Helipad Incident Video can be accessed and viewed at  https://link.brittstillwell.com/Helipad-Incident-07-03-22  Stillwell incorporates the July 2022 Helipad Incident Video by refence.

339.    On July 3, 2022, July 4, 2022 and July 5, 2022 Stillwell experienced severe emotional distress, and pain and suffering after observing residents and guests of Hope + Flower shoot fireworks from the parking lot on 12th & Hope Streets, as well as from the balconies residents.  Observing people throwing objects from the Flower Tower helipad also caused Stillwell severe emotional distress, and pain and suffering.

340.    Onni had knowledge of residents shooting fireworks and throwing objects from balconies since at least October 2020 and has taken no reasonable precautions to prevent foreseeable injuries.

**Locker Room A2: Storage Unit #21**

341.    On or about November 5, 2020, Stillwell contacted Onni for information about renting a storage unit. Stillwell was informed by Onni that its storage units were located inside locked storage facilities that were located inside Onni's "secure parking structure."

342.    Onni's storage units are located inside storage lockers inside of the parking structure at Hope + Flower. The parking structure has eight levels and requires card access to enter and exit. The parking structure connects the Hope and Flower Towers.

343.    On or about November 5, 2020, Onni assured Stillwell that the storage facilities were safe and monitored by surveillance. Onni stated Hope + Flower valet and security

made rounds throughout the garage frequently, due to the number of expensive vehicles parked in the parking structure.

344. Onni advertised the storage units as having "a third layer of security" because the storage units were located inside a "locked storage locker" that could only be accessed by the key fobs of residents with storage units assigned to a particular storage locker.

345. Onni advertised the storage units to residents and small businesses and informed Stillwell that members of the Los Angeles Clippers rent its storage facilities.

346. On November 7, 2020, Stillwell signed an addendum to the August 2020 Lease to lease Space 05, Storage Unit #21, located inside Locker Room A2, for $100.00 per month, ("Storage Addendum"). The Storage Addendum became effective November 7, 2020 and ended on October 31, 2021, the same date as the August 2020 Lease. A true and correct copy of the Storage Addendum is incorporated by reference and attached as **Exhibit K**.

347. Paragraph 2 LEASE CONTRACT DESCRIPTION of the Storage Addendum states in part,

> This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is here by incorporated into and made a part of such Lease Contract. Were the terms or conditions found in this Addendum very or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

348. Pursuant to Paragraph 3 GARAGE, CARPORT, OR STORAGE UNIT of the Storage Addendum, Stillwell was "entitled to exclusive possession" of her storage unit.

349. Stillwell's storage unit was not subjected to the California Self-Service Storage Facility Act, Bus. & Prof. §§ 21700-21716 et seq.

350. Stillwell's tenancy rights for her storage unit were the same as the Stillwell's tenancy rights for Apartment #2814.

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

351.     On or about November 8, 2020, began to store her belongings inside Locker Room A2, Space 05, Storage Unit #21, (hereafter, "Storage Unit #21") At all times Storage Unit #21 was locked with secured lock Stillwell purchased from Public Storage.

**Storage Unit: Retaliation / Unlawful lockout / Unlawful Eviction**

352.     On August 29, 2021, Stillwell was unable to access Storage Unit #21 because Locker Room A2 was locked with a chain and lock.

353.     Under Ca. Civil Code § 789.3(b), lockouts are illegal, and a landlord cannot prevent the tenant from gaining reasonable access to the property by "changing the locks or using a bootlock or similar methods." Tenants may only be removed from the property by a sheriff acting pursuant to a court order. An unlawful lockout is punishable as a crime under California Penal Code § 418.

354.     On August 29, 2021, the door of Locker Room A2 contained an undated letter, ("Storage Letter"), which stated:

> We are currently doing storage renovations and will need to relocate you into a new storage unit. Please take this as our written 18-day notice. We asked that you please contact us at your earliest convenience at the email below. HFresidentservices@onni.com.

355.     Below is a true and correct photo of the Storage Letter affixed to Locker Room A2. The photo taken by Stillwell on August 29, 2021. The photo is timestamped "August 29, 2021 9:12 AM" and shows the chain and lock that prevented Stillwell from accessing Locker Room A2 with her key fob.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



18   356.     On August 29, 2021, after gaining access to Locker A2, Stillwell noticed that the

19   lock on her storage unit had cut off and all the contents of Stillwell's storage unit were

20   gone. Onni informed Stillwell that the location of her belongings was "unknown."

21   357.     On August 29, 2021, Stillwell explained to the Onni property manager that her

22   father recently passed away and his funeral scheduled for September 2, 2021. Stillwell

23   informed Onni that without access to her belongings in storage, Stillwell would not be able

24   to honor her father's dying wishes.

25
26
27
28

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL
- 102 -

358.     On August 29, 2021, Stillwell called Los Angeles Police Department ("LAPD") and filed a police report after Onni refused to provide Stillwell with information about her belongings.

359.     Onni has the address, phone number, and email address of every person or business that rents storage units at Hope + Flower. Onni did not inform Stillwell that her storage unit was being renovated, or her belongings were being relocated.

360.     On August 29, 2021, Stillwell recorded video of the storage units inside Locker Room A2, (hereafter, "Locker Room A2 Video") The Locker Room A2 Video is fourteen (14) seconds in length. Stillwell uploaded the Locker Room A2 Video to a secure cloud drive to make the video available and accessible for viewing.

   a.   A true and correct copy of the Locker Room A2 Video can be accessed and viewed at https://link.brittstillwell.com/Storageunit-08-29-21

   b.   Stillwell incorporates the Locker Room A2 Video by refence.

   c.   Below are two true and correct screenshots taken from the Locker Room A2 Video Both screenshots are time stamped "August 29, 2021 9:13 AM"



361.    On November 6, 2020 Onni in an email titled, "Weekly Updates: Important Information, Onni stated in part:

no personal belongings are permitted to sit in outside of storage units or in common areas. If you are renting a storage cage, all belongings must be kept within your unit. Any items left unattended and in the exterior of cages will be removed and disposed of.

362.    On August 29, 2021, there were items left unattended in Locker Room A2, exterior of cages. At all times Stillwell's belongings were locked inside Storage Unit #21.

363. Upon information and belief, at all relevant times, Stillwell was the only Black, and African American leasing a storage unit in Locker Room A2.

364. On August 29, 2021, there did not appear to be any renovations, or preparations for renovations, as more than eighty percent (80%) of the occupied storage units inside Locker Room A2 had not been relocated.

365. Upon information and belief, Stillwell was the only resident whose property was "relocated" due to Onni's alleged renovations of Locker Room A2.

366. On August 29, 2021, Stillwell had not surrendered the premises and there was no emergency, or law reason for Onni to enter Stillwell's storage unit.

367. Pursuant to Ca. Civil Code §1954, Onni was required to serve Stillwell at least a 24-hour notice and obtain Stillwell's consent before entering her storage unit. Under Ca. Civil Code §1940.2 (a)(4) it unlawful Commit a significant and intentional violation of Ca. Civil Code §1954.

368. Upon information and belief, sometime in July 2021, Onni knowingly and willingly evicted Stillwell from her storage unit to retaliate against Stillwell for her complaints about the July 4, 2021, Balcony Incident, violation of Cal. Civ. Code § 1942.5(d)

369. On or about August 29, 2021, Onni used threat, intimidation, or coercion, or attempted to interfere by threat, intimidation, or coercion with Stillwell's exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of California, in violation of Ca. Civil Code §52.1.

370. Onni's conduct related to the Storage Unit #21 lockout and eviction of Stillwell was menacing conduct constituting a course of conduct that interfered with Stillwell's quiet

1  enjoyment of the premises and created an apprehension of harm in Stillwell in violation of

2  Cal. Civ. Code §§ 1927 and §1940.2 (a)(3).

3  371.      Onni has a duty to provide Stillwell with quiet enjoyment of the premises, pursuant

4  to Ca. Civil Code §1927.

5

6  372.      Physically removing Stillwell's possessions from her storage unit and changing the

7  locks to the unit and/or blocking the Stillwell access to her storage unit is an illegal eviction

8  tactic that violates Ca. Civil Code §§ 789.3(b) and 1940.2 (a)(3).

9  **Storage Unit: Burglary**

10

11  373.      On August 29, 2021, with Stillwell present, an Onni property manager informed

12  LAPD that Onni first became aware of thefts and break-ins of several storage units as early

13  as "June or July" 2021. Onni also stated it filed police reports each time it was made aware

14  of a theft on its property and in its storage facilities.

15  374.      Stillwell last placed additional items in Storage Unit #21 sometime in June 2021.

16
17  375.      Sometime in June 2021, Onni had actual knowledge of the unsafe conditions

18  surrounding its locker rooms and storage units and Hope + Flower and failed to take

19  reasonable precautions to prevent foreseeable injuries.

20  376.      Onni failed to inform Stillwell of the unsafe conditions once it became aware of

21  unsafe condition. The theft of Stillwell's belongings from Storage Unit #21 was a

22  foreseeable injury.

23
24  377.      Stillwell would have removed all of her belongings from Storage Unit #21 if she

25  knew about thefts and storage break-ins in June 2021.

26

27

28

378.     Storage Unit #21 is located five storage units from the entrance of Locker Room A2. A burglar would have passed more than six occupied storage units before reaching Storage Unit #21.

379.     On August 29, 2021, there was external damage to the metal door of Storage Unit #21 that was caused by the removal of Stillwell's lock. Storage Unit #21 was the only unit inside Locker Room A2 with external damage caused by the removal of a lock.

380.     Upon information and belief, Storage Unit #21 was the only unit in Locker Room A2 that was damaged, burglarized and or vandalized by the forceful entry.

381.     Upon information and belief, a special apparatus was used to cut through the metal exterior of Storage Unit #21 to remove Stillwell's belongings. At all relevant times, Hope + Flower maintenance staff and management had access to the special equipment needed to cut through the metal exterior of Storage Unit #21.

382.     Fob access is required to enter Locker Room A2, and card access is required to enter and exit the parking structure where Locker Room A2 is located.

383.     Upon information and belief, Stillwell's items were stolen from Storage Unit #21 by Onni and or the Doe Defendants, who would have needed Onni's assistance to bypass more than four layers of security to remove Stillwell's belongings from the parking structure.

**Property Stolen From Storage**

384.     Upon information and belief, Stillwell's belongings were stolen from Storage Unit #21 sometime in July 2021. Stillwell became aware of the theft on August 29, 2021.

385.     The following electronic devices stolen from Storage Unit #21 contain information required for Stillwell to access an undisclosed amount of assets belonging to Plaintiff and a company wholly owned by Stillwell, The Compliance Firm LLC:

a.   A USB containing Stillwell's passphrase for thirty (30) bitcoins, one laptop, a portable hard drive, two cellular phones, and three sim cards from three different countries that Stillwell used abroad for business purposes;

b.   On August 29, 2021, the opening price of one Bitcoin was $48,911.25 USD; and

c.   On August 29, 2021, Stillwell's thirty (30) Bitcoins were worth a total of $1,467,337.50 USD.

d.   The theft of Stillwell's cryptocurrency prevented Stillwell from retaining legal counsel to represent her company, The Compliance Firm LLC ("TCF") in several court cases. As a result, a $360,000 default judgement against TCF in a lawsuit that was barred and pre-empted by the PREP Act[10]

386.     The following items were also stolen from Storage Unit #21:

a.   More than $50,000.00 worth of Stillwell's home goods, jewelry, and personal and business property that were imported to the United States from Stillwell's former residence abroad;

b.   Stillwell's citizenship documents needed for her Native American tribal enrollment in the Muscogee (Creek) Nation of Oklahoma, including Stillwell's birth certificate and social security card; and

---

[10] FN Logistics, LLC v. The Compliance Firm LLC, et al. (Case No. 22STCV0144) pending in California Superior Court of Los Angeles County

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

     c.   Stillwell's family heirlooms, family photos and historical documents, including ancestral wills and deeds to more than one-hundred and twenty (120) acres located in Okmulgee County, Oklahoma. Upon information and belief, the land willed and deeded to Stillwell is worth approximately $500,000.00.

     d.   Plaintiff is the last *Stillwell* of her family's lineage and will not be able to replace her family's historical documents, some of which dated back to the early 1800s.

387.    Stillwell only recovered $2,500.00 for her losses, because Stillwell's insurance company applied a "special limit of liability of $2,500.00 for personal property stolen on the residence premises and are used for business purposes."

388.    Onni's dishonesty, lack of care, and overall handling of the theft of Stillwell's property caused Stillwell severe emotional distress, and pain and suffering.

**Unauthorized Storage Unit fees:**

389.    On August 29, 2021, Onni refused to provide Stillwell with a temporary location to use as a storage unit, while Onni completed its alleged renovations of Locker Room A2.

390.    Onni never stopped charging Stillwell $100.00 per month for Storage Unit #21, despite Stillwell loss of use and access in August 2021.

391.    In August 2021, September 2021, and October 2021 Stillwell provided with written and oral notice to terminate the lease terms for Storage Unit #21. Stillwell asked Onni to remove the $100 monthly storage fee from her account numerous times, most recently in August 2022.

392.     Pursuant to the Storage Addendum, the lease terms for Storage Unit #21 ended o

October 31, 2021. Stillwell did not renew the Storage Addendum or sign a new storage

addendum for her Current Lease.

393.     From August 29, 2021 until October 31, 2021, Onni over-charged Stillwell at least

three (3) months of storage fees for Storage Unit #21, which Stillwell did not have access

due to Onni's unlawful lockout and subsequent eviction.

394.     From November 1, 2021 until the time of filing this Complaint, Onni has over-

charged Stillwell at least fifteen (15) months of storage fees for Storage Unit #21, which

Stillwell does not have access to and did not agree to rent beyond October 31, 2021.

  a.   On November 1, 2021, Onni knowingly and willing charged Stillwell *twice* for

Storage Unit #21.

  b.   Onni owes Stillwell a credit of at least $1,500.00 for overcharging Stillwell at least

fifteen (15) times for storage rental fees.

395.     At the time of filing this Complaint, Onni knowingly and willfully continues

charging Stillwell for Storage Unit #21 in violation of Cal. Civ. Code § 1942.5 and has not

refunded or credited Stillwell's account.

**Discrimination & Retaliation related to Storage Unit**

396.     With respect to Storage Unit #21, Onni knowingly and willfully discriminated

against Stillwell on account of her protected classes of color and race, in violation of Cal.

Civ. Code § 51(b) and 42 U.S.C. §§ 3604, 3617, and did not subject similarly situated

persons outside of Stillwell's protected classes to the following adverse actions:

  a.   Unlawful lockout and evictions after complaining about safety issues;

  b.   Overcharging monthly storage fees despite no Storage Addendums being in force;

    c.   Overcharging monthly storage fees despite having no access to the storage unit;

    d.   Failure to Notify Stillwell of Locker Room A2 renovations, or that her belongings were being relocated;

    e.   Failure to Notify Stillwell of any alleged storage unit burglaries or theft;

    f.   Entering Stillwell's storage unit without notice or consent as required by Ca. Cvil Code § 1954; and

    g.   Physically removing Stillwell's possessions from her storage unit.

397.    From August 2021, until the filing of this Complaint, Onni knowingly and willfully overcharged Stillwell for Storage Unit #21, in violation of Civ. Code §§ 51(b), 1942.5(d), 42 U.S.C. §§ 3604, 3617, and L.A.M.C. § 45.33(13). Each of the more than fourteen (14) acts constitutes a separate act of discrimination, retaliation and a separate TAHO violation.

**Apartment #2814 Lease Renewal: (October 2021)**

398.    In August 2021, Felder informed Onni them that he would not be renewing the August 2021 Lease with Stillwell and needed to be removed from the August 2021 Lease so that Stillwell could renew her lease.

399.    On September 1, 2021, Onni informed Stillwell and Felder that Felder's needed to complete a "Notice to Vacate" form to be removed from August 2020 Lease. Onni emailed Felder a "Notice to Vacate" form "to sign as soon as possible." Felder returned the signed Notice to Vacate form on September 2, 2021. A true and correct copy of the Notice to Vacate is incorporated by reference and attached as **Exhibit L.**

400.    On or about September 5, 2021, Onni emailed and mailed Stillwell a lease renewal letter (hereafter "Renewal Letter") which offered Stillwell the following lease renewal options:

a.   Tenancy for 8 months at $4814.00 per month;

b.   Tenancy for 14 months at $4,619.00 per month;

c.    Tenancy for 15 months at $4,619.00 per month; and

d.    Month-to-month tenancy at $5,226.00 plus a $500 month-to-month fee, for a total of $5,726.00.

e.   According to the Renewal Letter, the prices were only honored through October 3, 2021. The Renewal Letter also required "a 30-day written notice-to-vacate" and a copy of "Renter's Insurance Policy"

f.   A true and correct copy of the Renewal Letter is incorporated by reference and attached as **Exhibit M.**

401.    On or about September 17, 2021, Stillwell informed Onni she wanted to renew her lease, without Felder, for fifteen (15) months with rent at $4,619.00 per month. Stillwell also asked Onni to remove the monthly storage fee of $100.00 per month from her account.

402.    On or about September 23, 2021, Onni informed Stillwell that she was required to sign her lease *in person*, because Rent Cafe would automatically require Felder's signature on the Lease since Felder was still listed as a co-tenant in Rent Cafe.

403.    On September 23, 2021, prior to Stillwell signing the lease Onni confirmed that the $100.00 monthly storage unit fee was removed, and Stillwell's account would be credited $300.00.

404.    On September 23, 2021, Stillwell provided Onni with a copy of her Renter's Insurance Policy. Onni requires all Hope+ Flower tenants to purchase personal liability insurance

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

405.     Pursuant to Paragraph 8 INSURANCE of the Standard Onni Lease, "failure to maintain personal liability insurance is an incurable breach of this Lease Contract and may result in the termination of tenancy and eviction and/or any other remedies as provided by this Lease Contract or state law."

406.     On September 23, 2021, Stillwell renewed her lease for Apartment #2814 in person with Sandra Leal, ("Leal"), the assistant property manager of Hope + Flower.

407.     On September 23, 2021, Stillwell signed a fifteen (15) month lease for Apartment #2814, with a monthly rent of $4,619.00 that began on November 1, 2021 and ends on January 31, 2023, (hereafter, "September 23, 2021 Lease").

408.     The September 23, 2021 Lease was numbered consecutively "Page 1 of 8" through "Page 8 of 8" plus an unnumbered signature page, for a total length of (9) pages. Stillwell did not sign any addendums to the September 23, 2021 Lease.

409.     Leal did not provide Stillwell with a copy of the September 23, 2021 Lease. Leal stated the countersigned lease would be uploaded to Rent Café.

410.     The September 23, 2021 Lease was a legally valid and enforceable contract.

**Cancelled September 23, 2021 Lease:**

411.     On or about October 6, 2021, Onni canceled Stillwell's September 23, 2021, Lease.

412.     On October 6, 2021, Onni sent Stillwell a new lease, via Rent Cafe for a term of fifteen (15) months and monthly rent of $5,726.00, which was the total cost of the month-to-month tenancy offered in the Renewal Letter, (hereafter "October 6, 2021 Lease")

413.     The October 6, 2021 Lease contained Felder's name and was $1,107.00 per month *more* expensive than the rent Stillwell agreed to in the September 23, 2021 Lease. Stillwell contacted Onni to inquire about the different leases.

414.     On October 6, 2021, Onni informed Stillwell it had no record of Stillwell signing the September 23, 2021 Lease, and the rental rates listed in Stillwell's Renewal Letter expired on October 3, 2021.

415.     On October 6, 2021, Stillwell signed the October 6, 2021 Lease via Rent Cafe, since she had no copy of the September 23, 2021 Lease or any other way of proving that she renewed her lease.

416.     The October 6, 2021 Lease was numbered consecutively "Page 1 of 8" through "Page 8 of 8" plus an unnumbered signature page, for a total length of (9) pages. Stillwell did not sign any addendums to the October 6, 2021Lease.  The October 6, 2021 Lease began on November 1, 2021 and ends on January 31, 2023.

**Cancelled October 6, 2021 Lease / Refused Rent / Refusal to Lease**

417.     On or about October 27, 2021, Onni rejected and refunded Stillwell's October 2021 rent payment.

418.      On or about October 27, 2021 blocked Stillwell and Felder's access to Rent Cafe, which prevented Stillwell from paying her rent, viewing her ledger, and accessing her lease renewal documents.

419.     Stillwell became aware of Onni's October rent payment rejection and Rent Cafe lockout on October 28, 2021, when Onni contacted Stillwell to schedule a move-out inspection, pursuant to Onni's purported "courtesy" seventy-two (72) hour end of lease process.

420.     On October 28, 2021, after Stillwell informed Onni that she renewed her lease, Onni informed Stillwell that the October 6, 2021 Lease was "void" and not being honored because Stillwell had not paid rent in October 2021. Onni then told Stillwell she would not

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

be out of Apartment #2814 by 11:59PM on October 31, 2021, which was the end date of the August 2020 Lease.

421.    Onni *never* served Stillwell with a 3-Day Notice for October 2021 Rent, and never explained why they rejected and refunded Stillwell's October 2021 rent payment.

422.    On October 28, 2021, Stillwell informed Onni that she would be suing Onni for its retaliatory and discriminatory leasing practices, including Onni's refusal to honor Stillwell's September 23, 2021 Lease.

423.    On October 28, 2021, after Stillwell's threats of litigation, Onni agreed to renew Stillwell's lease, *only* if she paid her October rent via "certified fund," in the amount of $5562.03, drawn from *Felder's* bank account by 5:00PM on Friday, October 29, 2021. Onni also informed Stillwell that the payment would need to include a $100 late fee.

424.    On October 28, 2021, Stillwell informed Onni that Felder was "on the East Coast," and it was "after close of business there," so Felder would not be able to make it to the bank until October 29, 2021, thus making Onni's deadline impossible, unless Felder took a last-minute flight to Los Angeles. Onni refused October 2021 rent from Stillwell.

425.    On Friday, October 29, 2021, Felder was forced to take a last-minute flight to Los Angeles, California to present Onni with certified funds drawn from *his* banking account.

426.    At approximately 3:00PM on October 29, 2021, Stillwell and Felder presented Onni with a certified check, drawn from Felder's banking account, in the amount of $5562.03.

427.    Leal refused to speak with Felder and Stillwell, until approximately 4:30PM, after Stillwell complained to Onni's regional manager, James O'Neill ("O'Neill"). When Leal

finally agreed to speak with Stillwell, Leal informed Stillwell that Felder would remain on Stillwell's lease until Felder provided a sixty (60) day notice.

428.     Stillwell provided Leal with a copy of her Renewal Letter, which required "a 30-day written notice-to-vacate," along with a copy of Felder's "Notice to Vacate," which Felder signed and returned to Onni via email on September 2, 2021. Leal refused to honor Felder's Notice to Vacate or the terms of Renewal Letter

429.     October 29, 2021, Leal agreed to release Felder from the August 2020 Lease, effective October 31, 2021, *only* after both Stillwell and Felder signed a form titled Release of Roommate(s) and/or Additional Roommate(s) form, ("Release of Roommates,").

430.     On October 29, 2021, Stillwell and Felder signed the Release of Roommates, and Felder was released from any legal liability relating to Apartment #2814 arising after October 31, 2021. A true and correct copy of the Release of Roommates is incorporated by reference and attached as **Exhibit D.**

**October 29, 2021 Lease**

431.     On October 29, 2021, *after* Stillwell and Felder signed the Release of Roommates, Leal informed Stillwell that Onni would not be able to renew Stillwell's lease without completing a credit check, and without Stillwell providing proof of income for the prior three months, which could take up to "3 to 5 business days" to complete, since it was "after 5:00PM on a Friday."

432.     Stillwell and Felder were not subjected to a second tenant screening process when they signed the August 2020 Lease. Stillwell was *not* subjected to a second tenant screening process when she signed the September 23, 2021 and October 6, 2021 Leases.

433.     Upon information and belief, in October 2021, Onni was allowing people to stay at Hope + Flower Apartments for more than six (6) months via short term rentals and did not require background checks, credit checks, or proof of income for short term rentals.

434.     On October 29, 2021, Stillwell informed Leal that she was reporting Onni. to California Department of Fair Employment and Housing ("DFEH"). After Stillwell's complaints Leal allowed Stillwell to renew her lease and agreed to credit Stillwell's account for $300.00 for Storage Unit #21.

435.     On October 29, 2021, Stillwell provided Leal with a third copy of her rental insurance and. Stillwell signed lease for a term of fifteen (15) months with a monthly rent of $5,726.00, ("October 29, 2021 Lease").

436.     The October 29, 2021 Lease was numbered consecutively "Page 1 of 8" through "Page 8 of 8" plus an unnumbered signature page, for a total length of (9) pages. Stillwell did not sign any addendums to the October 29, 2021 Lease. The October 29, 2021 Lease began on November 1, 2021 and ends on January 31, 2023.

437.     Leal did not provide Stillwell with a copy of the October 29, 2021 Lease. Leal stated the countersigned lease would be uploaded to Rent Café, however Stillwell's Rent Cafe access remains deactivated.

438.     Onni refused to provide Stillwell a copy of her lease until December 15, 2021, as discussed further below.

**Current Lease**

439.     On December 15, 2021, Onni emailed Stillwell a lease (hereafter, "Current Lease").

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

- 117 -

440.     Pages 1-8 of the Current Lease were the first eight (8) pages of the September 23, 2021 Lease. Onni had previously told Stillwell it had no record of her signing the September 23, 2021 Lease.  The monthly rent listed in the Current Lease was $4619.00.

441.     The signature page of the Current Lease is the signature page from the October 6, 2021 Lease. The signature page is the only difference between the September 23, 2021 Lease and the Current Lease. A true and correct copy of the Current Lease is incorporated by reference and attached as **Exhibit B.**

**Apartment #2814 Current Lease Renewal: (December 2022)**

442.     Stillwell's Current Lease ends on January 31, 2023. Pursuant to the lease agreement, Onni should have provided Stillwell with lease renewal options at least sixty (60) days prior to the end of Stillwell's Lease.

a.   Onni provides similarly situated tenants outside of Stillwell's protected class renewal options at least sixty (60) days prior to the expiration of their leases.

b.   At the time of filing this Complaint, Onni has not provided Stillwell with lease renewal options for her Current Lease.

c.   Onni provides similarly situated tenants outside of Stillwell's protected class renewal options at least sixty (60) days prior to the expiration of their leases.

d.   Stillwell's Current Lease defaults to month-to-month effective February 1, 2023.

**Discrimination related Lease Renewals (September-October 2021 & December 2022)**

443.     With respect to the lease renewals for Apartment#2814, from September 2021 until the filing of this Complaint; Onni knowingly and willfully discriminated against Stillwell on account of her protected classes of color and race, in violation of Cal. Civ.

Code § 51(b) and 42 U.S.C. § 3604, and did not subject similarly situated persons outside of Stillwell's protected classes to the following adverse actions:

    a.  Requirement that lease renewals to be signed in person;

    b.  Refusal to provide September 23, 2021 Lease, October 6, 2021, and October 29, 2021 leases within fifteen (15) days as required by Cal. Civ. Code § 1962;

    c.  Advertised, quoted and charged Stillwell higher rent for Apartment #2814;

    d.  Cancelation or termination of rental agreement without lawful cause;

    e.  Refusal to honor lease renewals and lease renewal offers without lawful cause;

    f.  Rejecting, refusing, and refunding rental payments without lawful cause;

    g.  Revoking privileges to view ledgers, utility statements, reserve amenities and request maintenance service in Rent Cafe, without lawful cause;

    h.  Application of different income requirements, rental standards, and qualification criteria for Stillwell to renew the lease Apartment #2814; and

    i.  Offering Stillwell inferior terms, conditions, privileges, or services in connection with renting Apartment #2814

444.    From September 1, 2021 through December 15, 2022, Onni knowingly and willfully took at least twenty (20) adverse actions against Stillwell because of her color or race, in violation of Civ. Code § 51(b), 42 U.S.C. § 3604, and L.A.M.C. § 45.33(13).

    a.  Each of the acts constitutes a separate act of discrimination and a separate TAHO violation.

**Service of Process on Onni-BC Pursuant to Cal. Civ. Code § 1962.7**

445.    Under Cal. Civ. Code § 1962(a)(4) Onni was required to provide Stillwell with a copy of her lease within 15 days of the signing.

446.     Onni provided Stillwell a copy of the Current Lease on December 15, 2021, which is eighty-three (83) days after Stillwell signed the September 23, 2021 Lease.  Onni was required to provide Stillwell with a copy of her lease by October 7, 2021.

447.     Each day beyond the 15th day of Stillwell signing the September 23, 2021 Lease is a separate violation of Cal. Civ. Code § 1962.

448.     Cal. Civ. Code § 1962.7 states:

> In the event an owner, successor owner, manager, or agent specified in Section 1961 fails to comply with the requirements of this chapter, service of process by a tenant with respect to a dispute arising out of the tenancy may be made by registered or certified mail sent to the address at which rent is paid, in which case the provisions of Section 1013 of the Code of Civil Procedure shall apply.

449.     Cal. Civ. Code § 1962(d) states that "a party who enters into a rental agreement on behalf of the owner who fails to comply with this section is deemed an agent of each person who is an owner"

450.     Onni entered the September 23, 2021 Lease on behalf of its parent company, Onni-BC, and failed to comply with the requirements of Cal. Civ. Code §1962. Onni is an agent of Onni-BC under Cal. Civ. Code § 1962(d).

451.     **Onni-BC** is an owner, successor owner, manager, or agent specified in Cal. Civ. Code § 1961 that failed to comply with the requirements of Cal. Civ. Code §1962.

452.     Stillwell's verified Complaint in this above-refenced suit is a dispute arising out of Stillwell's tenancy. Hope + Flower's address is the address at which Stillwell's rent is paid.

453.     Pursuant to Cal. Civ. Code § 1962.7, Stillwell's service of process of this instant verified Complaint on **Onni-BC** may be made by registered or certified mail sent to: 1201 S. Hope

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

- 120 -

454.     From October 8, 2021 until December 15, 2021, Onni knowingly and willfully refused to provide Stillwell a copy of her September 23, 2021 Lease sixty-eight (68) times, because of her color or race, in violation of Civ. Code § 51(b), 42 U.S.C. § 3604, and L.A.M.C. § 45.33(13).

    a.   Each of the sixty-eight (68) acts constitutes a separate act of discrimination and a separate TAHO violation.

**Overcharged Rent for Apartment #2814 – Current Lease**

455.     In September 2021, Stillwell renewed the August 2020 Lease for 15 months and Stillwell's monthly rent decreased from $4752.00 to $4619.00, which is Stillwell's current monthly rent. When Stillwell questioned Onni about her rent, she was informed all rental rates were *increased* by ten (10) percent, which is the maximum rate allowed by law in Los Angeles, California.

456.     Upon information and belief, the monthly rents at Hope + Flower have increased at least twenty percent (20%) since August 2020.

457.     In September 2022, Stillwell pretended to be a similarly situated White woman named "Jane" and applied to rent Apartment #3314, which was the most expensive Floorplan D14 apartment available. Apartment #3314 is five floors above Stillwell's unit, Apartment #2814.

458.     On September 18, 2022, the monthly rent range listed on Hope + Flower's website for Apartment #3314 was "$4,603 - $10,017."

459.     In September 2022, Onni offered to rent Apartment #3314 to "Jane" for $4,606.00 per month with a lease of 13 months or 15 months. Below is a true and correct screenshot of "Jane's" applicant portal, taken by Stillwell on September 18, 2022.

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

460.     On or about September 18, 2022, Onni informed "Jane" that once she submits her application and Jane's documentation is verified, the rental rate for Apartment #3314 will likely *decrease*. According to Onni, the quoted rent of $4,606.00 was the most expensive rate for Apartment #3314.

461.     Upon information and belief, on or about October 1, 2022, Onni rented Apartment #3314 to a similarly situated person outside of Stillwell's protected classes for a monthly rent of $4,267.00.

462.     In March 2020, Onni informed Stillwell that rent increases $15.00 per floor. Based on Onni's purported pricing to Stillwell, Apartment #3314 should have been

approximately $75.00 per month *more* expensive than Apartment #2814, because it was five floors higher than Apartment #2814.

463.     *Excluding* the 10% rental increase that occurred between September 2021 and September 2022, Stillwell's rent in Apartment #2814 is currently $352.00 per month *more* expensive than Apartment #3314.

464.     From November 1, 1, 2021 until October 27, 2021, Onni knowingly and willfully overcharged Stillwell for rent fourteen (14) times. Onni overcharged Stillwell at least $274.00 per month to rent Apartment #2814, because of Stillwell's race and or color in violation of Cal. Civ. Code § 51(b), Cal. Gov. Code § 12955(a), 42 U.S.C. § 3604(b), 24 C.F.R. § 100.60(a)(3), 24 C.F.R. §100.50(b)(2), and L.A.M.C. § 45.33(13).

   a.   On November 1, 2021 charged twice for rent

   b.   On October 27, 2022 billed for November 1, 2022 rent

   c.   Each of the fourteen (14) acts constitutes a separate act of discrimination and a separate TAHO violation

**Death of Heidi Planck at Hope + Flower**

465.     On October 1, 2021, Stillwell informed Onni that she received death threats in relation to litigation involving Stillwell's company, The Compliance Firm. Stillwell provided Onni with a copy of a LAPD police report regarding the threats, and asked Onni for permission to mount a doorbell camera.

466.     On October 1, 2021, Onni refused Stillwell's request to mount a Ring doorbell camera, but assured Stillwell that concierge would not send any persons to the 28th floor of Hope Tower without first confirming with residents.

467.     On or about October 26, 2021, Stillwell became aware of a missing person, Heidi Planck, ("Planck") who, upon information and belief was murdered at Hope + Flower on or about October 17, 2021. According to multiple news reports, "Planck's dog was found three hours after Planck was last seen, on the 28th floor of a high-rise building downtown," and the "owners of the apartment complex are reportedly refusing to cooperate with investigators and have refused requests to search the building, parking structure and security footage."

468.     On or about October 26, 2021, Stillwell informed Onni that she saw what Stillwell believed to be Planck's body being pulled from the trash chute after becoming stuck in the chute between the 29th and 28th floors in the Hope Tower. Stillwell raised her safety concerns with Onni and asked Onni if she could mount a Ring camera for safety reasons since there are no cameras on the hallways on the 28th floor of the Hope Tower.

469.     On or about October 26, 2021 Onni told Stillwell that Planck's disappearance was not related to Hope +Flower and Stillwell likely witnessed "influencers" filming a Halloween themed skit. Onni then reiterated the large number of social media influencers that resided at Hope + Flower, then threatened to terminate Stillwell's lease if she mounted a Ring doorbell camera.

470.     On November 10, 2021 CBS News reported, "The never before seen security tape of Planck in downtown LA shows her walking her dog in an alleyway behind the Hope and Flower Building where just hours later, her dog was found wandering around the 28th floor alone."

a. The November 10, 2021 CBS News article can be accessed at the following web address: https://www.cbsnews.com/losangeles/news/exclusive-new-video-shows-heidi-planck-in-downtown-la-less-than-an-hour-after-she-was-last-seen/

b. Stillwell incorporates the November 10, 2021 CBS News article by reference.

471. On or about November 11, 2021 three Los Angeles news stations, NBC Los Angeles, KTLA, and ABC7 also reported "security tape of Planck in downtown LA shows her walking her dog in an alleyway behind the Hope and Flower Building."

a. The November 11, 2021 NBC Los Angeles article can be accessed at the following web address: https://www.nbclosangeles.com/news/local/new-video-shows-missing-woman-walking-dog-heidi-planck-downtown-la/2757665/

b. The November 11, 2021 KTLA news article can be accessed at the following web address : https://ktla.com/news/local-news/video-shows-missing-mom-heidi-planck-in-downtown-los-angeles-minutes-before-her-disappearance/

c. The November 11, 2021 ABC7 news article can be accessed at the following web address: https://abc7.com/heidi-planck-new-video-downtown-los-angeles-missing/11227067/

d. Stillwell incorporates the NBC Los Angeles, KTLA, and ABC7 news articles by reference.

472. On November 29, 2021, LAPD Robbery-Homicide Division issued the following statement regarding its investigation of Planck, (hereafter "Missing Woman Investigation NR21336bb"):

The investigation has revealed Planck was last seen on October 17, 2021, at an apartment complex at 1201 S. Hope Street, in the downtown area of Los Angeles. Her dog was found in that same building. Forensic evidence was located inside the

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

- 125 -

building which has led detectives to believe an incident occurred resulting in Planck's death

The Los Angeles Police Department is requesting the community's help. Anyone who lives in the building, or was around 1201 S. Hope, on or about October 17, 2021, and has any information that may assist detectives in their investigation, is urged to contact Robbery-Homicide Division at (213) 486-6840.

473.    LAPD's November 29, 2021 Missing Woman Investigation NR21336bb can be accessed at: https://www.lapdonline.org/newsroom/robbery-homicide-division-missing-woman-investigation-nr21336bb/

    a.  Stillwell incorporates Missing Woman Investigation NR21336bb by reference.

474.    On November 29, 2021, NBC Los Angeles published a new article titled, "Police Search Landfill North of Los Angeles in Disappearance of West LA Mother Heidi Planck Evidence was found in downtown LA, where the LAPD says it believes Heidi Planck died during some kind of 'incident.' (hereafter, "November 29, 2021 NBC News Article")

475.    The November 29, 2021 NBC News Article stated in part:

The LAPD said in a statement that it appears Planck died at an apartment building in downtown LA in an 'incident,' and forensic evidence found at that building led to the landfill search. A specific area was to be unearthed at the Chiquita Canyon landfill, a privately operated site where commercial haul away trash containers from across Southern California are often dumped.

Wayne said Planck's dog was found on the 28th floor of the downtown LA building at 12th and Hope streets, but said he doesn't know how the dog got into the building and didn't think Planck knew anyone who lived there.

    a.  The November 29, 2021 NBC News Article can be accessed at: https://www.nbclosangeles.com/investigations/police-search-landfill-castaic-los-angeles-west-la-mother-heidi-planck-disappearance/2768400/?amp=1

    b.  Stillwell incorporates the November 29, 2021 NBC News Article by reference.

476.     On or about November 10, 2021, Stillwell complained to Onni about the crime and safety at Hope + Flower, including Onni's lack of cooperation with LAPD with the Heidi Planck investigation.

477.     On or about December 6, 2021, Stillwell wrote a Yelp review about Hope + Flower regarding the retaliation, safety concerns, including the climate of fear caused by Onni's lack of cooperation and dismissive response to resident's concerns about Planck's disappearance.

478.     Between November 2021 and March 2022, web sleuths called for the residents of the 28th floor of Hope Tower to be questioned by LADP and falsely alleged that residents of the 28th floor where withholding information about Planck's disappearance and murder. During this time Stillwell saw multiple people roaming around the 28th Floor of the Hope Tower claiming to be "investigating" the death of Planck.

479.     Onni's dishonesty, lack of care, and overall handling of the investigation of Planck's death caused Stillwell severe emotional distress, and pain and suffering.

480.     Stillwell's complaints to Onni regarding Heidi Planck and other unsafe or illegal living conditions at Hope + Flower were lawful, peaceful, and protected activities under, Cal. Civ. Code § 1942.5(d)

**Retaliation / Inferior Leasing Terms: Rent Cafe Resident Portal**

481.     Onni knowingly and willingly took the following adverse actions against Stillwell in retaliation because of Stillwell's complaints in October 2021 about safety and Heidi Planck, in violation of Cal. Civ. Code §§1942.5(d), 52.1 and 42 U.S.C. § 3617:

    a.  On or about October 27, 2021, Onni deactivated Stillwell's Rent Café access.

    b.  On or about October 27, 2021, Onni returned Stillwell's October 2021 rent.

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

c.   On or about October 28, 2021, Onni cancelled Stillwell's lease renewal

d.   On October 28, 2021, Onni endeavored to evict Stillwell, in violation of L.A.M.C § 49.99.2(B)

e.   On October 28, 2021, Onni refused to accept October 2021 rent from Stillwell.

f.   On October 29, 2021, Onni offered Stillwell inferior leasing terms compared to similarly situated persons outside of Stillwell's protected classes

g.   On October 29, 2021, Onni refused to provide copy of the October 29, 2021 Lease in violation of Cal. Civ. Code § 1962(a)(4).

**Rent Café' Tenant Portal**

482.   On October 6, 2021 Onni emailed Stillwell regarding its use of Rent Café:

Once activated, your Resident Services account will provide you online access to:

- Enjoy 24/7 self-service account management

- Check your balances and make payments

- Schedule recurring auto-payments for rent and other dues

- Submit maintenance requests

- Check out upcoming community events

- Much, much more!

Should your email address change, please remember to update your Resident Services account profile. Your email address must be current to receive payment notifications, community updates, and other online activity confirmations. If you have any questions, please contact us. We appreciate the opportunity to serve you.

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

483. On June 15, 2021 Onni emailed Stillwell regarding its use of Rent Café:

> Please be sure to use your Rent Cafe app to place work orders. Always be sure to include details and permissions to enter units when unavailable. Kindly allow our team 48-72 hours to follow up with pending work orders.

484. In a Community Update email dated March 24, 2022, Onni stated in part:

> Certified funds and/or personal checks will no longer be accepted. All rent payments must be submitted via resident portal starting 4.1.22. Late fees will be added to ledgers on the 4th day of each month in the amount of $100 if rent is not paid in full.

485. After Onni restricted Stillwell's Rent Café access, Stillwell was no longer able to enjoy 24/7 self-service account management, check her balances and make rent payments, schedule recurring auto-payments for rent and other dues, submit maintenance requests, reserve amenities, or check out upcoming community events.

    a. In August 2022 and October 2022 Stillwell was forced to contact YES Energy Management, ("YES") a third-party utility billing company used by Onni, to obtain copies of past utility statements.

486. At the time of filing this Complaint, Stillwell has not had access to Rent Cafe since October 2021. for 12 months, and Onni continues to refuse Stillwell access.

    a. Onni's restriction of Stillwell's Rent Café access constitutes twelve (12) separate offering of inferior terms, conditions, privileges, or services for each month that Stillwell was denied Rent Café access.

b. Onni's restriction of Stillwell's Rent Café access constitutes twelve (12) separate refusal of rent for each month that Stillwell was denied Rent Café access.

487.     On October 26, 2021, October 27, 2021, October 28, 2021, and October 29, 2021, Onni used threats, intimidation, or coercion, or attempted to interfere by threat, intimidation, or coercion with Stillwell's exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of California, in violation of Ca. Civil Code §52.1.

488.     Onni's conduct related to Heidi Planck's death On October 26, 2021, October 27, 2021, October 28, 2021, and October 29, 2021was menacing conduct constituting a course of conduct that interfered with Stillwell's quiet enjoyment of the premises and created an apprehension of harm in Stillwell in violation of Cal. Civ. Code §§ 1927  and 1940.2 (a)(3).

489.     At the time of filing this Complaint, Onni's restriction of Stillwell's Rent Café access constitutes twenty-four (24) separate violations of Cal. Civ. Code §§1942.5(d), 52.1 and L.A.M.C. § 45.33, for a total of seventy-two (72) violations.

**City of Los Angeles COVID-19 Emergency Renter Protections L.A.M.C. §§ 49.99 _et. seq._**

490.     On May 12, 2020, the Los Angeles City Council adopted the Temporary Protection of Tenants During Covid-19 Pandemic ("LA Eviction Ordinance") which suspends certain evictions of renters for failure to pay rent due to COVID-19 related loss of income.

491.     Section § 49.99 of LA Eviction Ordinance states in relevant part:

On March 4, 2020, the Governor of the State of California declared a State of Emergency in California as result of the COVID-19 pandemic. That same day, the Mayor also declared a local emergency.

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

- 130 -

On March 16, 2020, the Governor issued Executive Order N-28-20, which authorizes local jurisdictions to suspend certain evictions of renters and homeowners, among other protections. The Executive Order further authorizes the City of Los Angeles to implement additional measures to promote housing security and stability to protect public health and mitigate the economic impacts of the COVID-19 pandemic.

The economic impacts of COVID-19 have been significant and will have lasting repercussions for the residents of the City of Los Angeles….. As a result, many residents are experiencing unexpected expenditures or substantial loss of income as a result of business closures, reduced work hours, or lay-offs related to these government-ordered interventions.

The COVID-19 pandemic threatens to undermine housing security and generate unnecessary displacement of City residents and instability of City businesses. Therefore, the City of Los Angeles has taken and must continue to take measures to protect public health, life, and property.

This ordinance temporarily prohibits evictions of residential and commercial tenants for failure to pay rent due to COVID-19 and prohibits evictions of residential tenants during the emergency for no-fault reasons, for unauthorized occupants or pets, and for nuisance related to COVID-19. This ordinance further suspends withdrawals of occupied residential units from the rental market under the Ellis Act, Government Code Section 7060, et seq.

492.   Section § 49.99.2 of LA Eviction Ordinance states in relevant part:

During the Local Emergency Period and for 12 months after its expiration, no Owner shall endeavor to evict or evict a residential tenant for non-payment of rent during the Local Emergency Period if the tenant is unable to pay rent due to circumstances related to the COVID-19 pandemic… Tenants shall have up to 12 months following the expiration of the Local Emergency Period to repay any rent deferred during the Local Emergency Period.

493.   L.A.M.C § 49.99.2(B) states, "No Owner shall endeavor to evict or evict a residential tenant for a no-fault reason during the Local Emergency Period.

494.   L.A.M.C § 49.99.2(D) states, "No Owner shall charge interest or a late fee on rent not paid under the provisions of this article."

495.     L.A.M.C § 49.99.2(F) states, "No Owner shall influence or attempt to influence, through fraud, intimidation or coercion, a residential tenant to transfer or pay to the Owner any sum received by the tenant as part of any governmental relief program."

496.     L.A.M.C § 49.99.7 states in relevant part, a civil proceeding by a residential tenant under this section shall commence only after the tenant provides written notice to the Owner of the alleged violation, and the Owner is provided 15 days from the receipt of the notice to cure the alleged violation.

497.      L.A.M.C § 49.99.1(B) defines "Endeavor to evict" as conduct where the Owner lacks a good faith basis to believe that the tenant does not enjoy the benefits of this article and the Owner serves or provides in any way to the tenant: a notice to pay or quit, a notice to perform covenant or quit, a notice of termination, or any other eviction notice.

498.     L.A.M.C § 49.99.1(C) defines "Local emergency period" as the period of time from March 4, 2020, to the end of the local emergency as declared by the Mayor.

499.     Onni-BC and Onni are each an Owner as defined by L.A.M.C § 49.99.1(E).

500.     Hope + Flower Apartments are a "Residential real property" as defined by L.A.M.C § 49.99.1(F).

501.     Upon information and belief, the Local emergency period ends on January 31, 2023. Tenants must pay any rent deferred during the Local Emergency Period by February 1, 2024.

**Endeavor to Evict – November 2021**

502.     On November 3, 2021, Stillwell informed Onni that she applied for COVID-19 rental assistance through Housing is Key ("HIK"). Stillwell also provided Onni with a notice of her inability to pay rent due to circumstances related to the COVID-19 pandemic (hereafter, "November 2021 COVID-19 Declaration). A true and correct copy of the November 2021 COVID-19 Declaration is incorporated by reference and attached as **Exhibit N**.

503.     On November 9, 2021, Onni served Stillwell a 3-Day Notice to Pay Rent or Quit, for payment of November 2021 rent, in the amount of $4,752.00 (hereafter, "November 2021 Notice to Quit"). In November 2021, Stillwell's rent was $4,619.00 per month, *not* $4,752.00.

a.   On November 9, 2021, Onni also served Stillwell with Notice to Cure Covenant or Quit, for payment of $171.82 that was due on November 1, 2021 for Stillwell's utilities, ("Notice to Cure Covenant").

b.   According to Stillwell's utility statement that was due on November 1, 2021, ("November 2021 Utility Statement") the total amount of Stillwell's utilities that were due on November 1, 2021, were $156.41, *not* $171.82 as stated in Notice to Cure Covenant.

c.   The November 2021 Notice to Quit and Notice to Cure Covenant, (collectively, "November 2021 Notice to Quit and Cure") were served together. A true and correct copy of the November 2021 Notice to Quit and Cure is incorporated by reference and attached as **Exhibit O.**

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

- 133 -

504.     In August 2022, Stillwell obtained a copy of the November 2021 Utility Statement from YES.

    a.   November 2021 Utility Statement has statement date of October 22, 2021 and covers "Billing Period: 8/31/2021 – 9/30/2021."

    b.   According to the November 2021 Utility Statement, Onni charged Stillwell $4,752.00 for "Rent (11/2021)," $100.00 for "Storage," and $12.00 for "Resident Liability Waiver."

    c.   The November 2021 Utility Statement states Stillwell's total amount due on November 1, 2021 was **$10,487.44.**

    d.   A true and correct of Stillwell's November 2021 Utility Statement is incorporated by reference and attached as **Exhibit P.**

505.     The November 2021 Utility Statement and the November 2021 Notice to Quit and Cure both reported Stillwell's rent and Stillwell's utilities that were due on November 1, 2021; However, there is a discrepancy of **$5,563.62** between the amounts due in November 2021 Utility Statement versus the November 2021 Notice to Quit and Cure.

    **a.**   On November 1, 2021, Stillwell did not have a past due balance and could not have had a past due balance on November 1, 2021. November 2021 was the first month of Stillwell's new lease.

    **b.**   On October 29, 2021, Onni required Felder to pay Stillwell's outstanding balance on the August 2020 Lease, before allowing Stillwell to renew her lease.

506.     On November 10, 2021, pursuant to L.A.M.C § 49.99.7, Stillwell informed Onni that the November 2021 Notice to Quit and Cure was sent in violation of L.A.M.C § 49.99.2(B).

507.     On November 13, 2021, Onni emailed Stillwell stating in part, "Unfortunately, there is no record of any payment being posted to your account on October 29th"  As discussed above, on October 29, 2021 Felder was forced to fly to Los Angeles to present Onni with certified funds.

508.     Onni served the November 2021 Notice to Quit and Cure in bad faith and endeavored to evict for non-payment of rent during the Local Emergency Period because Stillwell unable to pay rent due to circumstances related to the COVID-19 pandemic.

**Malicious Prosecution – December 2021 Unlawful Detainer Complaint**

509.     On December 7, 2021, Evans and KTS filed an unlawful detainer complaint, *Onni Real Estate IX, LL vs Brittany Stillwell, et al.*  Case No. 21STUD03349, in Los Angeles Superior Court, ("December 2021 Unlawful Detainer Complaint").  Evans and KTS filed the Unlawful Detainer on behalf of Onni, for Stillwell's alleged nonpayment of rent, in the amount of $4,752[11] that was due to Onni on November 1, 2021.

510.     The December 2021 Unlawful Detainer Complaint included Form UD-101, Plaintiff's Mandatory Cover Sheet and Supplemental Allegations – Unlawful Detainer ("Supplemental Allegations").

    a.  Paragraph 3 of the Supplemental Allegations states in relevant part,

> Before filing the complaint in this action. Plaintiff completed an application for governmental rental assistance to cover the rent or other financial obligations demanded in this action, including all the required contact information and documentation, **and all** of the following are true: At least 20 days have passed since…. The date the plaintiff submitted the completed application. **And** Plaintiff has not received any notice from the governmental agency to which defendant has applied for governmental rental assistance to cover the rent or other financial obligations demanded from the defendant in this action. **And**

---

[11] On November 1, 2021 Stillwell's rent was $4,619.00 not $4,752.00

Plaintiff was not received a communication from the defendant that defendant has applied for governmental rental assistance to cover the rent or other financial obligations demanded from the defendant in this action.

b. Paragraph 3 of the Supplemental Allegations also states "Verifications required for issuance of summons-residential (Code Civ. Proc., § 1179.11(a) The Complaint and Supplemental Allegations were both verified under penalty of perjury by Sandra Leal, ("Leal"), an "Assistant Manager for Onni.

511.    As described in detail below in the allegations regarding Onni's COVID-19 rental assistance scheme:

a. In December 2021 Stillwell was unaware that Onni applied for rental assistance on her behalf.

b. Stillwell's November 2021 COVID-19 Declaration, which is attached as Exhibit N, contained a Verification of Program Participation in California's Housing is Key ("HIK") rental assistance through. Under penalty of perjury, Onni stated that as of December 7, 2021 Stillwell had not applied for governmental rental assistance, despite the HIK Verification of Program Participation stating, "Application Submission Date: 10/20/2021"

c. In December 2021 Onni attempted to unlawfully evict Stillwell while her application for rental assistance was pending.

d. As a part of its COVID-19 rental assistance scheme, Onni refused to complete the Landlord's portion of Stillwell's application for nearly five (5) months. Onni sought approval for the rental assistance application it filed sometime in September 2021, without Stillwell's knowledge. Stillwell became aware of Onni's rental assistance scheme sometime around August 2022.

e.   A true and correct copy of the December 2021 Unlawful Detainer Complaint and Supplemental Allegations is incorporated by reference as **Exhibit Q**.

512.   Pursuant to L.A.M.C.§ 49.99.2 Stillwell's November 2021 rent is due by February 1, 2024.

513.   On or about December 9, 2021, Onni contacted Stillwell and offered to dismiss the December 2021 Unlawful Detainer Complaint against Stillwell and honor her September 23, 2021 Lease if Stillwell agreed to remove her Yelp review about Heidi Planck's death and other criminal activity at Hope + Flower. Stillwell deleted the Yelp review on or about December 9, 2021.

514.   Stillwell's Answer to the December 2021 Unlawful Detainer Complaint was due on December 15, 2021. At 8:00AM on December 15, 2021 Onni had not dismissed the December 2021 Unlawful Detainer Complaint as promised.

515.   On December 15, 2021 at 8:56AM, Stillwell texted Onni Regional manager James O'Neill ("O'Neill") the following:

Good morning James. This is Brittany Stilwell. We spoke last week about the unlawful eviction suit. You stated someone from H+F would be contacting me - that hasn't happened. I also don't see where the case has been dismissed. My reply is due today in court. Please confirm by 12p that the case has been dismissed. Otherwise I'll proceed with a reply and counter-suit

516.   On December 15, 2021 at 12:40PM, Stillwell texted O'Neill the following:

Hi James. I spoke with Travis and he confirmed that the eviction suit was dismissed. I also wanted to confirm that the Yelp review has since been removed. Thanks so much for your assistance. Regarding this matter!

517.   O'Neill did not respond to either of Stillwell's text until December 20, 2021 at 4:36PM.

518.     Below is a true and correct screenshot of text messages Stillwell sent to O'Neill on December 15, 2021.



Awesome and sounds great, I am glad this is sorted out. Please work with Sandra and team to lock in your renewal. Once payment was made they should lock in renewal

Will do! Thanks again!

Wed, Dec 15, 8:56 AM

Good morning James. This is Brittany Stillwell. We spoke last week about the unlawful eviction suit. You stated someone from H+F would be contacting me – that hasn't happened. I also don't see where the case has been dismissed. My reply is due today in court. Please confirm by 12p that the case has been dismissed. Otherwise I'll proceed with a reply and counter-suit

Wed, Dec 15, 12:40 PM

Hi James. I spoke with Travis and he confirmed that the eviction suit was dismissed. I also wanted to confirm that the Yelp review has since been removed. Thanks so much for your assistance. Regarding this matter!

519.     On or about December 15, 2021, Evans and KTS filed a Request for Dismissal of the December Unlawful Detainer ("December 2021 Request for Dismissal"). The December 2021 Request for Dismissal was granted.

520.     On December 15, 2021, Onni emailed Stillwell with a copy of its request for dismissal and finally provided Stillwell, with a copy of her current lease. A true and correct copy of the request for dismissal that Onni emailed to Stillwell on December 15, 2021,

("December 2021 Request for Dismissal) is incorporated by reference and attached as **Exhibit C**.

521.     Onni endeavored to evict for non-payment of rent during the Local Emergency Period because Stillwell unable to pay rent due to circumstances related to the COVID-19 pandemic.

522.     Onni also endeavored to evict Stillwell in violation of L.A.M.C § 49.99.2 and to retaliate against Stillwell's against Stillwell's safety complaints and Yelp Review!!! The December 2021 Unlawful Detainer Complaint was filed in bad faith, and in furtherance of schemes to defraud Stillwell and California's COVID-19 rental assistance program.

523.     Onni knowingly and willingly took the following adverse actions against Stillwell in retaliation because of Stillwell's complaints in October 2021 about safety and Heidi Planck, in violation of Cal. Civ. Code §§1942.5(d), 52.1 and 42 U.S.C. § 3617:

    a.   On November 9, 2021, Onni served Stillwell a 3-Day Notice to Pay Rent or Quit

    b.   November 9, 2021, Onni also served Stillwell with Notice to Cure Covenant or Quit

    c.   On December 7, 2021 filed December 2021 Unlawful Detainer Complaint

524.     On or about November 9, 2021 and December 7, 2021, Onni used threats, intimidation, or coercion, or attempted to interfere by threat, intimidation, or coercion with Stillwell's exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of California, in violation of Ca. Civil Code §52.1

525.     Onni's retaliatory conduct related in November 2021 and December 2021, was menacing conduct constituting a course of conduct that interfered with Stillwell's quiet

enjoyment of the premises and created an apprehension of harm in Stillwell in violation of Cal. Civ. Code §§ 1927 and 1940.2 (a)(3).

526.     Onni's endeavors to evict Stillwell in November 2021 and December 2021 constitutes three (3) separate violations of Cal. Civ. Code §§1942.5(d), 52.1, and L.A.M.C. § 45.33.

**Fair Debt Collection Practices Act ("FDCPA") 15 U.S.C. §§ 1692 et seq.**

527.     Section 1692a (6) of the FDCPA defines "debt collector" as any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

528.      Attorneys who regularly engage in debt collection activity, even when that activity consists of litigation, are debt collectors as defined in the FDCPA.

529.     Attorneys and law firms who engage in eviction proceedings on behalf of landlords or residential property owners to collect unpaid residential rent are "debt collectors" as defined by the FDCPA.

530.     Evans and KTS are debt collectors" as defined by the FDCPA, 15 U.S.C. §1692(a)(6).

531.     Stillwell is a "consumer" within the meaning of the FDCPA, 15 U.S.C. §1692(a)(3).

532.     Pursuant to 15 U.S.C. § 1692, Stillwell has a congressionally defined right to receive all communications from a debt collector free from any misrepresentations and false threats.

533.    Alleged debt pursued by Onni, KTS, and or Evans in unlawful detainers is debt primarily for personal, family or household purposes and is therefore a "debt" as defined by 15 U.S.C. § 1692(a)(5).

534.    Pursuant to L.A.M.C.§ 49.99.2 city of Los Angeles tenants must pay any rent deferred during the Local Emergency Period by February 1, 2024.

535.    Every landlord filing an unlawful detainer in Los Angeles Superior Court during the Local Emergency Period, as defined by L.A.M.C. § 49.991(C), was required to complete Supplemental Allegations (Form UD- 101) and apply for Covid-19 rental assistance.

    a.  Eligibility for California's HIK rental assistance program required tenants to have sustained a COVID-19 related loss of income. Accordingly, if a Defendant-tenant would have needed to have a COVID-19 related loss of income, for a Plaintiff-landlord to have a pending COVID-19 rental assistance application.

    b.  L.A.M.C. § 49.992 made evictions pursuant to a COVID-19 related loss of income unlawful and made accumulated rent during the Local Emergency Period uncollectable, or not due until twelve (12) months after the expiration of Local emergency, or February 1, 2024.

    c.  Evans and KTS knowingly and willing filed hundreds of unlawful detainers that had Plaintiff-landlord pending rental assistance applications.

536.    The plain language of the FDCPA requires debt collectors to communicate the disputed status of a debt if the debt collector knows or should know that the debt is disputed.

This standard requires no notification by the consumer but depends on the debt collector's knowledge that a debt is disputed, regardless of how or when that knowledge is required. Evans and KTS knew or should have known that the debt it sought to collect during the Local Emergency Period, as defined by L.A.M.C § 49.991(C) was disputable debt, if the Plaintiff-landlord had a pending rental assistance application.

537.     Section 1692e of the FDCPA prohibits a debt collector from using any false, deceptive, or misleading representation or means in connection with the collection of any debt. Congress has found that "[a]busive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy." 15 U.S.C. § 1692(a).

538.     Section 1692d of the FDCPA prohibits any debt collector from engaging in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt. Section 1692f prohibits of the FDCPA the use of unfair and unconscionable means to collect a debt.

539.     Evans and KTS acted unconscionably by filing unlawful detainer suits on behalf of Onni during the Local Emergency Period and by attempting to collect on debts they knew or should have known, were not due.

**RICO Scheme #6– Unlawful Evictions**

540.     Upon information and belief Evans and KTS knowingly and willingly participated and or operated a scheme with Onni Group Enterprise of endeavoring to evict tenants in violation of L.A.M.C. § 49.99.2, which allowed Onni to apply and receive rental assistance after the tenant was evicted and without the tenant's knowledge.

a.   Once the tenants were evicted, Onni withdrew occupied residential units from the rental market and re-leased the units as short-term rentals, in violation of the Ellis Act, Cal. Gov. Code §§7060, et seq and L.A.M.C. § 49.99.4.

541.   Upon information and belief, from March 4, 2020 through the filing of this Complaint, KTS and Evans knowingly and willingly filed more than five hundred (500) unlawful detainers in Los Angeles Superior Court, on behalf of Onni Group Enterprise, in violation of L.A.M.C. § 49.99.2.

542.   Upon information and belief, this fraudulent scheme has harmed countless tenants throughout Los Angeles County.

543.   Upon information and belief, Defendants ~~Onni and~~ Onni-BC exercised control over Defendants Evans and KTS' attempts to collect the alleged debt via unlawful detainer lawsuits.

544.   Defendant Onni-BC is vicariously liable for Defendants Evans and KTS' actions as they had agency over determining the amount of the alleged debt that the debt collectors, Defendants Evans and KTS, were allowed to attempt to collect on their behalf.

545.   Defendant Onni is vicariously liable for Defendants Evans and KTS' actions as they had agency over determining the amount of the alleged debt that the debt collectors, Defendants Evans and KTS', were allowed to attempt to collect on their behalf.

546.   Defendants Evans and KTS would not legally be allowed to collect the alleged debt on behalf of Onni-BC and Onni if Defendants Onni-BC and Onni had not in fact given

them approval or agency to act on their behalf to collect in a manner Onni-BC and Onni had knowingly approved or permitted.

547.     Upon information and belief, Defendants Onni-BC and Onni gave Defendants Evans and KTS the green light, and thus agency, to attempt to collect the alleged debt in the manner in which Evans and KTS did.

548.     Evans and KTS each were each necessary and integral for the scheme

**Endeavor to Evict – May 2022**

549.     On May 5, 2022, Stillwell provided Onni with a notice of her inability to pay rent due to circumstances related to the COVID-19 pandemic ("May 2022 COVID-19 Declaration").

550.     On or about May 11, 2022, Onni served Stillwell a 3-Day Notice to Pay Rent or Quit, for payment of payment of May 2022 rent, in the amount of $4, 619.00 ("May 2022 Notice to Quit"). Pursuant to L.A.M.C.§ 49.99.2 Stillwell's May 2022 rent is due by February 1, 2024.

551.     Onni served the May 2022 Notice to Quit in bad faith and endeavored to evict for non-payment of rent during the Local Emergency Period because Stillwell unable to pay rent due to circumstances related to the COVID-19 pandemic.

**Threats of Intimidation and Violence**

552.     Onni Group uses threats of intimidation and violence to silence opponents and victims.  Stillwell was the victim of numerous break-in attempts and unlawful trespassing, which typically followed Stillwell's complaints about a serious safety or security issue.

553.     Onni Group's enforcers would typically pretend to be maintenance, security, or management to gain access into tenants' apartments. Once inside, some tenants were threatened and coerced to sign non-disclosure agreements, others were physically assaulted, as described in several Hope + Flower Yelp reviews of former residents.

**June 2, 2022 Maintenance Incident**

554.     On June 2, 2022, around 9:50AM, Onni sent a man pretending to be a maintenance worker to Stillwell's apartment to change her locks, in an unlawful attempt to lock Stillwell out of her apartment. The man was wearing a black Onni shirt and had a utility cart, similar to those used by Onni's maintenance workers. Later that night, on June 2, 2022, at approximately 10:00PM, the same man returned to Stillwell's apartment wearing street-clothes and attempted to enter Stillwell's apartment.

555.     On June 2, 2022, Stillwell recorded the man pretending to be an Onni maintenance worker, (hereafter, "Maintenance Video").   The Maintenance Video is thirteen (13) seconds in length. Stillwell uploaded the Maintenance Video to a secure cloud drive to make the video available and accessible for viewing. A true and correct copy of the Maintenance Video can be accessed and viewed at https://link.brittstillwell.com/10pm-Maintenance-06-02-22 Stillwell incorporates the Maintenance Video by refence.

556.     Below is a true and correct screenshot taken from the Maintenance Video, which was sent to Onni. The screenshot is time stamped "June 2 9:59 PM"

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL
- 145 -



557.    Stillwell called LAPD to report incident, however LAPD declined to take Stillwell's police report. Per LAPD, the hallways are a common area with no expectation of privacy, and only Onni could file a police report about trespassers on its property.

    a.  The concierge and security on duty informed LAPD that they did not recognize the man who pretended to be an Onni employee, and they were unaware of any emergency, or after hour maintenance requests.

    b.  The concierge and security confirmed with LAPD their process for emergency or after hour maintenance includes calling to inform the resident beforehand. They also confirmed that the maintenance man breached more than four layers of security to access Stillwell's apartment.

c.  According to Onni, the concierge and security "must follow protocol and ensure they are calling every resident every time there is a delivery or guests." Onni's protocol for emergency and non-emergency maintenance also includes notice and consent, especially or maintenance requests outside of normal business hours.

d.  Stillwell did not receive a call or notification that a maintenance would need to enter her home on June 2, 2022.

558.   Upon information and belief, Onni does not keep records of when its employees, vendors, or contractors enter a resident's home. Onni does not keep a log of its mandatory inspections. Without any oversight, Onni's employees, vendors, or contractors are given free rein to enter Stillwell's home, unlawfully, without notice or consent.

559.   Onni refuses to allow Stillwell to mount a doorbell camera despite Stillwell's multiple complaints to Onni about unsafe, menacing, and harassing conduct by Onni's employees, contractors, and vendors, who enter Stillwell's home without notice or consent.

a.  Sometime in 2022 Onni placed an "Occupied" sticker on Stillwell's door because Onni employees kept entering Stillwell's apartment without notice or consent. At the time of filing this complaint, Stillwell has been the only tenant on the 28th floor with an "Occupied" sticker on her door. According to Onni, employees enter Stillwell's apartment because Onni's system shows Apartment #2814 as "empty."

b.   Upon information and belief, Onni kept multiple books and records of occupancy and rental payments as part of its COVID-19 rental assistance schemes.

560.   Onni has failed to take steps to prevent its employees, contractors, and vendors from trespassing and unlawfully entering Stillwell's residence.

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

- 147 -

561.     Onni failed to address or investigate the June 2nd incident.  On or about June 4, 2022 Stillwell informed Onni that she filed a complaint against Onni with California Department of Fair Employment and Housing ("DFEH"). Stillwell's complaints to DFEH were lawful, peaceful, and protected activities under, Cal. Civ. Code § 1942.5(d)

**Hidden Cameras Placed in Stillwell's Apartment**

562.     Sometime in 2022, two of Stillwell's smoke detectors were placed with smoke detectors that contained hidden audiovisual recording devices. Stillwell discovered the hidden recording devices sometime in August 2022.

    a.  Upon information and belief, sometime in 2021-2022 several undercover FBI agents lived at Hope + Flower. Onni became aware of the FBI agents via a FBI agent who worked in the FBI's Los Angeles Field office.

    b.  Upon information and belief, sometime in 2022 Onni installed recording devices in the apartments of residents suspected of being undercover FBI agents and residents suspected of being "snitches."

**September 13, 2022 Manager Incident**

563.     On September 13, 2022, a man pretending to be an Onni manger attempted to enter Stillwell's home with a master key fob, without notice or consent. Stillwell's deadbolt was on, thus preventing Onni's entry, and signaling to Onni that Stillwell's residence was occupied. The deadbolt lock could only be activated and deactivated from *inside* the apartment.

564.     Stillwell observed the encounter from *inside* her home via live surveillance. While the "manager" was at Stillwell's door, a domestic dispute is heard from the unit next to Stillwell's apartment. Stillwell also noticed the "manger" arrived on the 28th floor via the

stairwell. The Hope + Flower management office is located twenty (20) floors below Stillwell, on the 8th floor. There are cameras in the elevators, but no cameras in the stairwells or hallways. Thus, a person can avoid cameras by taking the stairs.

565.     Stillwell's security cameras captured the "manager" less than a week prior casing Stillwell's door with another man. Stillwell did not recognize either man. Stillwell called Hope + Flower security on September 13, 2022, and they were unable to identify the man who pretended to be an Onni property manager.

566.     On September 13, 2022, Stillwell recorded the man pretending to be an Onni maintenance worker, (hereafter, "Manager Video").  The Manager Video is one minute and twenty-seven (27) seconds in length. Stillwell uploaded the Manager Video to a secure cloud drive to make the video available and accessible for viewing.

    a.  A true and correct copy of the Manager Video can be accessed and viewed at https://link.brittstillwell.com/Manager-Video-9-13-2022 Stillwell incorporates the Manager Video by refence.

567.     Below is a true and correct screenshot taken from the Manager Video, which was sent to Onni. The screenshot is time stamped "September 13 2:04 PM"

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL
- 149 -



568.     On or about September 14, 2022, Onni locked Stillwell out of her apartment by removing access to Apartment #2814 from both of Stillwell's key fobs.

569.     Two LAPD officers arrived but refused to take Stillwell's police report, stating the lockout appeared to be "an accident."

     a.   It took LAPD more than 6 hours to respond to Stillwell's last two calls for assistance- and both times LAPD officers refused to take Stillwell's report. Stillwell has refrained from reporting incidents to LAPD out of fear of retaliation and fear of being gaslit as a victim of crime.

570.     At the time of filing this Complaint, Onni has not addressed Stillwell's safety and security concerns, despite receiving video and photos of the security and safety incidents discussed herein.

571.     Onni's conduct related to the lockout was menacing conduct constituting a course of conduct that interfered with Stillwell's quiet enjoyment of the premises and created an apprehension of harm in Stillwell in violation of Cal. Civ. Code §§ 1927 and §1940.2 (a)(3).

572.     On or about June 2, 2022, September 13, 2022, and September 14, 2022, Onni used threat, intimidation, or coercion, or attempted to interfere by threat, intimidation, or coercion with Stillwell's exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of California, in violation of Ca. Civil Code §52.1.

**Malicious Prosecution - June 2022 Unlawful Detainer**

573.     On June 22, 2022, Evans and KTS filed an unlawful detainer complaint, *Onni Real Estate IX, LL vs Brittany Stillwell, et al.*  Case No. 22STUD03096, in Los Angeles Superior Court, ("June 2022 Unlawful Detainer Complaint").  Evans and KTS filed the Unlawful Detainer on behalf of Onni, for Stillwell's alleged nonpayment of rent, in the amount of $4,619 that was due to Onni on May 1, 2021.

574.     Onni endeavored to evict Stillwell in violation of L.A.M.C § 49.99.2 and to retaliate against Stillwell's complaints to DFEH and on June 4, 2022.

575.     On or about July 11, 2022, Stillwell served Onni, KTS and Evans with Motion for Sanctions, but KTS and Evans maintained and defended suit until day that its Reply to Motion for sanctions was due, on August 22, 2022. On August 22, 2022 Evans and KTS

filed a Request for Dismissal of the July 2022 Unlawful Detainer. The dismissal was granted on or about September 6, 2022.

576.     During a hearing on August 12, 2022 for the June Unlawful Detainer suit, Stillwell informed Judge Viramontes and KTS that Stillwell had not received any mailed copies of documents as specified in KTS' proofs of service. On August 12, 2022 Judge Viramontes ordered KTS to serve Stillwell via email, pursuant to Stillwell's request for electronic service. Despite Judge Viramontes order, KTS continued to serve Stillwell documents via mail.

   a.   Upon information and belief, KTS and Evans either filed at least five (5) falsified proofs of service in the June Unlawful Detainer suit, or Onni stole mail from Stillwell's mailbox, in violation of 18 U.S.C. § 1708.

577.     In June 2022, Onni used threats, intimidation, or coercion, or attempted to interfere by threat, intimidation, or coercion with Stillwell's exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of California, in violation of Ca. Civil Code §52.1

578.     Onni's retaliatory conduct related in June 2022 was menacing conduct constituting a course of conduct that interfered with Stillwell's quiet enjoyment of the premises and created an apprehension of harm in Stillwell in violation of Cal. Civ. Code §§ 1927 and 1940.2 (a)(3).

579.     Onni caused the June 2022 Unlawful Detainer Complaint to be filed in bad faith, and in furtherance of schemes to defraud Stillwell, violations of Cal. Civ. Code §§1942.5(d), 52.1, and L.A.M.C. § 45.33.

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL
- 152 -

580.     Each time Onni, KTS and Evans sent a person to Stillwell's home to collect a debt that was not due, constitutes a separate TAHO violation. Onni, KTS, and Evans attempted to collect debt knew wasn't due and on the following dates:

a.   December 8, 2022, at approximately 8:50PM

b.   On June 28, 2022, at approximately 9:57PM,

c.   On June 29, 2022, at approximately 1:02PM,

d.   On June 30, 2022, at approximately 7:49AM

e.   On June 30, 2022, at approximately 10:08PM

f.   On June 30, 2022, at approximately 10:15PM

g.   Hope + Flower security and concierge deviated from their established procedures and did not call Stillwell beforehand to inform her that anyone was being sent to her residence.

581.     The alleged debt pursed in the June 2022 Unlawful Detainer Complaint was rent deferred during the Local Emergency Period, therefore it was not collectable pursuant to L.A.M.C. § 49.99.2

582.     Evans and KTS used deceptive and misleading tactics when they communicated personal credit information which was known or which should have been known to be false, including the failure to communicate the debt was disputed and by reporting a an alleged debt known to be invalid in violation of 15 U.S.C. §§1692e, 1692e(8)

583.     KTS and Evans acted unconscionably and engaged in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt, in violation of 15 U.S.C. § 1692f.

584.     Each communication used December 2021 and June 2022 Unlawful Detainer Complaints used interstate wires in furtherance of Onni Group's schemes to defraud Stillwell. The exact, date, time, location, and contents of the communications are in possession of KTS, Evans, Onni, and Stillwell.

585.     In December 2021 and in June 2022 Onni, KTS, and Evans each used threat, intimidation, or coercion, or attempted to interfere by threat, intimidation, or coercion with Stillwell's exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of California, in violation of Ca. Civil Code §52.1.

586.     The conduct of Onni, KTS, and Evans, each of them, related to the December 2021 and June 2022 Unlawful Detainer Complaints was threatening, harassing, and menacing conduct constituting a course of conduct that interfered with Stillwell's quiet enjoyment of the premises and created an apprehension of harm in Stillwell in violation of L.A.M.C. §§ 49.99.2, 45.33, Cal. Civ. Code §§ 1927,1940.2, 51.2 and 42 U.S.C. § 3617.

**Lease Violation - July 2022**

587.     On July 23, 2022 and August 4, 2022, Onni falsified two lease violations in an attempt evict Stillwell for cause, effectively circumventing the Los Angeles Eviction Ordinances. Onni served Stillwell with unsubstantiated lease violations in an endeavor to evict her, in violation of the LA Eviction Ordinances, TAHO and California Civil Code § 1940.2. Stillwell had never received a lease violation prior to the July 2022 Lease Violation.

588.     The July 2022 Lease Violation lease violation that falsely states "It has been reported to the management office there has been continuous smoking excessive noise that

has been affecting the surrounding neighbors. Please refrain from this action to avoid any more lease violation fines and/or further legal action pursued." The July 2022 Lease Violation also accuses Stillwell of "Harassing Staff (Parking)."  A true and correct copy of the July 2022 Lease Violation, dated "July 23rd" is incorporated by reference and attached as **Exhibit E**

589.    On July 23, 2022, from approximately 4:00PM to 11:30PM, Stillwell's neighbor's music was loud enough to be heard from the elevator, which was approximately one hundred (100) feet away from her neighbor's door.

    a.   On July 23, 2022, Stillwell sent Onni an audio video recording that showed loud music coming from her neighbor's apartment, which was audible and obvious when Onni served Stillwell July 2022 Lease Violation.

    b.   Stillwell's neighbor is Asian and did not receive a verbal warning or lease violation for having loud and excessive noise on July 23, 2022.

590.    On July 24, 2022, Onni emailed Stillwell that the smoking and loud music allegations were a "misprinted section about smoking and noise. That does not apply to you or your unit." Onni's email further stated, "The lease violation you received is about the parking arm and the discussions with our staff. (As was checked in the box)."

591.    On July 24, 2022, Stillwell informed Onni that she does not own a car and never parked in the parking structure.

    a.   Stillwell asked Onni to provide her with more information about the alleged 'parking arm incident,' including: the time and date of the alleged incident, the process in which Onni identified Stillwell, names of the witnesses, the type of vehicle Stillwell was allegedly driving, the words, or conduct that gave rise to being

considered "harassing staff," and any other information that would substantiate Onni's allegations.

592.     On July 24, 2022 an Onni property manager emailed Stillwell stating,

> I'm going to take over for the resident services and investigate this matter further. Just to clarify the lease violation has nothing to do with noise or smoking. You were sent a violation for an incident that occurred on the 16th of July that had to do with our parking garage. If you have received this violation in error rest assured that I will ensure this is removed from your file. I will be requesting camera footage of the time and date in question as someone stated there was an incident involving your unit.

593.     At the time of filing this Complaint, Onni has not been unable to substantiate its July 2022 Lease Violation allegations against Stillwell. Onni declined to remove the retaliatory lease violation from Stillwell's file. Onni also declined to revise the July 2022 Lease Violation to remove the allegations of smoking and excessive noise, despite Onni's acknowledgement that the smoking and noise complaints were a 'misprinted section about smoking and noise" that does not apply to Stillwell or her unit.

**Lease Violation – August 2022**

594.     On July 17, 2022, Stillwell informed Onni that someone left an oversized teddy bear outside of her door. The bear remained in front of Stillwell's door until July 23, 2022. Below are two photos of the teddy bear sitting outside of Stillwell's apartment door. Stillwell took the photos on July 17, 2022 and July 18, 2022. The bear was placed in different positions each day that it sat outside of Stillwell's door.



595.　　　Upon information and belief, on July 23, 2022 an Onni employee affixed the July 2022 Lease Violation on Stillwell's door, then took photos of the teddy bear in front of her door. After photographing the teddy bear in front of Stillwell's door, the Onni employee placed the oversized stuffed animal in front of the trash chute on Stillwell's floor to frame Stillwell for improperly disposing of her trash.

596.　　　On August 4, 2022, just twelve (12) days after receiving the July 2022 Lease Violation, Onni served Stillwell with a *second* unsubstantiated lease violation for improperly disposing of her trash (hereafter, "August 2022 Lease Violation")

597.　　　The August 2022 Lease Violation states in part, "If you are having a difficult time disposing your trash and action is not taken to properly dispose of your trash and continue

to disregard your lease terms and community guidelines, serious to severe action will follow including but not limited to eviction."

598.     Onni has been unable to substantiate its false trash disposal allegations against Stillwell and declines to remove the retaliatory lease violation from Stillwell's file.

599.     From March 2020 until August 2022, Stillwell has made over five complaints about Hope + Flower residents leaving trash in the hallway and by the trash chutes on the 21st and 28th floors of Hope Tower. Stillwell's trash complaints to Onni always included photos of the trash, which *always* had shipping labels or other information that readily identified the resident to whom the trash belonged.

600.     All the trash complaints made by Stillwell were residents outside of Stillwell's protected class. None of the residents Stillwell complained about ever received lease violations, despite being repeat offenders.

601.      A Hope + Flower resident, who is not a member of Stillwell's protected class, was served with five (5) pages of lease violations. The dates of occurrence for the tenant's lease violations spanned a period of at least two *months* before the resident was finally served with a Notice of Lease Violation. The resident's lease violations included the time, date, witnesses, and conduct that gave rise to the lease violations. The resident posted copies of her lease violation on Yelp.com.

602.     Stillwell was served with two unsubstantiated lease violations, which each threaten eviction, during a two-*week* time span.

603.     Upon information and belief, from March 2020 until the filing of this complaint, Onni falsified at least ten (10) lease violations against African American tenants, in an effort to evict the tenants for cause.

**Unlawful Entry / Trespass**

604.      On the following dates Onni attempted to enter or entered Stillwell's apartment

illegally, without giving proper notice as required by Cal. Civ. Code § 1954.

      a.  January 3, 2022

      b.  January 29, 2022

      c.  March 12, 2022

      d.  June 2, 2022

      e.  June 3, 2022

      f.  June 8, 2022

      g.  June 22, 2022

      h.  August 12, 2022

      i.  September 13, 2022

      j.  October 16, 2022

      k.  November 9, 2022

      l.  December 2, 2022

      m. December 13, 2022

605.      The actions of Onni in attempting to enter and entering Stillwell's apartment

illegally constitute Trespass against Stillwell and were undertaken by Onni deliberately

and with malice and with the intent to oppress Stillwell, and were intended to, and did

cause, Stillwell to suffer damages, including but not limited to, severe emotional distress

and mental anguish and humiliation.

606.      Onni did the actions previously alleged with malice in that they intended to cause

injury to Stillwell by despicable conduct which was carried on by Onni with a willful and

1   conscious disregard of the rights or safety of Stillwell, and with oppression in that Onni

2   engaged in despicable conduct that subjected Stillwell to cruel and unjust hardship in

3   conscious disregard of the rights of Stillwell, with the intent to oppress Stillwell and

4   cause her to suffer injury, in that Onni was angry at Stillwell for asserting her legal rights

5

6   under California law.

**RICO Scheme #7 Overcharged Tenants Utilities and Unnecessary Fees**

7

8   607.    Upon information and belief, Onni developed a scheme in which it overcharged its

9   residents on average $100 - $300 per month in unnecessary fees and overcharged utilities.

10  Onni also passed off its commercial expenses, such as illegal hotel operations, to residents

11

12  of Hope + Flower.

13  608.    Onni recommended and encourage automatic payments. Automatic payments were

14  also required for Stillwell's lease renewal in September 2021. Upon information and belief,

15  Onni locked Stillwell out of Rent Café and automatically processed rent and utility

16

17  payments without Stillwell able to inspect or question the fees being charged.

18  609.    In March 2021 Onni switched its third-party utility management company. Onni

19  stopped using Utility Smart and switched to ConService from May 2021 until August 2021.

20  In August 2021 Onni began using Yes Management but did not allow its Hope + Flower

21  residents access to utility statements issued by Yes Management. Beginning in August

22  2021, all fees, utilities, and rents were only made available via Rent Café, Onni's residential

23  portal. In April 2021 Stillwell was no longer able to access past bills from Utility Smart.

24

25  610.    In August 2022, Stillwell called Yes Management and was emailed copies of her

26  prior utility statements because Onni refused to provide them. After noticing more than

27  $5,000 of excessive fees and charges, Stillwell asked Onni to email a copy of her Ledger,

28

(hereafter, "August 2022 Ledger"). A true and correct copy of Stillwell's August 2022 Ledger, is incorporated by reference and attached as **Exhibit R.**

611.     According to the August 2022 Ledger, on November 1, 2021, Onni charged Stillwell a total of $9,371.00[12] for rent in November 2021, which is $4,752.00 more than Stillwell's rent of $4,916.00. In November 2021 Onni also charged Stillwell twice for storage and twice for Resident Liability Waiver.

612.     Beginning March 4, 2022, Onni began charging Stillwell late fees on unpaid COVID-19 rent. Pursuant to the LA Eviction Ordinances and Cal. Health & Saf. Code § 50897.1, landlords may not charge interest or late fees on unpaid rent due to COVID-19.

   a.   At the time of filing this Complaint, Onni charged Stillwell ten (10) late fees on unpaid rent due to COVID-19 in the amount of $100.00 on the following dates: 03/04/2022,  04/04/2022,  05/04/2022,  06/04/2022,  07/04/2022,  08/04/2022, 09/04/2022, 10/04/2022, 11/04/2022, and 12/04/2022. Onni owes Stillwell a credit of $1,000.00 for unlawfully charging Stillwell late fees on ten (10) months of unpaid rent due to COVID-19.

613.     According to the August 2022 Ledger, and unbeknown to Stillwell, on September 1, 2020, Onni began sporadically charging Stillwell for electricity in the common areas, ("Common Area Electricity Fee").

---

[12] According to the August 2022 Ledger, on November 1, 2021 Onni charged Stillwell "Rent (11/2021) 4,752" and "Rent (11/2021) 4,619" for a total amount of $9, 371. On November 24, 2021, $4,752 was credited as "MEC Adjustment," then $4,752 charged again on November 24, 2021 as "MEC Adjustment."

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL
- 161 -

a.  Stillwell has never signed a utility service addendum consenting to the common area electricity charge, because Onni passes of its commercial electricity charges to its residential tenants.

b.  Onni advertises and offers free electrical car charging for residents in its parking structure located at Hope + Flower. However, non-residents can access the car charging ports and charge their cars for free. Stillwell has never used Onni's electrical car charging ports and has never agreed to cost-sharing an expense that Onni advertises as an included amenity.

c.  Each month Onni charged Stillwell for Common Area Electricity Fees, these fees were on average 150% *more* than Stillwell's entire monthly electricity costs for her two-bedroom apartment, which is over 1,000 square feet.

d.  Since 2020, Onni has overcharged Stillwell for a Common Area Electricity Fee fourteen (14) times, for a total amount of $1,603.54. Onni owes Stillwell a credit of $1,603.54 for overcharging Stillwell fourteen (14) times for Common Area Electricity Fees.

e.  California law prohibits landlords from profiting from providing utility services. Onni is only allowed to charge Stillwell the same amount as the utility company charges Stillwell, plus a small fee for creating Stillwell's invoices and managing Stillwell's utilities.

614.    In November 2021, Onni began charging Stillwell $2.00 per month for 'Pest Charges.' Stillwell does not have any pet or pest and has never had a pest or rodent problem. According to the California Department of Consumer Affairs, pest control is

responsibility of landlord's warranty of habitability. Pursuant to every lease Stillwell has signed with Onni, the cost of Pest control is paid by Onni.

    a.   Onni owes Stillwell a credit of $28.00 for overcharging Stillwell fourteen (14) times for Pest Control Fees.

615.     In March 2021, Onni began charging Stillwell $12.00 per month for Resident Liability Waiver.

    a.   Onni charges tenants a Resident Liability Waiver fee whenever the tenant does not have rental insurance, or whenever a tenant signs a Resident Liability Waiver addendum agreeing to be charged for insurance.

    b.   Stillwell provided Onni with proof of her Rental Insurance multiple times and has made multiple requests for Onni to remove this charge.

    c.   Stilwell has never signed a Resident Liability Waiver addendum agreeing to be charged for insurance and has maintained Renter's Insurance as required by lease

    d.   Onni owes Stillwell a credit of $300 for overcharging Stillwell twenty-five (25) times for Resident Liability Waiver fee.

616.     Since March 2020, Onni has overcharged Stillwell at least $7,795 in unnecessary rents, utilities, and fees.

617.     Upon information and belief, since March 2020, Onni overcharged Hope + Flower residents more than $1,000,000 in duplicate rents, unnecessary fees, overcharge utilities, and other unauthorized expenses.

618.     Each time Onni processed a payment without Stillwell having access to Rent Café to review the fees and charges constitutes an unauthorized bank charge and a separate RICO predicate act of wire fraud.

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

**RICO Scheme #8– COVID-19 Rental Assistance Scheme**

619.     Upon information and belief, in March 2021 Onni devised a scheme to submit fraudulent rental assistant applications on behalf of unknowing Hope + Flower residents, including Stillwell. Onni began creating falsified documents and ledgers and backdated rent statements with the intentions of collecting rental assistance for rent that had been paid by tenants. The fraudulent applications sought rental payments for rent that had previously been paid by tenants.

620.     Upon information and belief, Onni targeted Stillwell in a scheme to fraudulently collect COVID-19 rental assistance on behalf of Stillwell, and on account of her marital status, race, ethnicity, ancestry and/or source of income.

621.     On March 15, 2021, California's COVID-19 Rent Relief program, Housing is Key, (hereafter, "HIK") began to accept applications for rent and utility support, helping Californians hit hardest by the pandemic. Tenants and landlords were able to request up to 18-months in assistance covering the time between April 1, 2020 and March 31, 2022.

622.     Upon information and belief, HIK was a federally funded program and only required Landlord applicants to submit the following three items to receive funding: a W9, expired or current lease agreement, and rental invoices or ledgers that show the rental and utility fees in arrears.

623.     In March 2021 Onni stopped emailing Stillwell rental payment confirmation emails, and many Hope + Flower residents began to complain about being locked residents out of Rent Café, or unable to make rental payments.

624.      In March 2021 Onni served Stillwell a 15-Day Notice to Quit, (hereafter, March 2021 Notice to Quit"). According to the March 2021 Notice to Quit, Stillwell had a total of $11,377.74 in outstanding rent for the following months:

    a.   December 1, 2020 - $2,589.00

    b.   January 1, 2021 – $3,489.00

    c.   February 1, 2021 - $1,810.74

    d.   March 1, 2021 - $3,489.00

625.      The March 2021 Notice to Quit also stated that Stillwell submitted declarations of her inability to pay rent due to COVID-19 for the following months: December 2020, January 2021, February 2021, and March 2021. In March 2021 Stillwell did not have any rent in arrears and had never submitted a declaration of COVID-19 financial distress. A true and correct copy of the March 2021 Notice to Quit is incorporated by reference and attached as **Exhibit S**

626.      On or about March 11, 2021 Stillwell emailed Onni that she believed the March 2021 Notice to Quit was sent in error. March 12, 2021 Katherine Rosales ("Rosales") Onni replied stating in part, "Please disregard the notice that you received as it does not pertain to you. Your account is current and you do not owe us anything at the moment, sorry for the confusion." Onni attached a screenshot of Stillwell's ledger to the email, which showed Stillwell's balance as "0.00" on March 12, 2021. Below is a screenshot of Rosales email to Stillwell on March 12, 2021.

1
2

H   Hope & Flower Reside...   Mar 12, 2021

to me, Hope, Felix ⌄

3
4

Good Evening Brittany,

5
6
7

Thank you for reaching out and I apologize for the delayed response. Please disregard the notice that you received as it does not pertain to you. Your account is current and you do not owe us anything at the moment, sorry for the confusion. Have a great rest of your night!

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Date : 3/12/2021                                                    Print

| Code | 10075045 | Property | 000323 | Lease From | 09/01/2020 |
| Name | Brittany Stillwell | Unit | 2814 | Lease To | 10/31/2021 |
| Address | 1201 S Hope Street | Status | Current | Move In | 09/01/2020 |
| | | Rent | 4,752.00 | Move Out | |
| City | Los Angeles, CA 90015 | Phone (H) | (908) 848-1566 | Phone (W) | |

| Date | Chg Code | Description | Charge | Payment | Balance |
|------|----------|-------------|--------|---------|---------|
| 02/01/2021 | water | WATER/SEWER/STORM DRAINAGE 12/01/20 - 01/01/21 | 58.75 | | 4,910.75 |
| 02/01/2021 | utilfees | ADMIN. FEE/SCEP/NEW ACCOUNT FE 12/01/20 - 01/01/21 | 8.36 | | 4,919.11 |
| 02/01/2021 | trash | TRASH 12/01/20 - 01/01/21 | 21.93 | | 4,941.04 |
| 02/01/2021 | gas | GAS 12/01/20 - 01/01/21 | 31.23 | | 4,972.27 |
| 02/01/2021 | electric | ELECTRIC/ELECTRIC (COMMON AREA 12/01/20 - 01/01/21 | 132.74 | | 5,105.01 |
| 02/24/2021 | | chk# 89274007 Credit Card On-Line Payment ; Web - Resident Services | | 4,852.00 | 253.01 |
| 02/24/2021 | | chk# 89274036 Debit Card On-Line Payment ; Web - Resident Services | | 253.01 | 0.00 |
| 02/28/2021 | | chk# 89586703 Recurring Credit Card Payment; | | 300.00 | (300.00) |
| 03/01/2021 | rent | Rent (03/2021) | 4,752.00 | | 4,452.00 |
| 03/01/2021 | storage | Storage (03/2021) | 100.00 | | 4,552.00 |
| 03/01/2021 | waiver | Resident Liability Waiver (03/2021) 14 days | 5.42 | | 4,557.42 |
| 03/01/2021 | water | WATER/SEWER/STORM DRAINAGE 01/01/21 - 02/01/21 | 50.98 | | 4,608.40 |
| 03/01/2021 | utilfees | ADMIN. FEE/SCEP/NEW ACCOUNT FE 01/01/21 - 02/01/21 | 8.36 | | 4,616.76 |
| 03/01/2021 | trash | TRASH 01/01/21 - 02/01/21 | 23.07 | | 4,639.83 |
| 03/01/2021 | gas | GAS 01/01/21 - 02/01/21 | 40.32 | | 4,680.15 |
| 03/01/2021 | electric | ELECTRIC/ELECTRIC (COMMON AREA 01/01/21 - 02/01/21 | 130.35 | | 4,810.50 |
| 03/07/2021 | | chk# 91143667 Credit Card On-Line Payment ; Web - Resident Services | | 4,810.50 | 0.00 |

23
24
25

Best,

26

Katherine Rosales

27
28

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

- 166 -

1

2

3

4

5

627.    On March 29, 2021, Stillwell received a utility statement from Utility Smart in the amount of $223.48 for Stillwell's utilities, (hereafter "April 2021 Utility Statement").

a.  Stillwell's Utility Smart Account Number for Apartment #2118 is 3657-00948361

b.  Stillwell's Utility Smart Account Number for Apartment #2814 is 3657-00980933

c.  Sometime in April 2021 Stillwell was unable to access her ledger from Utility Smart. Stillwell also noticed her Utility Smart reflected a balance of $9,951.45 due on April 1, 2021. This amount was $9,727.97 *more* than the bill Stillwell received on March 29, 2021.

d.  Stillwell's account was not in arrears, nor was there a past due balance in March 2021 or April 2021 to account for the discrepancy.

e.  Stillwell took two screenshots of her Utility Smart account because her access to download documents in Utility Smart has been restricted.  Upon information and believe, Stillwell's utility statements and ledgers from Utility Smart are in Onni's possession and are discoverable.

628.    Below are three true and correct screenshots of Stillwell's Utility Smart bills:

a.  The first screenshot is Stillwell's utility bill that was emailed on March 29, 2021 and states the amount due on April 1, 2021 is 223.48.

b.  The second screenshot was taken from Stillwell's Utility Smart account sometime in April 2021 and states the amount due on April 1, 2021 is $9,951.48.

c.  The third screenshot was taken from the landing page of Stillwell's Utility Smart account sometime in October 2022 and shows both of Stillwell's account numbers

for Apartment #2118 and Apartment #2814. The screenshot also shows that

Stillwell has an outstanding balance of $9,951.48.

d.  The April 2021 balance of $9,951.48 is *not* reflected on Stillwell's August 2022

Ledger. Upon information and belief, Onni kept multiple ledgers for Stillwell's

account.

e.  Stillwell has been unable to contact representatives from Utility Smart to obtain

copies of her past statements and ledger, as the numbers listed online are all

incorrect or disconnected.





629.    In June 2021, August 2021, and September 2021 Onni served Stillwell with fraudulent Notices to Quit. Onni informed Stillwell that it had a "snafu" and "accidentally" served Stillwell with notices to quit.

a.   True and correct copies of the June 2021, August 2021, and September 2021 Notices to Quit are incorporated by reference and attached as **Exhibit T**.

630.    Upon information and belief, sometime in September 2021 Onni created a HIK Tenant Account and completed a Tenant Application, Tenant/ Client ID 755125, for Stillwell without her knowledge or consent. Onni made itself the Representative, which

1    allowed Onni to request application status and update the fraudulent application on

2    Stillwell's behalf.

3        a.  According to Question B.13 on the tenant application, Representatives must be

4            added by the *tenant*. Stillwell did not authorize Onni as a representative and she

5            was unaware of this until August 2022. In August 2022, Stillwell confirmed with

6

7            HIK that the account was created in September 2021.

8        b.  Below is true and correct screenshot of tenant portal for  Tenant /Client ID 755125

9            taken by Stillwell  in August 2022. The screenshot shows that the application was

10           "Last updated by jaube@onni.com on 9/17/21 9:10:51AM."

11



631.     Upon information and belief, from March 2021 through November 2021, Onni created at least seven (7) fake rental statements for December 1, 2020, January 2021, February 2021, March 2021, April 2021, October 2021, and November 2021 to submit with rental applications on behalf of Stillwell. Stillwell's rent for these seven months was paid by Stillwell and not in arrears when Onni applied for rental assistance.

    a.  The Supplemental Allegations that accompanied the December 2021 Unlawful detainer states Onni had a rental app pending at least 20 days before the suit was filed. The complaint and supplemental allegations were verified by Leal, under penalty of perjury.

    b.  Upon information and belief, sometime in October 2021, Onni sought to obtain, and did receive more than $40,000 in rental assistance on Stillwell's behalf for rent Onni falsely alleged was dur from December 2020 through October 2021.

632.     When Stillwell applied for rental assistance in October 2021, Tenant/ Case ID 1157162, she was unaware Onni applied on her behalf. In December 2021, Stillwell's HIK case manager informed her that Onni had not been responsive to emails and had not completed the landlord portion of Stillwell's application, Tenant/ Case ID 1157162.

    a.  From December 2020 until April 2021, Onni misrepresented to Stillwell that it never received her application information.

    b.  The HIK program stopped accepting applications on March 31, 2022. On April 6, 2022 Onni emailed Stillwell asking if Stillwell had a "pending application with

Housing is Key." Upon information and belief, on or about April 6, 2022 after Onni was informed that Stillwell's rental assistance application was approved. Onni intended to trick Stillwell into believing her app wasn't not completed, so that it could keep Stillwell's rental assistance funds.

c. Onni never informed Stillwell of the approval or it's receipt of the funds, which it received on or about May 3, 2022. Stillwell never received any correspondence from HIK stating her application was approved. Stillwell reasonably believed her rental assistance application had been *denied*.

d. Stillwell became aware of the rental payment in August 2022 when she noticed the payment as a line item on the August 2022 Ledger.

633.    Upon information and belief, on or about May 3, 2022, Onni received $23,760.00 in rental assistance, from Housing Is Key to be applied towards Stillwell's "Rental arrears, prospective rent payments, and utilities, including arrears and prospective payments for utilities, pursuant to Cal. Health & Saf. Code § 50897.1"

634.    Below is a screenshot of Stillwell's HIK portal taken in September 2022, which shows that $23,760 was dispersed for Tenant/ Case ID 1157162.

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

- 172 -



635.     Upon information and belief, in February 2022, Onni applied for a second round of assistance on Stillwell's behalf, under Tenant / Case ID 755125, for four (4) months of rental assistance. In its second application for funding, Onni sought rental for December 2021, January 2022, and sought prospective payments for months February 2022, March 2022.

a.   Upon information and belief, in May 2022 Onni's second attempt to receive assistance for Stillwell was denied as a "duplicate."

b.   Below is a screenshot of the HIK portal for Tenant/ Case ID, which shows the application status as "Duplicate"

1
2
3
4
5
6
7
8
9
10



11
12  636.   Due to Onni's overcharges described herein, at least $6,000 of the $23,760.00 in
13  HIK rental assistance awarded to Stillwell was kept by Onni, and not actually applied to
14  rent and utilities truly owed by Stillwell. Onni converted more than $6,000 of the rental
15  assistance funds awarded to Stillwell.

16  637.   On or about August 16, 2022, Stillwell informed Onni, Evans and KTS about the
17  overcharges and misappropriated COVID-19 rental assistance. At the time of this filing,
18  Onni has not credited Stillwell's ledger for the overcharges described herein and is still
19  wrongfully in possession of at least $6,000 in COVID-19 rental assistance funds that were
20  awarded to Stillwell.

21
22  638.   Upon information and belief Onni submitted at least two-hundred and seventy (270)
23  rental assistance applications, under penalty of perjury, on behalf of unsuspecting Hope +
24  Flower tenants. The rental relief applications contained fraudulent information about the
25  amount of rent and fees in arrears.

26
27
28

**Fiduciary Duty**

639.     Onni owed Stillwell and Housing is Key fiduciary duties of care and accounting.

640.     Onni and Stillwell were in a fiduciary relationship because the Onni exclusively maintained documentation showing expenses for property maintenance, utilities, and rent compelling Stillwell to rely on the good faith of Onni in assessing the charges and past due rent Stillwell owed. Onni also exclusively maintained control and possession of rental assistance that was awarded to Stillwell to be applied towards Stillwell's rent in arrears

641.     Onni and Housing is Key were in a fiduciary relationship because Onni exclusively maintained documentation showing expenses for property maintenance, utilities, and rent compelling Housing is Key to rely on the good faith of Onni in assessing the charges and past due rent Stillwell owed.

642.     Onni's fiduciary Duty of Care - required Onni to exhibit honesty, act in good faith, and exercise ordinary and reasonable care in the discharge of their duties.

643.     Onni's fiduciary Duty of Accounting - required Onni to adopt and following accounting procedures and controls and ensure Stillwell's HIK rental assistance funds were used for lawful purposes.

644.     Onni breached its fiduciary duty to Housing is Key and breached its fiduciary duties to Stillwell.

645.     As an attorney licensed in California, Evans owed Stillwell a duty of care and was legally obligated to prevent foreseeable harm to Stillwell because it was reasonable for Evans to do so. It was foreseeable that filing frivolous unlawful detainer suits against Stillwell could result in a default judgment against Stillwell and in emotional as well as financial injury to her.

646.     As debt collection agency and law firm operating in California, KTS owed Stillwell a duty of care and was legally obligated to prevent foreseeable harm to Stillwell because it was reasonable for KTS to do so. It was foreseeable that maintaining frivolous unlawful detainer suits against Stillwell could result in a default judgment against Stillwell and in emotional as well as financial injury to her.

647.     Evans and KTS breached each their duties of care to Stillwell.

## CIVIL RICO ALLEGATIONS

**Times Mirror Square ("Project M")**

648.     Formerly known as Times Mirror Square, The Times' current Civic Center ("Project M") headquarters is a mix of five interconnected structures that fill an entire city block, bounded by Broadway and Spring and 1st and 2nd streets. Shortly after Onni bought the property for more than $100 million in 2016, the developer filed plans with the city to demolish part of the complex and build a pair of high-rise residential towers and several retail stores and restaurants."

649.     Upon information and belief, two months before the PLUM Committee approved Onni's redevelopment of Project M, Onni Group donated $50,000 to Families for a Better Los Angeles, a campaign committee to support Huizar's wife's campaign to succeed him as Councilmember for CD14.

650.     Upon information and belief, Huizar also sent an aide to testify in support of Project M, in violation of the Brown Act.

**CD14 Enterprise**

651.     On June 22, 2020 a criminal complaint was filed against Huizar in United States of America vs. Jose Luis Huizar et al Case No CR 20-326 (A) – JFW ("Huizar Complaint")

652.     On November 11, 2020 a First Superseding Indictment was filed against Huizar in United States of America vs. Jose Luis Huizar et al. Case No CR 20-326 (A) – JFW ("Huizar Indictment")

653.     According to paragraphs 37 – 42 of the Huizar Indictment:

A.  THE RACKETEERING ENTERPRISE
At times relevant to this First Superseding Indictment:

37. Defendant JOSE LUIS HUIZAR, defendant RAYMOND SHE WAH CHAN, George Esparza, George Chiang, and others known and unknown to the Grand Jury, were members and associates of the CD-14 Enterprise, a criminal organization whose members and associates engaged in, among other things: bribery; mail and wire fraud, including through the deprivation of the honest services of City officials and employees; extortion; interstate and foreign travel in aid of racketeering; money laundering; structuring; and obstruction of justice.  The CD-14 Enterprise operated within the Central District of California and elsewhere.

38.   The CD-14 Enterprise, including its leaders, members, and associates, constituted an "enterprise," as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact.  The CD-14 Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.  The CD-14 Enterprise engaged in, and its activities affected, interstate and foreign commerce.

B.  OBJECTIVES OF THE ENTERPRISE
39.  The objectives of the CD-14 Enterprise included, but were not limited to, the following:

a.  enriching the members and associates of the CD-14 Enterprise through means that included: bribery; extortion; and mail and wire fraud, including through the deprivation of the honest services of City officials and employees;

b.  advancing the political goals and maintaining control and authority of the CD-14 Enterprise by elevating members and associates of the CD-14 Enterprise to, and maintaining those individuals' placement in, prominent elected office, through means that included bribery and mail and wire fraud, including through the deprivation of the honest services of City officials and employees;

c.  concealing the financial activities of the CD-14 Enterprise, through means that included money laundering and structuring; and

d.  protecting the CD-14 Enterprise by concealing the activities of its members and associates and shielding the CD-14 Enterprise from detection by law enforcement, the City, the public, and others, through means that included obstructing justice.

C.  RICO CONSPIRACY

40.   Beginning on a date unknown to the Grand Jury, but no later than February 2013, and continuing to the present, in Los Angeles County, within the Central District of California and elsewhere, defendants HUIZAR and CHAN, persons employed by and associated with the CD-14 Enterprise, which engaged in and its activities affected interstate and foreign commerce, conspired with each other and others known and unknown to the Grand Jury, including George Esparza and George Chiang, to unlawfully and knowingly violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the CD-14 Enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of multiple acts:

a.   involving bribery, in violation of California Penal Code Sections 31, 67, 67.5(b), 68 and 182(a)(1);

b.   indictable under Title 18, United States Code, Sections 1341, 1343, and 1346 (Mail and Wire Fraud, including through the Deprivation of Honest Services);

c.   indictable under Title 18, United States Code, Section 1951 (Extortion);

d.   indictable under Title 18, United States Code, Section 1952 (Interstate and Foreign Travel in Aid of Racketeering);

e.   indictable under Title 18, United States Code, Sections 1956 and 1957 (Money Laundering);

f.   indictable under Title 18, United States Code, Section 1512 (Obstruction of Justice and Witness Tampering); and

g.   indictable under Title 31, United States Code, Section 5324 (Structuring Transactions to Evade Reporting Requirement).

41.   It was a further part of the conspiracy that defendants HUIZAR and CHAN each agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

D.   <u>MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE ACCOMPLISHED</u>

42.   Defendants HUIZAR and CHAN and other members and associates of the CD-14 Enterprise agreed to conduct the affairs of the CD-14 Enterprise through the following means, among others:

a.   In order to enrich its members and associates, the CD-14 Enterprise operated a pay-to-play scheme, wherein   public officials demanded and solicited financial benefits from developers and their proxies in exchange for official acts. Specifically, through a scheme that involved bribery, mail and wire fraud, and extortion, defendant HUIZAR, defendant CHAN, George Esparza, and other City officials demanded, solicited, accepted, and agreed to accept from developers and their proxies, including George Chiang, some combination of the following types of financial benefits, among others: (1) cash; (2) consulting and retainer fees; (3) favorable loans; (4) gambling chips at casinos; (5) political contributions; (6) flights on private jets and commercial airlines; (7) stays at luxury hotels; (8) expensive meals; (9) spa services; (10) event tickets to concerts, shows, and sporting events; (11) escort and prostitution services; and (12) other gifts.

b.   In exchange for such financial benefits from developers and their proxies, defendant HUIZAR, defendant CHAN, George Esparza, and other City officials agreed to perform and performed the following types of official acts, among others: (1) presenting motions and resolutions in various City committees to benefit projects; (2) voting on projects in various City committees, including the PLUM Committee, and City Council; (3) taking, or not taking, action in the PLUM Committee to expedite or delay the approval process and affect project costs; (4) exerting pressure on other City officials to influence the approval and/or permitting process of projects; (5) using their office to negotiate with and exert pressure on labor unions to resolve issues on projects; (6) leveraging voting and scheduling power to pressure developers with projects pending before the City to affect their business practices; and (7) introducing or voting on City resolutions to enhance the professional reputation and marketability of businesspersons in the City.

c.   To hide the money, bribes, and other personal benefits that flowed from the developers and their proxies to the public officials, the CD-14 Enterprise engaged in money laundering and other concealment activities.   Specifically, members and associates of the CD-14 Enterprise engaged in the following activities, among others: (1) storing large amounts of cash in one's residence; (2) providing cash to family members and associates; (3) directing payments to family members, associates, and entities to avoid creating a paper trail between the developers, their proxies and public officials; (4) using family members and associates to pay expenses; (5) depositing and exchanging cash at ATMs and banks in amounts under $10,000 to avoid bank reporting requirements; and (6) failing to disclose payments and benefits received on Forms 700 and on tax returns.

d.   In order to maintain its power and control, members and associates of the CD-14 Enterprise used their positions and relationships to illicitly ensure it maintained a political power base filled with their allies and obtained significant official City positions, resources, and financial support.  Specifically, through bribery, members and associates of the CD-14 Enterprise raised funds from developers and their proxies with projects in CD-14 for the following, among others: (1) defendant HUIZAR's re-election campaigns and officeholder accounts; (2) HUIZAR Relative 1's election campaign for the CD-14 seat; and (3) PACs designed to benefit HUIZAR Relative 1's election campaign.

e.   In order to protect the CD-14 Enterprise and avoid detection by law enforcement, the City, the public, and others, members and associates of the CD-14 Enterprise engaged in the following conduct: (1) lying to law enforcement in an effort to impede the investigation into criminal conduct of the CD-14 Enterprise; (2) attempting to corruptly influence the statements of others to law enforcement; and (3) using encrypted messaging applications, including those utilizing a self-destructing message system, to communicate about the affairs of the CD-14 Enterprise.

654.     Upon information and belief, Onni and Onni-BC are members of the CD-14 Enterprise.

655.     According to Overt Act Nos. 241 – 300 of the Huizar Indictment:

Project M Bribery Scheme

**a. $25,000 Contribution to PAC B**
Overt Act No. 241:  On August 18, 2016, defendant HUIZAR met with Morrie Goldman and Executive M at defendant HUIZAR's City Hall office to discuss Project M.  At the meeting, Goldman and Executive M asked defendant HUIZAR to file a motion to initiate a General Plan Amendment for Project M.  Defendant HUIZAR agreed to initiate the General Plan Amendment, either by exerting pressure on the Planning Department to do so or by filing a motion.

Overt Act No. 242:  On or about August 26, 2016, defendant HUIZAR and his staff urged the Planning Department to approve the General Plan Amendment initiation for Project M, which the Planning Department did.

Overt Act No. 243:  In September 2016, less than a month after defendant HUIZAR had provided significant assistance to Company M and Executive M, defendant HUIZAR asked Morrie Goldman for contributions to PAC B from Goldman's clients with projects pending in CD-14, including from Executive M on behalf of Company M.  Goldman agreed to convey the request to his clients.

Overt Act No. 244: On October 10, 2016, defendant HUIZAR sent an e-mail to George Esparza and another CD-14 staffer, writing: "I spoke with [Morrie Goldman] already about [another developer] and [Company M] contributions to [HUIZAR Associate 2] Account.  He is on board.  Work with him to get them in. Get [Goldman] the [HUIZAR Associate 2] acco[u]nt name and number etc."

Overt Act No. 245:  On October 13, 2016, George Esparza sent a text message to Morrie Goldman, providing the information for PAC B and adding: "according to my boss that's for [another developer] and [Company M]. He said he spoke to u about it."

Overt Act No. 246:  On October 13, 2016, Morrie Goldman sent an e-mail to Executive M, passing on the information for PAC B he received from George Esparza.  Executive M replied: "Timing and amount?"  Goldman then wrote: "25K as soon as possible."

Overt Act No. 247:  On October 14, 2016, Morrie Goldman sent an e-mail to Executive M, attaching a remit form for PAC B, and writing: "HUIZAR is asking

that contributions be directed to this committee. Please hold off if you are processing a contribution to the other primary committee."

Overt Act No. 248:  On October 26, 2016, Morrie Goldman received an e-mail from Executive M about the $25,000 PAC B contributions, which stated: "I should have checks by tomorrow. All I need is the letter. Would it be worth setting up a quick drink or coffee with JOSE [HUIZAR] when we deliver? Could be good to talk big picture, etc."

Overt Act No. 249:  On or about October 27, 2016, defendant HUIZAR caused Company M to send three checks from three separate entities, payable to PAC B in the amount of $8,333.33 for a total of $25,000, by U.S. Mail to the Company M office in Los Angeles, California.

Overt Act No. 250:  On October 31, 2016, Morrie Goldman sent a text message to George Esparza, writing: "When can I get [Executive M] in with JOSE [HUIZAR] to deliver the checks?"

**b.  Additional $25,000 Contribution to PAC B**

Overt Act No. 251:  On February 14, 2017, defendant HUIZAR sent a text message to George Esparza, writing: "at dinner make sure u remind me to get [Company M] to do 25 k for [PAC B] on measure h."

Overt Act No. 252:  On February 15, 2017, defendant HUIZAR met Morrie Goldman for lunch in downtown Los Angeles to discuss various projects.  At the lunch, defendant HUIZAR asked Goldman for an additional $25,000 contribution to PAC B from Company M, which Goldman agreed to convey to Executive M.

Overt Act No. 253:  On February 15, 2017, at a dinner at a Los Angeles restaurant for which Company M paid approximately $1,778, defendant HUIZAR requested and Executive M committed to paying $25,000 to PAC B on behalf of Company M.

Overt Act No. 254:  On February 21, 2017, Morrie Goldman informed George Esparza via text message that Executive M "acknowledged the conversation with JOSE [HUIZAR]" regarding Company M's additional contribution to PAC B.

Overt Act No. 255:  On February 22, 2017, Morrie Goldman wrote to Executive M in a text message: "We never connected about your conversation with HUIZAR on Measure H. They want to connect with you about getting a check for their Measure H mailer targeting DTLA."

Overt Act No. 256:  On February 24, 2017, Morrie Goldman received an e-mail from Executive M sent to another Company M employee with the subject line

"questions regarding HUIZAR PAC," which stated: "You can direct any specific questions on the PAC to [Goldman], who is cc'd."

Overt Act No. 257:  On February 25, 2017, defendant HUIZAR sent a text message to George Esparza, writing: "Any update on [Executive M] 25k?"

Overt Act No. 258:  On or about March 2, 2017, defendant HUIZAR caused Company M to send a check for $25,000 made payable to PAC B by U.S. Mail to PAC B in Sacramento, California.

Overt Act No. 259:  On March 20, 2017, Morrie Goldman received an e-mail from Executive M, which stated: "Do you think we are in a more favored status with JOSE [HUIZAR] compared to [another developer]?"

Overt Act No. 260:  On May 5, 2017, in a telephone call, defendant HUIZAR and Morrie Goldman discussed Company M's contribution to PAC B at defendant HUIZAR's direction.  Defendant HUIZAR and Goldman found out that PAC B publicly disclosed Company M as a top donor for a Los Angeles City Council candidate.  Goldman told defendant HUIZAR that a reporter was "asking who asked us for the donation, but we, we're not gonna respond to that."  Defendant HUIZAR responded: "Thank you very much. I appreciate that."  Goldman stated: "No of course."  Goldman then stated: "When I told George [Esparza], I said, look, my two things that I gotta protect you know... [Company M] and gotta protect you."  Defendant HUIZAR stated "we can't be sloppy about this and trust, uh, [HUIZAR Associate 2], but, anyway, we will save that conversation for tomorrow, ok?"

Overt Act No. 261:  On May 9, 2017, Morrie Goldman received an e-mail from Executive M asking about the media inquiry regarding the Company M campaign contribution to PAC B in support of a Los Angeles City Council candidate.  Goldman responded by e-mail, reminding Executive M that the PAC B contribution "was an 'ask' from JOSE HUIZAR."

**c.  $25,000 Contribution and Additional $25,000 Commitment to PAC A**

Overt Act No. 262:  In or around January 2018, defendant HUIZAR spoke with Morrie Goldman regarding Project M's approval in the PLUM Committee and City Council.  Specifically, they discussed that Company M wanted the City to approve Project M with a 5% affordable housing requirement, while defendant HUIZAR initially insisted on 11% affordable housing.  Goldman told defendant HUIZAR that Executive M was concerned he would suffer significant professional consequences, including the loss of his job with Company M, if Project M was not approved, and that if Project M did not obtain its preferred affordable housing requirements it would threaten the viability of the project altogether.

Overt Act No. 263:  On January 5, 2018, Morrie Goldman sent a text message to Executive M, writing: "We are confirmed for dinner with HUIZAR on Monday [January 8, 2018]."

Overt Act No. 264:  On January 8, 2018, defendant HUIZAR and Morrie Goldman had a discussion via text message regarding Project M and Company M's willingness to contribute to their newly established PAC, PAC A.  Specifically, defendant HUIZAR wrote: "Let's do the pac stuff later this week. See u there at 6. What's purpose of tonight's meeting? Are they [Company M] gonna help with pac?"  Goldman replied:"[Executive M] wants to talk about their [Project M] and see if you're comfortable with the height and affordability levels." Defendant HUIZAR answered: "Are they gonna help with pac?"  Goldman replied: "I'm sure they will, however - as your friend - let's discuss this in a different text thread" in order to avoid documenting defendant HUIZAR's conditioning his official assistance with Project M on Company M's financial support for PAC A.

Overt Act No. 265:  On February 23, 2018, defendant HUIZAR and Morrie Goldman had a discussion via text message regarding PAC A. Specifically, Goldman wrote: "Are you checking the Confide App for texting on your iPhone?" Goldman further wrote: "I was going to text you about your meeting with [PAC A's attorney]. Wanted to see if we got any clarification. Confide is good for texting because it is like Snap Chat...message disappears."

Overt Act No. 266:  On March 1, 2018, defendant HUIZAR met with Morrie Goldman and discussed Company M's contributions to PAC A. Specifically, defendant HUIZAR asked for a $50,000 contribution to PAC A to be paid in two installments, $25,000 as soon as possible and another $25,000 by the end of the year, after Project M was approved. Goldman agreed to convey the request to Executive M.

Overt Act No. 267:  On March 14, 2018, Morrie Goldman met with Executive M and relayed defendant HUIZAR's request to have Company M contribute $50,000 to PAC A, which Goldman explained was designed to benefit HUIZAR Relative 1's campaign for the CD-14 seat.  Executive M agreed.

Overt Act No. 268:  On March 14, 2018, at approximately 4:00 p.m., defendant HUIZAR met with Morrie Goldman to discuss PAC A, including the fact that Executive M agreed to have Company M contribute to PAC A.

Overt Act No. 269:  On March 15, 2018, Morrie Goldman sent an e-mail to Executive M with the subject line "[PAC A]," writing: "this is the committee we previously discussed," and attaching a contribution form for PAC A.

Overt Act No. 270:  On March 26, 2018, defendant HUIZAR sent an

e-mail to himself, attaching a document titled "Fundraising Plan." The document included, among other things, company and individual names, contribution amounts, and the person responsible for soliciting contributions to PAC A and PAC B. Under the PAC A section, the document included an entry for Company M for $50,000, and listed Morrie Goldman.

Overt Act No. 271:  On April 13, 2018, defendant HUIZAR sent an e-mail to Morrie Goldman, attaching a document titled "[PAC A]" that included, among other things, an entry for Company M for $50,000, with the note: "B/4 June. 2 checks. 2 Entities."

Overt Act No. 272:  On May 8, 2018, Morrie Goldman had a discussion via text message with Executive M regarding a meeting with the Planning Department scheduled for the same day for Project M. Specifically, Executive M wrote: "Very important that [City Staffer A-2] calls [a Planning Department official] letting them know he supports the height etc. please please make sure this happens prior." Goldman later wrote: "[City Staffer A-2] will let them know their position, and then make the changes in PLUM."  Executive M later wrote: "This would be a disaster if they took a position to deny[.] This meeting seems to be a really bad idea now. When does JOSE [HUIZAR] get back?"  Goldman responded: "Spoke with [City Staffer A-2]. He will speak with [the Planning Department official], and then call me to report back prior to our meeting."

Overt Act No. 273:  On May 8, 2018, defendant HUIZAR caused City Staffer A-2 to advocate CD-14's position and encourage the Planning Department official to approve Project M to allow the project to proceed to a hearing before the City Planning Commission.

Overt Act No. 274:  On or about June 13, 2018, defendant HUIZAR caused Company M to send two checks from two separate entities, each made payable to PAC A, in the amount of $12,500 each for a total of $25,000, by U.S. Mail to the Company M office in Los Angeles, California, around the same time that the City Planning Commission approved Project M, allowing it to move forward to a hearing before the PLUM Committee and ultimately City Council.

Overt Act No. 275:  On June 18, 2018, Morrie Goldman and Employee M discussed sending the Company M checks to PAC A per defendant HUIZAR's request during the same conversation as discussing the official acts Company M needed from defendant HUIZAR, namely, the scheduling of Project M for hearing before the PLUM Committee. Specifically, after Goldman provided the address for PAC A to send the Company M contribution checks, Employee M responded that the checks would be sent that day.  Employee M then wrote: "Will we be able to make the July 31st plum?"  Goldman later explained they would know "[w]hen HUIZAR decides his schedule for July," adding: "He sometimes takes an extra week. PLUM could still happen but without HUIZAR. I think we should wait for a

meeting where he is there." Employee M responded: "We would want [HUIZAR] there."

**d.   Additional $50,000 Commitment to PAC A in Exchange for Defendant HUIZAR's Help on Project M**

Overt Act No. 276:  On August 9, 2018, Morrie Goldman sent an e-mail to Executive M regarding Project M's upcoming hearing before the PLUM Committee, writing: "We need to address the Labor issue. Seriously...we need to take [the executive of a labor union] off the chess board."  Goldman and Executive M believed the labor union was an issue that could affect Project M's approval in the PLUM Committee with the potential to create delays, increase costs, threaten the viability of Project M, resulting in negative repercussions for Executive M personally, including the potential loss of his job.

Overt Act No. 277:  On August 14, 2018, Morrie Goldman and Employee M discussed the status of Project M and defendant HUIZAR's position on the project. Specifically, Goldman explained: "I did speak to HUIZAR last night. I do think we will need one more meeting with him.  I think he will get 'there,' just think it will a bit more painful that we hope."  Employee M then asked: "More painful meaning more money?"  Goldman then explained that defendant HUIZAR "stressed that it is a heavy lift" even with community support because "[i]t is the hit he will take with housing advocates and LA Times."

Overt Act No. 278:  On September 4, 2018, Morrie Goldman received an e-mail from Executive M, asking: "Any updates on HUIZAR meeting?"  Goldman responded: "I'm having a one-on-one meeting with [HUIZAR], and you're #1 on the agenda."

Overt Act No. 279:  On September 4, 2018, defendant HUIZAR met with Morrie Goldman regarding the labor union issue Company M was facing on Project M. During the meeting, Goldman requested on behalf of Executive M for defendant HUIZAR to vote against the labor union's appeal by approving Project M in the PLUM Committee.  Defendant HUIZAR explained that voting against the labor union, which he considered an ally, could have negative ramifications on HUIZAR Relative 1's campaign.  Because of this risk, defendant HUIZAR told Goldman that if he were to vote against the labor union in the PLUM Committee, then Company M would have to make it worthwhile, which Goldman understood to mean that defendant HUIZAR expected a financial benefit from Company M in exchange for his efforts with the labor union.

Overt Act No. 280:  On September 6, 2018, Morrie Goldman and Executive M met to discuss Project M and resolving its labor union issue.  During the meeting, Goldman discussed with Executive M that they needed to make it worthwhile for defendant HUIZAR's intervention with the labor union.  Executive M and Goldman agreed that Company M should offer to make an additional $50,000 contribution to

PAC A. Company M had previously agreed to contribute $50,000, and paid the first installment in June 2018.  This additional $50,000 contribution would bring the total agreed-upon contributions on behalf of Company M to PAC A to $100,000 in exchange for defendant HUIZAR's assistance with Project M.

Overt Act No. 281:  On September 6, 2018, defendant HUIZAR and Morrie Goldman met outside a restaurant in Boyle Heights to discuss the new arrangement with Executive M.  At the meeting, Goldman conveyed the offer of an additional $50,000 contribution to PAC A, bringing the total to $100,000, and defendant HUIZAR agreed to accept the contribution in exchange for voting to approve Project M over objections by the labor union.  Defendant HUIZAR also requested a private meeting with Executive M.

Overt Act No. 282:  On September 6, 2018, Morrie Goldman asked Executive M via text message: "Can you do dinner with HUIZAR on Tuesday, 9-25?"

Overt Act No. 283:  On September 10, 2018, in a text message, Morrie Goldman asked defendant HUIZAR: "Re: [Company M] & [Project M]. You are meeting with [Executive M] on 9-25 to negotiate public benefits package. Could we target PLUM on 10-02 with the clear understanding that the item gets pulled from agenda with no deal? [City Staffer A-2] is waiting for direction from you before scheduling."

Overt Act No. 284:  On September 11, 2018, in a text message, defendant HUIZAR asked Morrie Goldman: "Hey, let's talk about your fundraiser for [HUIZAR Relative 1] before event and who U are inviting. I want to make sure we are hitting people up for right amount and we are not calling same people." Goldman replied: "Of course."  Defendant HUIZAR then asked: "Oct 11 still good for you?"

Overt Act No. 285:  On September 11, 2018, just after the text messages with defendant HUIZAR, Morrie Goldman sent a text message to Executive M stating: "Plan on 10-02 PLUM. But let's discuss..."

Overt Act No. 286:  On September 12, 2018, while defendant HUIZAR was negotiating the additional financial benefit he sought from Executive M and Company M, defendant HUIZAR used his official position as PLUM Committee Chair to postpone the committee's hearing on Project M to October 2, 2018, thereby causing the project to be delayed until after he met with Executive M.

Overt Act No. 287:  On September 24, 2018, Morrie Goldman told defendant HUIZAR via text message: "We are meeting [Executive M] tomorrow for dinner. Do you still want [a restaurant in downtown Los Angeles], or would you like someplace a bit more private?"

Overt Act No. 288:  On September 24, 2018, Morrie Goldman told Executive M via text message: "Meeting is moved to breakfast on 10-04 @ 9 AM." Executive M replied: "But that pushes our date??? This is a disaster."  Goldman responded: "Yes....it pushes the date. It's going to get done."

Overt Act No. 289:  On September 26, 2018, in a text message, Morrie Goldman asked Executive M: "any chance you can do your one on one dinner with HUIZAR THIS Friday, 9-28?"  Executive M replied: "Yes. I'm assuming hearing date is the same?"

Overt Act No. 290:  On September 28, 2018, defendant HUIZAR and Executive M met to discuss defendant HUIZAR's support for Project M, its approval in the PLUM Committee, and Company M's support for the PAC to benefit HUIZAR Relative 1's campaign.  During the same conversation, Executive M offered to provide opposition research to defendant HUIZAR on a young female former CD-14 staffer who planned to file a lawsuit against defendant HUIZAR, and defendant HUIZAR accepted this offer.  As part of their negotiation to help Project M, defendant HUIZAR and Executive M also discussed Company M hiring defendant HUIZAR after he left office.

Overt Act No. 291:  On September 28, 2018, defendant HUIZAR sent a text message to Morrie Goldman, writing: "Good meeting with [Executive M]. He is willing to help [HUIZAR Relative 1] committee. He will collect from consultant/contractors. We didn't discuss amount. Please enlist him for your event and ask him to collect 15-20k for your event."

Overt Act No. 292:  On October 2, 2018, defendant HUIZAR used his official position as the PLUM Committee Chair to postpone his committee's hearing on Project M to October 16, 2018.

Overt Act No. 293:  On October 11, 2018, defendant HUIZAR, Executive M, Employee M, and Morrie Goldman attended a fundraiser for HUIZAR Relative 1 hosted by Goldman.  At the fundraiser, Executive M provided defendant HUIZAR the opposition research against the young female staffer he had promised as part of their agreement for defendant HUIZAR to help Project M.

Overt Act No. 294:  On October 13, 2018, Morrie Goldman and Executive M had a text message conversation regarding the upcoming PLUM Committee hearing for Project M.  Executive M asked: "Anyone else on plum we should connect with?"  Goldman replied: "I was thinking about it but I really don't want to call attention to it. I would rather let JOSE [HUIZAR] power play it through."

Overt Act No. 295:  On October 16, 2018, defendant HUIZAR voted to deny the union appeal and to approve Project M in the PLUM Committee, including accepting certain modifications requested by Company M.  Specifically, the PLUM

Committee accepted Company M's preferred modifications to the affordable housing restrictions, thereby undoing the more stringent requirements recommended by the City Planning Commission.  As a result of defendant HUIZAR's approval and undoing the CPC recommendations, Company M obtained significant reductions to Project M's affordable housing requirements, from 11% "Very Low Income" units to 6% "Moderate Income" units.  Specifically, defendant HUIZAR's approval of Company M's modifications decreased low-income individuals' access to the project while ensuring Company M obtained an estimated $14 million in net savings.

Overt Act No. 296:  On October 16, 2018, after the PLUM Committee approval, in a text message, Morrie Goldman told Executive M: "Let's talk tomorrow. I'm seeing JOSE [HUIZAR] on Thursday, so I know he will bring up follow up on a few items," referring to Company M's commitment to contribute the remaining $75,000 to PAC A.

Overt Act No. 297:  On October 18, 2018, defendant HUIZAR and Morrie Goldman had a meeting at defendant HUIZAR's residence, where defendant HUIZAR raised Company M's commitment to contribute to PAC A.

Overt Act No. 298:  On October 31, 2018, defendant HUIZAR voted to approve Project M in City Council, which caused Executive M to write an e-mail to the owners of Company M and other employees: "Great news, we just received final unanimous approval for [Project M] by city council.  Although today is bit of a formality (PLUM is where the discretion usually happens), this is the final step."  Executive M highlighted the benefits Company M was able to secure in PLUM from defendant HUIZAR, writing: "our obligations related to rent [affordable housing] restrictions and union involvement are minimal compared to other future projects in the area."  Executive M also touted "the entitlement of the tallest building in the arts district by 3 times (35 stories) in a wealthy opinionated hipster community" as a "truly amazing" accomplishment.

Overt Act No. 299:  On or around October 31, 2018, Morrie Goldman updated a document tracking commitments and contributions made to PAC A.  Among other things, the document had an entry for Company M with the figure $25,000 in the column titled "Paid," and $75,000 in the column titled "Committed."  In addition, in the "Comments" column, the entry for Company M stated "$75K by December."

Overt Act No. 300:  On November 1, 2018, Morrie Goldman wrote to Executive M via text message, asking for a meeting to "go through the HUIZAR political stuff," referring to the $75,000 contribution to PAC A Company M had committed to defendant HUIZAR in exchange for defendant HUIZAR's now successful help with Project M.

656.    Upon information and belief, Project M is the Times Mirror Square project.

657.     Upon information and belief, Company M is Onni

658.     Upon information and belief, Executive M is an Onni executive.

659.     Stillwell incorporates by reference the First Superseding Indictment filed on November 11, 2020 United States vs. Jose Luis Huizar et al CR 20-326 (A) – JFW. The Huizar Indictment 138 pages long and can be accessed and downloaded from the following website:

https://storage.courtlistener.com/recap/gov.uscourts.cacd.790267/gov.uscourts.cacd.7902 67.74.0.pdf

**Onni Group Racketeering Enterprise**

660.     At all relevant times Jose Luis Huizar, Defendant Onni, Defendant Onni-BC, Defendant KTS, Defendant Evans, and others known and unknown to Stillwell, were members and associates of the Onni Group Enterprise, a criminal organization whose members and associates engaged in, among other things: bribery; mail and wire fraud, including through the deprivation of the honest services of City officials and employees; extortion; interstate and foreign travel in aid of racketeering; money laundering; structuring; and obstruction of justice.  The Onni Group Enterprise operates within the Central District of California and elsewhere.

661.     The Onni Group Enterprise, including its leaders, members, and associates, constituted an "enterprise," as defined by 18 U.S.C. § 1961(4), that is, a group of individuals associated in fact.  The Onni Group Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.  The Onni Group Enterprise engaged in, and its activities affected, interstate and foreign commerce.

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

**Objectives of the Onni Group Enterprise**

662.    The objectives of the Onni Group Enterprise included, but were not limited to, the following:

a.   enriching the members and associates of the Onni Group Enterprise through means that included: bribery; extortion; and mail and wire fraud, including through the deprivation of the honest services of City officials and employees and through defrauding and harassing its residential tenants;

b.   advancing the political goals and maintaining control and authority of the Onni Group Enterprise by elevating members and associates of the Onni Group Enterprise to, and maintaining those individuals' placement in, prominent elected office, through means that included bribery and mail and wire fraud, including through the deprivation of the honest services of City officials and employees;

c.   concealing the financial activities of the Onni Group Enterprise, through means that included money laundering and structuring; and

d.   protecting the Onni Group Enterprise by concealing the activities of its members and associates and shielding the Onni Group Enterprise from detection by law enforcement, the City, the public, and others, through means that included obstructing justice.

**RICO Conspiracy**

663.    Beginning on a date unknown to Stillwell, but no later than February 2013, and continuing to the present, in Los Angeles County, within the Central District of California and elsewhere, Defendants Onni, Onni-BC, Evans, KTS, and persons employed by and associated with the Onni Group Enterprise, which engaged in and its activities affected

interstate and foreign commerce, conspired with each other and others known and unknown to Stillwell, including Huizar and DeLeon, to unlawfully and knowingly violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Onni Group Enterprise through a pattern of racketeering activity, as that term is defined in 18 U.S.C. §§1961(1) and 1961(5), consisting of multiple acts:

a. involving bribery, in violation of California Penal Code Sections 31, 67, 67.5(b), 68 and 182(a)(1);

b. Mail and Wire Fraud, including through the Deprivation of Honest Services, indictable under 18 U.S.C. §§ 1341, 1343, and 1346;

c. Interstate and Foreign Travel in Aid of Racketeering, indictable under 18 U.S.C. § 1952; and

d. Obstruction of Justice and Witness Tampering, indictable under 18 U.S.C. § 1512

664. It was a further part of the conspiracy that defendants Onni, Onni-BC, Evans, and KTS each agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

**Means By Which the Object of The Conspiracy Was to Be Accomplished**

665. Defendants Onni, Onni-BC, Evans, and KTS and other members and associates of the Onni Group Enterprise agreed to conduct the affairs of the Onni Group Enterprise through the following means, among others:

a. In order to enrich its members and associates, the Onni Group Enterprise operated or participated in a pay-to-play scheme, wherein it paid public officials and their proxies in exchange for official acts.

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL
- 191 -

b. In exchange for such financial benefits from developers and their proxies, Huizar, DeLeon, and other LA City officials agreed to perform and performed the following types of official acts, among others: (1) presenting motions and resolutions in various City committees to benefit projects; (2) voting on projects in various City committees, including the PLUM Committee, and City Council; (3) taking, or not taking, action in the PLUM Committee to expedite or delay the approval process and affect project costs; (4) exerting pressure on other City officials to influence the approval and/or permitting process of projects; (5) using their office to negotiate with and exert pressure on labor unions to resolve issues on projects; (6) leveraging voting and scheduling power to pressure developers with projects pending before the City to affect their business practices; and (7) introducing or voting on City resolutions to enhance the professional reputation and marketability of businesspersons in LA City.

c. To hide the money, bribes, and other personal benefits that flowed to elected officials and their proxies, the Onni Group Enterprise engaged in money laundering and other concealment activities.

d. In order to maintain its power and control, members and associates of the Onni Group Enterprise used their positions and relationships to illicitly ensure it maintained a political power base filled with their allies and obtained significant official LA City positions, resources, and financial support. Specifically, through bribery, members and associates of the Onni Group Enterprise provided funds to elected officials and their proxies with projects in CD14.

e.   In order to protect the Onni Group Enterprise and avoid detection by law enforcement, the City, the public, and others, members and associates of the Onni Group Enterprise engaged in the following conduct: (1) lying to law enforcement in an effort to impede the investigation into criminal conduct of the Onni Group Enterprise; (2) attempting to corruptly influence the statements of others to law enforcement; and (3) using encrypted messaging applications, including those utilizing a self-destructing message system, to communicate about the affairs of the Onni Group Enterprise.

**CAUSES OF ACTION**

**<u>1st Cause of Action – Negligence</u>**

**(Against Defendants Onni Real Estate IX, LLC & Onni Real Estate Holdings LTD)**

666.   Stillwell refers to, and incorporate by reference, the allegations of paragraphs 1 through 665 of this complaint, as though fully set forth herein.

667.   As owners, operators and managers of Hope + Flower Apartments ("Property"), Onni Real Estate IX, LLC, Onni Real Estate Holdings LTD ("Count I Defendants") owed Stillwell the duty to exercise reasonable care in the ownership, management and control of the Property.

668.   These duties owed by the Count I Defendants to Stillwell to exercise reasonable care include, but are not limited to: the duty to refrain from interfering with Stillwell's full use of and quiet enjoyment of her rented premises; the duty to comply with all applicable federal, state and local laws governing Stillwell's rights as tenant; the duty to maintain Stillwell's premises in a safe, healthy and habitable condition for the entire term of

Stillwell's tenancy and the duty to not obstruct Stillwell's full use and occupancy of her rented residences.

669.     The Count I Defendants, by the conduct alleged above, so negligently and carelessly maintained, operated, and managed the Property as to breach the duties that they owed to Stillwell.

670.     As a proximate result of the Count I Defendants' actions as herein alleged, Stillwell suffered damages in an amount in an amount not yet ascertained, but which exceeds the jurisdictional minimum of this Court and will be proven at time of trial.

## 2nd Cause of Action – Premise Liability

**(Against Defendants Onni Real Estate IX, LLC & Onni Real Estate Holdings LTD)**

671.     Stillwell realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 670, inclusive, as though set forth in full

672.     In California, the law of premise liability places a duty of care on property owners to maintain their property in a reasonably safe condition, and to warn guests and visitors of lurking dangers that may not already be open and obvious.

673.     Onni Real Estate IX, LLC, Onni Real Estate Holdings LTD ("Count II Defendants") owed Stillwell a duty of reasonable care to maintain and inspect its Property, repair any potentially dangerous conditions, and to give adequate warning of any dangerous conditions.

674.     The Count II Defendants breached their duty of care to Stillwell, and the Count II Defendants' breach of duty is the proximate cause of Stillwell's injuries.

## 3rd Cause of Action – Violation of Unruh Civil Rights Act, Ca. Civ. Code §§ 51, 52 _et seq_

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

- 194 -

**(Against Defendant Onni Real Estate IX, LLC & Onni Real Estate Holdings LTD)**

675.     Stillwell realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 674, inclusive, as though set forth in full.

676.     Stillwell is an aggrieved person as defined by Ca. Civ. Code § 52(f)

677.     Stillwell is informed and believes that Onni and Onni-BC ("Count III Defendants") were aware of the outrageous and discriminatory conduct of their employees, vendors, guests, tenants and agents. Rather than taking steps to stop such conduct, Onni and Onni-BC ratified, condoned, aided, abetted, and covered for wrongdoers by allowing its employees, vendors, guests, tenants and agent to remain in the same positions, engaging in the same wrongful conduct against Stillwell.

678.     The Count III Defendants' acts and omissions interfered with the Plaintiff's Civil Rights to seek, obtain, and hold housing without discrimination based upon her race, ethnicity, ancestry, marital status, and source of income, as each of these characteristics is a protected class under the Unruh Civil Rights Act and other bases provided by Section 51 of the California Civil Code.

679.     The Count III Defendants' acts and omissions interfered with the Plaintiffs statutory rights to be free from discrimination in pricing, housing, and other aspects of her life and to be free from discrimination based upon her protected class, retaliation, and unfair business practices as guaranteed by the United States Constitution; the California Constitution; the federal Civil Rights Act and Fair Housing Act/Fair Housing Act of 1968/Fair Housing Act Amendments of 1988;42 U.S.C. §§ 1985(3)& 3601 et seq.; the California Unruh Act, Fair Employment & Housing Act, and Civil Rights Amendments of

1999; Business & Professions Code §§ 17000 &17200 et seq.; Civil Code §§ 51(b),51.5(a),51.6,51.9; and other state and federal laws and regulations.

680.     Section 52.1 of the California Civil Code sets forth the Plaintiff's rights, procedures, and remedies for bringing a civil action when the exercise or enjoyment of rights secured by the Constitution or laws of the United States, of rights secured by the Constitution or laws of this state have been interfered with or attempted to be interfered with.

681.     The Count III Defendants' violations of the Plaintiff's' civil rights became so severe, persistent, and offensive that Plaintiff and other tenants found it necessary to vacate the premises.

682.     As a direct and proximate result of the Count III Defendants' actions, Plaintiff has suffered nominal and actual damages in an amount exceeding the minimum jurisdiction of this Court.

683.     As a further direct and proximate result of the Count III Defendants' actions, Plaintiff suffered grief, anxiety, worry, mortification, shock, humiliation, and indignity; and had other mental and emotional distress and suffering. The Defendants' despicable conduct was carried on with a wanton, willful, and conscious disregard for the Plaintiff's' rights.

684.     In addition to compensatory and punitive damages, Stillwell is entitled, pursuant to § 52.1(d, f& h) of the California Civil Code, to the issuance of temporary and permanent injunctions and temporary restraining orders appropriate to prevent the Count III Defendants from continuing to engage in their unlawful practices.

685.     Stillwell is entitled, under § 52. 1((i) of the California Civil Code in addition to any damages, injunction, or other equitable relief awarded in an action brought pursuant 6 to subdivision (b), the court may award the petitioner or plaintiff reasonable attorney's fees.

686.     Stillwell's race, ethnicity, ancestry, marital status, and source of income are each a protected class under the Unruh Civil Rights Act, and the basis upon which the Count III Defendants' discriminatory conduct, described herein, was based upon.

687.     The Count III Defendants willfully and knowingly discriminated against Stillwell on account of her marital status, race, ethnicity, ancestry and/or source of income, in violation of the Unruh Civil Rights Act, Civil Code §§ 51 *et seq*, by taking the following adverse actions described in detail herein.

688.     Pursuant to Ca. Civ. Code § 52(a), the Count III Defendants are liable to Stillwell for each and every act of discrimination alleged herein.

689.     As a result of the Count III Defendants' discrimination described herein, Stillwell's emotional well-being has substantially suffered and will continue to suffer; Stillwell has experienced and continues to experience severe emotional distress, in an amount to be proven at trial. Stillwell alleges that she has and will continue to suffer substantial losses in earnings, other employment opportunities, employment benefits and other damages, the precise amounts to be proven at trial.

690.     The Count III Defendants' conduct as described herein was extreme, malicious, and oppressive and done with a conscious disregard of Stillwell's rights, safety, or well-being. The Count III Defendants' acts were designed to humiliate and oppress Stillwell; and they had that effect. The Count III Defendants condoned, ratified, and encouraged the conduct of its employees, contractors, and agents. Thus, Stillwell is entitled to exemplary and

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

punitive damages against the Count III Defendants' pursuant to Cal. Civil Code. §3294, if applicable.

**4th Cause of Action – Violations of Fair Housing Act (42 U.S.C. §§ 3604 *et seq*)**

**(Against Defendant Onni Real Estate IX, LLC, Onni Real Estate Holdings LTD, City of Los Angeles, Chris James Evans, and Kimball, Tirey & St. John LLP)**

691.    Stillwell realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 690, inclusive, as though set forth in full.

692.    Stillwell is an aggrieved person as defined by 42 U.S.C. § 3613(a).

693.    Hope + Flower Apartments at 1201 South Hope Street, Los Angeles, California 90015 are dwelling within the meaning of the Fair Housing Act, 42 U.S.C. § 3603(b).

694.    Defendants Onni Real Estate IX, LLC, Onni Real Estate Holdings LTD, City of Los Angeles, Chris James Evans, and Kimball, Tirey & St. John LLP ("Count IV Defendants"), through actions including those described above, have engaged in a pattern and practice of housing discrimination on the basis of race or color as described herein.

695.    The Count IV Defendants' conduct described herein was intentional, willful, and taken in disregard for the rights of others, including Stillwell.

696.    Each of the Count IV Defendants have thereby violated 42 U.S.C. §§ 3604 *et seq*.

**5th Cause of Action – Violation of 42 U.S.C. § 1982**

**(Against Defendants City of Los Angeles)**

697.    Stillwell realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 696, inclusive, as though set forth in full.

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

- 198 -

42 U.S.C. § 1982 ensures that all "citizens shall have the same right…is enjoyed by white citizens…to inherit, purchase, lease, sell, hold, and convey real and personal property."

698.    The City of Los Angeles' pattern and practice of housing discrimination denies African-Americans the same rights enjoyed by Whites to lease apartments at Hope + Flower.

699.    The City of Los Angeles' and it City Council tolerated and /or facilitated Onni's pattern of racist conduct, despite Stillwell's repeated specific request to investigate Onni on behalf of Stillwell and other tenants at Hope + Flower.

700.    The City of Los Angeles' actions and the LA City Council's tolerance and/ or facilitation of said acts were sufficiently pervasive and severe so as to create a hostile environment based on race in violation of Stillwell's rights to lease, use and convey real property on an equal basis regardless of race under 42 U.S.C. § 1982.

701.    The City of Los Angeles and its City Council's tolerance and/or facilitation of Onni's discriminatory conduct described herein, demonstrates a willful and gross disregard for the civil rights of Ms. Stillwell.

702.    The City of Los Angeles has thereby violated 42 U.S.C. § 1982.

### 6th Cause of Action – Violation of 42 U.S.C. § 1983

### (Against Defendants City of Los Angeles)

703.    Stillwell realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 702, inclusive, as though set forth in full.

704.    Stillwell's constitutional rights were deprived, and that the deprivation was caused by persons acting under color of law. Specifically, Stillwell's constitutional rights were violated by former and current Los Angeles City Councilmembers.

**7th Cause of Action – Violation of 42 U.S.C. § 1985**

**(Against Defendants City of Los Angeles)**

705.     Stillwell realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 704, inclusive, as though set forth in full.

706.     The City of Los Angeles, including several former and current City Councilmembers, "conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly" any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws" in violation of 42 U.S.C. § 1985.

707.     Specifically, the City of Los Angeles and several of its former and current elected official conspired to underfund the Los Angeles Housing Department, which led to thousands of uninvestigated housing discrimination complaints, effectively subjecting Los Angeles' most vulnerable residents to unlawful housing discrimination.

**8th Cause of Action – Violation of 42 U.S.C. § 1986**

**(Against Defendants City of Los Angeles)**

708.     Stillwell realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 707, inclusive, as though set forth in full.

709.     The City of Los Angeles, including several former and current City Councilmembers, have knowledge of the wrongs conspired to be done, and mentioned in 42 U.S.C. § 1985, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do.

710.     Specifically, the City of Los Angeles is aware that several former and current City Council members, including Jose Huizar and Kevin DeLeon, participated in pay-for-play

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

schemes with Onni Group, which allowed Onni to proceed with its plans for Hope + Flower and Times Mirror Square, in violation of local, state and federal laws.

711.     The City of Los Angeles has the authority to revoke Onni Group's business licenses, its building and occupancy permits at Hope + Flower and Times Mirror Square, as taking these actions will prevent Onni's continued commission of unlawful conduct.

712.     The City of Los Angeles has the authority to not enforce DTLA 2040, as this up-zoning of Downtown Los Angeles removes much needed residential housing units from the market, and was also the byproduct of a corrupt pay-for-play scheme, as described herein.

713.     The City of Los Angeles' neglect and refusal to stop Onni Group's unlawful conduct leads to the continued deprivation of the constitutional rights of *thousands* of Los Angeles residents.

**9th Cause of Action – Malicious Prosecution (December 2021 Unlawful Detainer)**

**(Against Defendants Onni Real Estate IX, LLC, Onni Real Estate Holdings LTD, Chris James Evans, and Kimball, Tirey & St. John LLP)**

714.     Stillwell realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 713, inclusive, as though set forth in full.

715.     On or about December 7, 2021, Defendants Onni Real Estate IX, LLC, Onni Real Estate Holdings LTD, Chris James Evans, and Kimball, Tirey & St. John LLP ("Count V Defendants") filed an Unlawful Detainer Eviction against Stillwell with malice and without probable cause.  The lawsuit terminated in Stillwell's favor.

716.     The Count V Defendants' conduct caused Stillwell severe emotional distress, expenses, loss of time, and injury to business.

**10th Cause of Action – Malicious Prosecution (June 2022 Unlawful Detainer)**

**(Against Defendants Onni Real Estate IX, LLC, Onni Real Estate Holdings LTD,**

**Chris James Evans, and Kimball, Tirey & St. John LLP)**

717.     Stillwell realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 716, inclusive, as though set forth in full.

718.     On or about June 22, 2022, Defendants Onni Real Estate IX, LLC, Onni Real Estate Holdings LTD, Chris James Evans, and Kimball, Tirey & St. John LLP ("Count VI Defendants") filed an Unlawful Detainer Eviction against Stillwell with malice and without probable cause.  The lawsuit terminated in Stillwell's favor.

719.     The Count VI Defendants' conduct caused Stillwell severe emotional distress, expenses, loss of time, and injury to business.

**11th Cause of Action - Violations of City of Los Angeles Temporary Protection of**

**Tenants During COVID-19 Pandemic (L.A.M.C. §§ 49.99 _et seq._)**

**(Against Defendants Onni Real Estate IX, LLC & Onni Real Estate Holdings LTD)**

720.     Stillwell realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 719, inclusive, as though set forth in full.

721.     Pursuant to L.A.M.C. § 49.99.7, an aggrieved residential tenant may institute a civil proceeding for injunctive relief, direct money damages, and any other relief the Court deems appropriate, including, at the discretion of the Court, an award of a civil penalty up to $10,000 per violation depending on the severity of the violation.

722.     Stillwell is an aggrieved residential tenant as defined by L.A.M.C. § 49.99.7.

723.     Stillwell provided written notice to Onni and Onni-BC of the alleged violations. Onni and Onni-BC were provided more than 15 days from the receipt of Stillwell's notice to cure the alleged violations. Onni and Onni-BC did not cure the alleged violations.

724.     Onni and Onni-BC knowingly and willingly violated L.A.M.C. §§ 49.99 *et seq.* at least fifteen (15) times, as described in detail herein.

725.     Stillwell was injured financially and emotionally as a result of Onni and Onni-BC's conduct.

726.     Due to the severity of Onni and Onni-BC's conduct, a civil penalty of $10,000 per violation is appropriate here.

### 12th Cause of Action - Violations of the of Fair Debt Collection Practices Act (15 U.S.C. §§ 1692 et seq)

### (Against Defendants Chris James Evans and Kimball, Tirey & St. John LLP)

727.     Stillwell realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 726, inclusive, as though set forth in full.

728.     Evans and KTS' ("Count XII Defendants") December 2021 and June 2022 communications to Stillwell did not contain the disclosures required by 15 U.S.C. § 1692g(a)(5), nor did the Count XII Defendants' provide such disclosure within five days thereafter. Specifically, the Count XII Defendants failed to inform Plaintiff that unless she, within thirty days after receipt of the December 2021 and June 2022 communications, disputed the validity of the debt, or any portion thereof, the debt would be assumed to be valid.

729.     The harm suffered by Stillwell is particularized in that the violative initial debt collection communications at issue were sent to her personally, regarded her personal

alleged debt, and failed to effectively provide her statutorily mandated disclosures to which she was entitled.

730.    Section 1692g furthers the purpose of protecting debtors from abusive debt collection activity by requiring a debt collector who solicits payment from a consumer to provide that consumer with a detailed validation notice, which allows a consumer to confirm that she owes the debt sought by the collector before paying it.

731.    The content of the Count XII Defendants' December 2021 and June 2022 communications to Stillwell created a material risk of harm to the concrete interest Congress was trying to protect in enacting the FDCPA. Specifically, when a consumer is not provided with her legal rights as required by law, she is left in the dark about her options in responding to a debt collection letter. That risk manifested itself here, as Plaintiff was unaware of her validation rights. In addition, The Count XII Defendants' actions invaded a specific private right created by Congress, and the invasion of that right creates the risk of real harm.

732.    The FDCPA at 15 U.S.C. § 1692e provides, in pertinent part, that "[a] debt

733.    collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt.

734.    The Count XII Defendants' used a false, deceptive, and misleading representation in connection with the collection of the Debt, in violation of 15 U.S.C. § 1692e.

735.    The harm suffered by Plaintiff is particularized in that the violative initial debt collection letter at issue was sent to her personally, regarded her personal alleged debt, and directed to her a false, deceptive, and misleading representation in connection with the collection of the Debt.

736.    The content of the Count XII Defendants' December 2021 and June 2022 communications to Stillwell created a material risk of harm to the concrete interest Congress was trying to protect in enacting the FDCPA. Specifically the December 2021 and June 2022 communications to Stillwell presents a risk of harm to the FDCPA's goal of ensuring that consumers are free from deceptive debt-collection practices because the letter provides misleading information about the manner in which the consumer can exercise her statutory right to pause debt collection activity while she obtains verification of the debt, or the name and address of the original creditor. In addition, Count XII Defendants' actions invaded a specific private right created by Congress, and the invasion of that right creates the risk of real harm.

**13th Cause of Action – Violations of Ca. Civ. Code §1942.5 (Retaliation),**

**(Against Defendants Onni Real Estate IX, LLC, Onni Real Estate Holdings LTD)**

737.    Stillwell realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 736, inclusive, as though set forth in full.

738.    Pursuant to Ca. Civ. Code § 1942.5(d) "it is unlawful for a lessor to increase rent, decrease services, cause a lessee to quit involuntarily, bring an action to recover possession, or threaten to do any of those acts, for the purpose of retaliating against the lessee because the lessee has lawfully organized or participated in a lessees' association or an organization advocating lessees' rights or has lawfully and peaceably exercised any rights under the law."

739.    As described herein, Onni and Onni-BC retaliated against Stillwell after she lawfully and peaceably exercised any rights under the law.

**14th Cause of Action –Violations of the Tom Bane Civil Right Act (Ca. Civ. Code §§ 52.1, 52 *et seq.*)**

**(Against All Defendants)**

740.     Stillwell realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 739, inclusive, as though set forth in full.

741.     The Tom Bane Civil Rights Act provides a private right of action for damages against any person who "interferes," or "attempts to interfere by threat, intimidation, or coercion," with the exercise or enjoyment of a constitutional or other right under California or federal law. (Ca. Civ. Code, § 52.1, subd. (b)–(c).) Public entities are vicariously liable for Bane Act violations. (See Ca. Gov. Code, § 815.2.) The California Supreme Court long ago explained that the Bane Act simply requires "an attempted or completed act of interference with a legal right, accompanied by a form of coercion." (Jones v. Kmart Corp. (1998) 17 Cal.4th 329, 334.) Many if not all violations of fundamental rights could be so framed. (Venegas v. County of Los Angeles (2004) 32 Cal.4th 820, 850 (Baxter, J., concurring).)

742.     Onni, Onni-BC, Evans, KTS, and the City of Los Angeles used threat, intimidation, or coercion, or attempted to interfere by threat, intimidation, or coercion with Stillwell's exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of California, in violation of Ca. Civ. Code § 52.1

**15th Cause of Action –Violations of Tenant Anti-Harassment Ordinance (TAHO)**

**(L.A.M.C §§ 45.30 *et seq.*)**

**(Against Onni Real Estate IX, LLC, Onni Real Estate Holdings LTD, Chris James Evans, and Kimball, Tirey & St. John LLP)**

743.    Stillwell realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 742, inclusive, as though set forth in full.

744.    Pursuant to L.A.M.C. § 45.35,

An aggrieved tenant under this article, or any person, organization, or entity who will fairly and adequately represent the interests of an aggrieved tenant(s) under this article, may institute civil proceedings as provided by law, against any landlord violating any of the provisions of this article and any person who aids, facilitates, and/or incites another to violate the provisions of this article, regardless of whether the rental unit remains occupied or has been vacated due to harassment.

A tenant prevailing in court under this article may be awarded compensatory damages, rent refunds for reduction in housing services, reasonable attorney's fees and costs, imposition of civil penalties up to $10,000 per violation depending upon the severity of the violation, tenant relocation, and other appropriate relief, as adjudged by the court.

745.    Stillwell is an aggrieved tenant as defined by L.A.M.C. § 45.35.

746.    KTS and Evans aided, facilitated, and/or incited Onni and Onni-BC to violate TAHO by filing frivolous unlawful detainer suits to evict tenants who had pending rental assistance applications, in violation of L.A.M.C. 49.99 *et seq.*

747.    Onni and Onni-BC knowingly and willingly violated L.A.M.C. §§ 45.35 *et seq.* at least forty (40) times, as described in detail herein.

748.    Stillwell was injured financially and emotionally as a result of Onni and Onni-BC's conduct.

749.     Due to the severity of Onni, Onni-BC, Evans, and KTS' conduct, a civil penalty of $10,000 per violation is appropriate here.

**16th Cause of Action – Civil RICO (18 U.S.C. §§ 1962(c), 1964(c)**

**Predicate Act: Honest Services Fraud, 18 U.S.C. § 1346**

**(Against Onni Real Estate IX, LLC, Onni Real Estate Holdings LTD, Chris James Evans, and Kimball, Tirey & St. John LLP)**

750.     Stillwell realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 749, inclusive, as though set forth in full.

751.     At all relevant times, Onni, Onni-BC, Evans, and KTS ("Count XVI Defendants") were "person[s]" pursuant to 18 U.S.C. §§ 1961(3) and 1962(d).

752.     At all relevant times, the Onni Group Enterprise ("OGE") constitutes an "Enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

753.     At all relevant times, OGE was engaged in, and/or its activities affected, interstate commerce and/or foreign commerce within the meaning of 18 U.S.C. § 1962(c).

754.     At all times relevant hereto, the Count XVI Defendants each held a position in or were otherwise affiliated with OGE as well as participated in the operation, management, and directed the affairs of OGE.

755.     OGE, as alleged herein, was not limited to the Count XVI Defendants' predicate acts and has activities extending beyond the Count XVI Defendants' racketeering activity. OGE and its members exists separate and apart from the pattern of racketeering activity. The Count XVI Defendants have had and do have legitimate business plans outside the pattern of racketeering activity related to OGE.

756.     The Count XVI Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1346 as described above, in violation of 18 U.S.C. § 1962(c).

757.     OGE's racketeering activity commenced at least as early as January 2013 and remains ongoing.

758.     The purpose of OGE's schemes against Stillwell was to defraud Stillwell of money, property, and benefits of monetary value by using wire and mail frauds, devising multiple schemes to deceive, trick and defraud Stillwell.

759.     Each Count XVI Defendants committed at least two predicate acts in furtherance of the conspiracies and schemes against Stillwell.  These predicate acts in furtherance of the  conspiracies and schemes against Stillwell are the  acts  set forth above in the paragraphs containing RICO Schemes # 1, 2, 3, 4, 5, 6, 7, and 8.

760.     The Count XVI Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of the Count XVI Defendants was necessary to allow the commission of this pattern of racketeering violation of  18 U.S.C. § 1346, in violation of  18 U.S.C. § 1962(c).

761.     Each Count XVI Defendant knew about and agreed to facilitate the scheme to defraud Stillwell of her money,  property,  and other  business property and business interests, including state  and  federal  benefits  of monetary  value by  fraudulently depriving  Stillwell of  honest services of her elected officials.

762.     It was part of the conspiracy that Count XVI Defendants would commit a pattern of racketeering activity in the conduct of the affairs of OGE, including the acts of racketeering set forth herein.

763.     As a direct and proximate result of the Count XVI Defendants' conduct, the acts of racketeering activity of OGE, the predicate acts completed in furtherance of the schemes and artifices, and violations of 18 U.S.C. § 1962(c), Stillwell has been injured in her money and business property, in an amount of $24,068.00

764.     Pursuant to 18 U.S.C. § 1964(c), Stillwell is entitled to recover treble damages plus costs and attorneys' fees from Defendants as well as any other relief authorized by statute.

**17th Cause of Action – Civil RICO (18 U.S.C. §§ 1962(c), 1964(c)**

**Predicate Act: Wire Fraud, 18 U.S.C. § 1343**

**(Against Onni Real Estate IX, LLC, Onni Real Estate Holdings LTD, Chris James Evans, and Kimball, Tirey & St. John LLP)**

765.     Stillwell realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 764, inclusive, as though set forth in full.

766.     At all relevant times, Onni, Onni-BC, Evans, and KTS ("Count XVII Defendants") have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1343 as described above, in violation of 18 U.S.C. § 1962(c).

767.     Each Count XVII Defendants committed at least two predicate acts in furtherance of the conspiracies and schemes against Stillwell. These predicate acts in furtherance of

the  conspiracies and schemes against Stillwell are the  acts  set forth above in the paragraphs containing RICO Schemes # 1, 2, 3, 4, 5, 6, 7, and 8.

768.     The Count XVII Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of the Count XVII Defendants was necessary to allow the commission of this pattern of racketeering violation of  18 U.S.C. § 1343, in violation of  18 U.S.C. § 1962(c).

769.     Each Count XVII Defendant knew about and agreed to facilitate the scheme to defraud Stillwell of her money, property, and other business property and business interests, including state and federal benefits of monetary value.

770.     It was part of the  conspiracy that Count XVII Defendants would commit a pattern of racketeering activity in the conduct of the affairs of OGE, including the acts of racketeering set forth herein.

771.     As a direct and proximate result of the Count XVII Defendants' conduct, the acts of racketeering activity of OGE, the predicate acts completed in furtherance of the schemes and artifices, and violations of 18 U.S.C. § 1962(c), Stillwell has been injured in her money and business property, in an amount of $1,885,000.00

772.     Pursuant to 18 U.S.C. § 1964(c), Stillwell is entitled to recover treble damages plus costs and attorneys' fees from Defendants as well as any other relief authorized by statute.

**<u>18th Cause of Action - Violations of Bus. & Prof. Code §§ 17200 et seq.</u>**

**(Against Defendants Onni Real Estate IX, LLC, Onni Real Estate Holdings LTD**

**Chris James Evans, Kimball, Tirey & St. John LLP)**

773.     Stillwell realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 772, inclusive, as though set forth in full.

774.     Onni, Onni-BC, Evans, and KTS' ("Count XVIII Defendants") conduct constituted unlawful, unfair, and fraudulent business acts or practices under Business and Professions Code §§ 17200 *et seq.*

775.     The Count XVIII Defendants practices were unlawful in that they violated:

   a.   City of Los Angeles Temporary Protection of Tenants During COVID-19 Pandemic, L.A.M.C. §§ 49.99 *et seq.*

   b.   Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 *et seq.*

   c.   Unruh Civil Rights Act, Ca. Civ. Code §§ 51 -52 *et seq.*

   d.   Fair Housing Act, 42 U.S.C. §§ 3604 *et seq.*

   e.   City of Los Angeles Tenant Anti- Harassment Ordinance ("TAHO"), L.A.M.C §§ 45.30 *et se.q*

   f.   Ca. Civ. Code § 1942.5

   g.   Civil RICO (18 U.S.C. §§ 1962(c), 1964(c))

776.     The Count XVIII Defendants' practices were unfair because any utility for their conduct is outweighed by the gravity of the consequences to Stillwell and/or the Count XVIII Defendants' conduct is immoral, unethical, oppressive, unscrupulous or substantially injurious to Stillwell.

777. The Count XVIII Defendant' practices were fraudulent because they were likely to and did deceive Stillwell, and the Count XVIII Defendants engaged in such practices knowingly.

778. As a result of the Count XVIII Defendants acts Stillwell lost money and suffered injury in fact, and thus is entitled to restitution, injunctive relief and such other relief authorized under Ca. Civ. Code § 17203, and under all applicable law.

<h3 align="center"><u>19th Cause of Action – Breach of Contract</u></h3>

**(Against Defendants Onni Real Estate IX, LLC & Onni Real Estate Holdings LTD)**

779. Stillwell realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 778, inclusive, as though set forth in full.

780. California law implies a covenant of good faith and fair dealing in all contracts between parties entered into in the State of California.

781. The actions of Onni and Onni-BC previously in failing to provide habitable premises and refusing to investigate Stillwell's safety concerns or rectify any of the other problems with the Property constituted a violation of the covenant of good faith and fair dealing.

782. California law provides that all lease agreements constitute a warranty by the landlord that the premises are habitable.

783. The actions of Onni and Onni-BC previously in failing to provide habitable premises and refusing to investigate Stillwell's safety concerns or rectify any of the other problems with the Property constituted a breach of his contract with Plaintiffs as the Property became inhabitable.

784.     As a proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiffs have been damaged in an amount in an amount not yet ascertained but which exceeds the jurisdictional minimum of this Court and will be proven at time of trial.

785.     As a proximate result of Defendant's breach of the contract Plaintiffs have been damaged in an amount not yet ascertained but which exceeds the jurisdictional minimum of this Court and will be proven at time of trial.

**20th Cause of Action – Intentional Infliction of Emotional Distress**

**(Against Defendants Onni Real Estate IX, LLC, Onni Real Estate Holdings LTD**

**Chris James Evans, Kimball, Tirey & St. John LLP)**

786.     Stillwell realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 785, inclusive, as though set forth in full.

787.     The unlawful conduct of Onni, Onni-BC, Evans, and KTS' ("Count XX Defendants") described herein was undertaken by the Count XX Defendants deliberately and with malice and with the intent to oppress Plaintiff, and were intended to, and did cause, Stillwell to suffer damages, including but not limited to, humiliation, severe emotional distress and mental anguish.

788.     The Count XX Defendants did the actions previously alleged with malice in that they intended to cause injury to Stillwell by despicable conduct which was carried on by the Count XX Defendants with a willful and conscious disregard of the rights or safety of Stillwell. The oppression in that the Count XX Defendants engaged was despicable conduct that subjected Stillwell to cruel and unjust hardship in conscious disregard of her rights,

with the intent to oppress Plaintiff and cause here to suffer injury. Thus, Stillwell is entitled to exemplary and punitive damages in an amount according to proof at time of trial.

### 21st Cause of Action – Negligent Infliction of Emotional Distress

### (Against Defendants Onni Real Estate IX, LLC, Onni Real Estate Holdings LTD Chris James Evans, Kimball, Tirey & St. John LLP)

789.    Stillwell realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 788, inclusive, as though set forth in full.

790.    Onni, Onni-BC, Evans, and KTS' ("Count XXI Defendants") conduct owed Stillwell a duty of care and each of the Count XXII Defendants breached that duty of care.

791.    Stillwell suffered and continues to suffer damages as a proximate result of each of the Count XXI Defendants' breach of care, as described herein.

792.    But for, and as a direct and proximate result of each of the Count XXI Defendants' conduct as alleged herein, Stillwell's emotional well-being has substantially suffered and will continue to suffer; Stillwell has experienced and continues to experience severe emotional distress, in an amount to be proven at trial. Stillwell alleges that she has and will continue to suffer substantial losses in earnings, other employment opportunities, employment benefits and other damages, the precise amounts to be proven at trial.

793.    The Count XXI Defendants actions were fraudulent, malicious, and oppressive. Plaintiff is thus entitled to and herein seeks punitive and exemplary damages from the Count XXI Defendants, in an amount according to proof at trial, to punish Defendants and deter Defendants and others from engaging in similar future conduct.

## **REQUEST FOR JURY TRIAL**

Stillwell requests a trial on all causes of action for which she has the right to jury.

## **PRAYER FOR RELIEF**

WHEREFORE, Stillwell's pray for judgment as follows:

1. As to the First Cause of Action - Negligence, Stillwell prays for judgment against the Count I Defendants and an amount to be proven at trial for economic, noneconomic, monetary, or compensatory damages;

2. As to the Second Cause of Action - Premise Liability, Stillwell prays for judgment against the Count II Defendants, and an amount to be proven at trial for economic, noneconomic, monetary, or compensatory damages

3. As to the Third Cause of Action - Violation of Unruh Civil Rights Act Civil Code §§ 51 *et seq.*, Stillwell prays for judgment against the Count III Defendants, and compensatory and emotional damages according to proof, and all monetary damages awarded be trebled pursuant to Civil Code § 52;

4. As to the Fourth Cause of Action – Violations of Fair Housing Act (42 U.S.C. §§ 3604 *et seq.*), Stillwell prays for judgment against Onni, Onni-BC, Evans, and KTS, an amount to be proven at trial for monetary, or compensatory damages, and for punitive damages under 42 U.S.C. § 3613(c)(1), and as otherwise allowed by law, a permanent injunction enjoining the Onni, Onni-BC, Evans, and KTS from unlawful discriminatory patterns and practice of denying the opportunity to rent apartments at Hope + Flower Apartments on the basis of race or color, order Onni, Onni-BC, Evans, and KTS to implement policies and procedures sufficient to prevent such unlawful actions in the future, and a permanent injunction to stop all illegal conduct.

Stillwell prays for judgment against the City of Los Angeles, and a permanent injunction enjoining the City of Los Angeles from engaging in discriminatory housing practices, an injunction to stop illegal conduct and prevent it from occurring again in the future, including requirements of adopting new whistleblower policies, anti-discrimination training, monitoring, testing, reporting, and auditing , and requirements for adopting citywide ordinances that create a process for investigating allegations of corruption and procedures for removing elected city official from office due to corruption, as well as procedures for appealing City Council actions that are influenced by corruption.

5.  As to the Fifth, Six, Seventh, and Eighth  Causes of Action – Violations of  42 U.S.C. §§ 1982, 1983, 1985 and 1986, Stillwell prays for judgment against the City of Los Angeles, and a permanent injunction enjoining the City of Los Angeles ("City") from renewing Onni and Onni-BC's business licenses, revoke the building and occupancy permits at Hope + Flower Apartments and Times Mirror Square, permanently enjoin the City from entering contracts with Onni, Onni-BC and their subsidiaries, permanently enjoin the City from enforcing the DTLA 2040 rezoning plan, and permanently enjoin the City from allowing CD-14 Councilmember Kevin DeLeon from participating in any committees and from voting on any City Council measure, act, or ordinance.

6.  As to the Ninth and Tenth Causes of Action – Malicious Prosecution, Stillwell prays for judgment against Onni, Onni-BC, Evans, and KTS, and an amount to be proven at trial for economic, noneconomic, monetary, or compensatory damages;

7.  As to the Eleventh Cause of Action – Violations of City of Los Angeles Temporary Protection of Tenants During COVID-19 Pandemic (L.A.M.C. §§ 49.99 *et seq*.), Stillwell prays for judgment against Onni and Onni-BC,  a civil penalty up to $10,000 per each of Onni and Onni-

BC's violations, an amount to be proven at trial for monetary, damages, and injunctive relief to stop Onni and Onni-BC from violating local, state, and federal housing laws;

8. As to the Twelfth Cause of Action – Violations of the of Fair Debt Collection Practices Act (15 U.S.C. §§ 1692 et seq), Stillwell prays for judgment against Evans, and KTS, and actual and statutory damages pursuant to 15 U.S.C. § 1692k, an order enjoining Evans and KTS from future violations of 15 U.S.C. §§ 1692g(a)(3)-(5) and 15 U.S.C. § 1692e, and reasonable costs and attorneys' fees incurred in this action, including expert fees, pursuant to 15 U.S.C. § 1692k;

9. As to the Thirteenth Cause of Action – Violations of Ca. Civ. Code § 1942.5 (Retaliation), Stillwell prays for judgment against Onni and Onni-BC, and an amount to be proven at trial for punitive, exemplary, economic, noneconomic, monetary, or compensatory damages;

10. As to the Fourteenth Cause of Action – Violations of the Tom Bane Civil Right Act (Ca. Civ. Code §§ 52.1, 52 *et seq*.), Stillwell prays for judgment against Onni, Onni-BC, Evans, and KTS, and compensatory and emotional damages according to proof, and all monetary damages awarded be trebled pursuant to Civil Code § 52; Stillwell prays for judgment against the City of Los Angeles, and a permanent injunction enjoining the City of Los Angeles ("City") from renewing Onni and Onni-BC's business licenses, revoke the building and occupancy permits at Hope + Flower Apartments and Times Mirror Square, permanently enjoin the City from entering contracts with Onni, Onni-BC and their subsidiaries, permanently enjoin the City from enforcing the DTLA 2040 rezoning plan, and permanently enjoin the City from allowing CD-14 Councilmember Kevin DeLeon from participating in any committees and from voting on any City Council measure, act, or ordinance.

11. As to the Fifteenth Cause of Action – Violations of Tenant Anti-Harassment Ordinance (TAHO) (L.A.M.C §§ 45.30 *et seq*.), Stillwell prays for judgment against Onni, Onni-BC, Evans,

and KTS,  a civil penalty up to $10,000 per each of Onni Onni-BC, Evans and KTS' violations, an amount to be proven at trial for monetary, damages, and injunctive relief to stop Onni and Onni-BC from violating local, state, and federal housing laws;

12. As to the Sixteenth Cause of Action – Civil RICO (18 U.S.C. §§ 1962(c), 1964(c)), Predicate Act: Honest Services Fraud (18 U.S.C. § 1346) Stillwell prays for judgment against Onni, Onni-BC, Evans, and KTS,  and monetary damages in the amount of $5,655,000.00;

13. As to the Seventeenth Cause of Action – Civil RICO (18 U.S.C. §§ 1962(c), 1964(c)), Predicate Act: Wire Fraud (18 U.S.C. § 1343), Stillwell prays for judgment against Onni, Onni-BC, Evans, and KTS, and monetary damages in the amount of $72,204.00;

14. As to the Eighteenth Cause of Action - Violations of Bus. & Prof. Code §§ 17200 et seq. Stillwell prays for judgment against Onni, Onni-BC, Evans, and KTS, and for restitution, injunctive relief and such other relief authorized under Bus. & Prof. Code § 17203;

15. As to the Nineteenth Cause of Action- Breach of Contract, Stillwell prays for judgment against Onni, Onni-BC and and monetary damages in the amount to be determined at trial, which will compensate Stillwell for all the detriment proximately caused by Onni and Onni-BC's breach, or the amount that, in the ordinary course of things, would be likely to result therefrom;

16. As to the Twentieth Cause of Action- Intentional Infliction of Emotional Distress, Stillwell prays for judgment against Onni, Onni-BC, Evans, and KTS, and an amount to be proven at trial for punitive, exemplary, economic, noneconomic, monetary, or compensatory damages;

17. As to the Twenty-first Cause of Action- Negligent Infliction of Emotional Distress, Stillwell prays for judgment against Onni, Onni-BC, Evans, and KTS, and an amount to be proven at trial for economic, noneconomic, monetary, or compensatory damages;

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL

18. For general damages according to proof;

19. For damages for mental and emotional distress according to proof;

20. For an award of attorneys' fees;

21. For prejudgment interest;

22. For an award of exemplary and punitive damages in an amount to be proven at trial;

23. For costs of suit; and

24. For such other relief as the Court may deem proper and just.

Dated: December 27, 2022

/s/ Brittany A. Stillwell                ,

Brittany A. Stillwell
PLAINTIFF APPEARING IN PRO PER

## VERIFICATION

### Subscription and verification of pleadings
### (Pursuant to Code Civ. Proc., § 446)

I, Brittany A. Stillwell, declare:

I am the Plaintiff in the above-entitled matter. I have read the foregoing Complaint and know of the contents thereof. The same is true of my own knowledge, except as to those matters which are therein stated on information and belief, and, as to those matters, I believe it to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 27, 2022, at Los Angeles County, California

/s/ Brittany A. Stillwell                ,

Brittany A. Stillwell
PLAINTIFF APPEARING IN PRO PER

VERIFIED COMPLAINT OF BRITTANY A. STILLWELL
- 220 -